

FILED

08 JUL -3 AM 11: 38

RICHARD W. WIEKING
CLERK, U.S. DISTRICT
NORTHERN DISTRICT OF CALIFORNIA

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

E-filing

Name   DANIEL                     DEMETRIUS
           (Last)                    (First)                    (Initial)

Prisoner Number   E-03098

Institutional Address  SAN QUENTIN STATE PRISON; SAN QUENTIN CA 94974

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(PR)

SBA

DEMETRIUS DANIEL                    CV 08        3221
Full Name of Petitioner
                                              Case No.(To be provided by the
                                              clerk of court)

        vs.

ROBERT L. AYERS JR. Warden    PETITION FOR A WRIT OF HABEAS CORPUS
      Name of Respondent
      (Warden or jailor)

Read Comments Carefully Before Filling In

When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

1

petition will likely be transferred to the district court for the district that includes the institution where you are confined.  Habeas L.R. 2254-3(b).

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

<u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

1.    What sentence are you challenging in this petition?  PETITIONER IS NOT CHALLENGING A COURT DECISION.

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):  PETITIONER IS CHALLENGING A BOARD DECISION

_____          _____
                    Court                                                        Location

(b)    Case number, if known _____
(c)    Date and terms of sentence _____
(d)    Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes  X  No

Where?  SAN QUENTIN STATE PRISON; SAN QUENTIN, CA 94974
                (Name of Institution)                            (Address)

2.    For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

_____ SECOND DEGREE MURDER, P.C. 187 _____

_____

_____

3.    Did you have any of the following?

Arraignment: Yes  X  No ___  Preliminary Hearing: Yes  X  No ___ Motion to Suppress: Yes ___ No ___

4.    How did you plead?

Guilty  _X_____    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) _____

5    If you went to trial, what kind of trial did you have?

Jury _____    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes __ No __

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment   Yes _X_        No __
(b)    Preliminary hearing        Yes  X        No __
(c)    Time of plea   Yes _X_      No _
(d)    Trial   Yes __       No __
(e)    Sentencing   Yes __       No __
(f)    Appeal        Yes ___       No
(g)    Other post-conviction proceeding     Yes __        No __

8.    Did you appeal your conviction?    Yes __ No _X_

(a)    If you did, to what court(s) did you appeal?

Court of Appeal        Yes __       No __        _____
                                                                    (Year)                      (Result)

Supreme Court of
California                    Yes __       No __        _____
                                                                    (Year)                      (Result)

Any other court        Yes __       No __        _____
                                                                    (Year)                      (Result)

(b)    If you appealed, were the grounds the same as those that you are raising in this
petition?                    Yes __ No __

(c)    Was there an opinion?        Yes        No

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                                    Yes            No

If you did, give the name of the court and the result:

_____

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes          No __

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

      (a)   If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

PETITIONER IS APPEALING A BOARD DENIAL. SEE ATTACHED PAGES.

I.   Name of Court _____

    Type of Proceeding _____

    Grounds raised (Be brief but specific):

      a.   _____

      b.   _____

      c.   _____

      d.   _____

    Result _____ Date of Result _____

II.   Name of Court _____

    Type of Proceeding _____

    Grounds raised (Be brief but specific):

      a.   _____

      b.   _____

      c.   _____

      d.   _____

    Result _____ Date of Result _____

III.   Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

      (b)    Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes <u>X</u> No __ PETITIONER HAS TWO HABEAS PETITIONS IN THE
DISTRICT COURT, ONE IN THE CENTRAL DISTRICT
AND ONE IN THE NORTHERN DISTRICT.

   IN THE INSTANT ACTION PETITIONER WAS DENIED IN THE STATE COURT
SEE EXHIBIT "E"

(Name and location of court)

## B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to

support each claim. For example, what legal right or privilege were you denied? What happened? Who

made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need

more space. Answer the same questions for each claim.

<u>Note</u>: You must present ALL your claims in your first federal habeas petition. Subsequent

petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); <u>McCleskey v. Zant</u>, 499

U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One:   SEE ATTACHED PAGES FOR ALL CLAIMS RAISED

Supporting Facts: ___SEE ATTACHED_____

_____

_____

_____

Claim Two: _____ SEE ATTACHED PAGES FOR REMAINING CLAIMS _____

_____

Supporting Facts: _____

_____

_____

_____

Claim Three: _____

_____

Supporting Facts: _____

_____

_____

_____

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why:

_____

_____

_____

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

_____

_____

_____

Do you have an attorney for this petition?    Yes ___ No ___

If you do, give the name and address of your attorney:

_____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on ___6/23/08___          ___Demetrius Daniel___
　　　　　　　　　　Date　　　　　　　　　　　Signature of Petitioner

( rev. 5/96)

# CONTENTION

## I.

**PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT WERE VIOLATED WHEN THE BOARD OF PRISON HEARINGS DENIED PETITIONER PAROLE WITHOUT "SOME EVIDENCE" TO SUPPORT IT FINDINGS, THAT PETITIONER POSES A CURRENT THREAT TO SOCIETY**

On March 8, 2007, Petitioner, Demetrius Daniel (Petitioner) appeared before the Board of Parole Hearings (Board) for parole consideration. Petitioner was found to be unsuitable for parole. The Board's determination was based on the following statements:

> The panel finds that the offense was carried out in an very cruel, very cold and callous manner. And that the inmate and his crime partners basically sought out to go find someone to carjack and **Mr. Daniel's crime partner basically approached an unarmed Mr. Day** while he was putting water into his radiator and proceeded to shoot him to death. And everyone just took off.

> It was carried out in a very calculated manner. And again, it goes to the planning states. I mean this was a planned out offense by the inmate and his two crime partners, where they had planned to drive around and look for a potential victim, where they could easily carjack a vehicle in order to be able to strip the car down later on and be able to sell the parts for money.

> It was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering. After the victim was shot, **even though this inmate did not see the shooting occur, he did hear the shot and proceeded to just take off,** ...

The Board further held that:

> The motive for the crime was really based on greed and was very trivial in relation to the offense.

> Regarding the inmate's prior records, we not that he does have an escalating pattern of criminal conduct. **And does have, we <u>think</u> is a history of somewhat unstable, tumultuous relationships with others,.** .

(Exhibit "A" p. 86-87)

The primary reason for denial of parole was the commitment offense. However, "[a] conviction for murder does not automatically render one unsuitable for parole." (See In re Smith, (2003) 114  Cal.App.4th 343, 366).

California Penal Code (Penal Code) § 3041 (a) states in pertinent part:

> One year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and **shall normally set a parole release date as provided in Section 3041.5**... The release date shall be set in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates..."

Penal Code § 3041 (b) states in pertinent part:

> The panel or the board, sitting en banc, shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date therefore, cannot be fixed at this meeting.

The legislative intent was that parole should be denied if the panel believed that Petitioner will pose a threat to public safety  However, that **exception** was not intended to be used continuously, over and over again without "some evidence" to support its use. In In re Rosenkrantz, 29 Cal.4th 616, 683, the California Supreme Court stated that in order for the Board to find someone unsuitable for parole based on the commitment offense, the offense had to be particularly egregious. The California Supreme Court stated in pertinent part:

2

> In some circumstances, a denial of parole based
> upon the nature of the offense alone might rise
> to the level of a due process violation for example
> where no circumstances of the offense reasonably
> could be considered more aggravated or violent
> than the minimum necessary to sustain a conviction
> for that offense. Denial of paorle under these
> circumstances would be inconsistent with the
> statutory requirement that a parole date normally
> shall be set"in a manner that will provide uniform
> terms for offenses of similar gravity and magnitude
> in respect to their threat to the public.."

(In re Rosenkrantz, 29 Cal.4th at 683)

Although Petitioner did not kill anyone, nor did he know anyone was going to get killed. Petitioner made a bad decision to partake in a robbery as a driver. However, When compared to other murder convictions such as In re Elkins, (2006) 144 Cal.App.4th 475, 480-481, who was convicted of first degree murder. Elkins killed his victim by beating him repeatedly with a baseball bat, while the victim was sleeping. Elkins, stole money and property from the victim's bedroom, placed the body in a car trunk, (of which the victim may still have been alive) and drove to an isolated area near Donner Pass and dumped it. In a recent decision in by the California Court of Appeals, Second Appellate District in In re Sandra Davis Lawrence, Case No. B190874, that court found that, that petitioner's offense was not particularly egregious, although Lawrence was convicted of premeditated first degree murder, it does not reflect a person intent on torturing or otherwise causing unusual suffering to that victim. The Lawrence court compared its decision with several other California Appellate Court (and federal court)[1] findings and stated:

> The Governor characterized all seven of those
> murders with the same sort of pejorative terms

as was included in the report justifying denial
of Lawrence parole. yet the appellate courts in
those cases did not deem these characterizations
satisfied the "some evidence" test...

Lawrence was convicted of first degree murder.
Premeditation first degree murders ordinarily are
bloody events, unless committed with poison or the
like. At the option of the observer, most could be
said to be "atrocious, heinous, or callous" --or
pick your pejorative. And, in the experience of
this Division in regularly reviewing parole board
and gubernatorial denials of parole to murders over
the past few years, it is seldom either a board or
a governor classifies a murder, first or second
degree, as less than "atrocious heinous, or callous
or the equivalent. Indeed they usually add a
qualifier such as "extremely" or "vicious" to the
description.

(In re Sandra Davis Lawrence, Case No. B190874 p. 52).

Further, comparison of Petitioner's offense to the above

mentioned cases in fn. 1, it is clear that Petitioner's offense

fails in comparison to the Lawrence case, and Elkins case as well

as some of the most allegedly "egregious second degree cases,

such as Rosenkrantz, and Scott, supra. Especially when Petitioner

did not kill anyone.

The Board stated that the offense was an exceptionally

callous  disregard for human suffering because, although,

Petitioner did not see the victim get shot, after hearing a

gunshot "proceeded to just take off." (Exhibit "A" p. 131 How

does Petitioner's fear of the unexpected constitute the offense

being particularly egregious or more than the minimum to convict

him of that offense.

------------------------------

1. Cases referred to by Lawrence court: In re Scott (2005) 133
Cal.App.4th 573, 595; In re Smith, (2003) 109 Cal.App.4th 489;
In re Lee (2006) 143 Cal.App.4th 1400; In re Weider (2006)
145 Cal.App.4th 570 (In re Elkins supra); Rosenkrantz v.
Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063; Martin v.
Marshalll (N.D. Cal. 2006) 431 F.Supp.2d 1038.

There is absolutely no evidence to support Respondent's determination that Petitioner poses a threat to society and is a current threat to society. On the contrary, the facts prove that Petitioner **does not** pose a risk of dan⌈g⌉er to society **now**. The determination by Respondent' that Petitioner is a current threat to society is contrary to what a licensed psychologist has found. Deputy Commissioner Herron read the following into the record:

> Okay I want to shift your attention to the psychological assessment that was completed by Richard Starrett, Ph.D...

(Exhibit "A" p. 51) Deputy Commissioner Herron further read:

> In rating you in the clinical factor, you would rate in the low range for future violence. He indicates that you've made excellent plans in many areas and that you have all the bases covered. **Again, he reiterates that you would rate in the low range, in terms of risk management for the future.**

(Exhibit "A" p.53)

## A.  CONTINUED RELIANCE ON IMMUTABLE FACTORS DOES NOT CONSTITUTE "SOME EVIDENCE TO DENY PAROLE.

The immutable factors of the offense and past offenses can negate suitability, only if circumstances of such immutable factors are reliably established by the evidence and the record rationally indicate that the offender will present an unreasonable risk to public safety if released from prison. The predictive value of such factors may be very questionable after a long period of time and effort to rehabilitate oneself. The First Appellate District of California stated:

> We have also noted as has our Supreme Court, strong legal and scientific support that "predictions of future dangerousness are exceedingly unreliable," even where passage of time is not a facotr and the assessment is made by a expert.

5

(In re Scott, 133 Cal.App.4th at pp. 594-595 fn. omitted.)

"Reliance on an immutable factor, without regard to the rehabilitative goals espoused by the prison system, may result in a due process violation.

In another unpublished decision by the Appellate Court in California's Sixth district, that court reasoned the following:

> The court noted that Weider "has served so much time that, with custody credits, he is within the matrix for first degree murder... **[I]t should be self evident that after an inmate has served the equivalent of 25 years, whether his actions were more than minimally necessary for a second degree conviction... is no longer the appropriate question.** [The Board's] position, that inmates who were convicted of second degree may forever be denied parole based on some modicum of evidence that their acts rose to the level of a first, without acknowledging the fact that they have already served the time for a first, should be seen as so ridiculous that simply to state it is to refute it."

(See In re Weider, 145 Cal.App.4th 470, 479 (2006).

In the recent decision by the Second Appellate District of California in In re Lawrence, supra, p. 54 stated regarding other Appellate Court decisions:

> Nonetheless, our fellow state appellate courts or federal courts found crime so described as inadequate to provide the sole or primary "some evidence" of present dangerousness some  5 to 20 years later, at least when in the meantime the prisoner had an exemplary record in prison.

The Lawrence Court further stated:

> Thus, if as some of the federal cases hold, the predictive value of the commitment crime dissipates to the point it cannot satisfy the "some evidence" standard 17 to 20 years after its commission, a fortiori it has lost all its predictive steam over a third of a century after it was committed and nearly a quarter century in to the prisoner's incarceration.

(In re Lawrence, Case. No. B190874)

The U.S. District Court for the Northern District of California in <u>Rosenkrantz v. Marshall</u>, (C.D. Calif. 2006) 444 F.Supp.2d 1063, 1065-1070.) held that:

> While relying upon petitioner's crime as a indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances--after nearly two decades of incarceration and half dozen parole suitability hearings-- violates due process because petitioner's commitment offense has become such an unreliable predictor of his present future dangerousness that it does not satisfy the 'some evidence standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil.

The Board has relied on unchanging circumstances of the commitment offense and past behavior. While it may have been reasonable to rely upon Petitioner's crime and criminal history as an indicator of dangerousness for some period of time continued reliance on such unchanging circumstances - after over twenty years of rehabilitation, and several suitability hearings - violates due process. (See Biggs v Terhune, (9th Cir. 2003) 334 F.3d 916-917.

One district court has explained the rationale underlying this aspect of <u>Biggs</u> as follows:

> Whether the facts of the crime of conviction, or other unchanged criteria affect the parole eligibility decision can only be predicated on the "predictive value" of the unchanged circumstance. Otherwise, if the unchanged circumstance per se can be used to deny parole eligibility, sentencing is taken out of the hands of the judge and totally reposited in the hands of the BPT. That is, parole eligibility could be indefinitely and forever delayed based on the nature of the crime even though the sentence given set forth the possibility of parole - a sentence given with the facts of the crime fresh in the mind of the judge. while it would not be a constitutional violation to forgo parole altogether for certain crimes, what the state cannot

7

constitutionally do is have a sham system where
the judge promises the possibility of parole, but
because of he nature of the crime, the BPT
effectively deletes such from the system. Nor can
a parole system, where parole is mandated to be
determined on someone's future potential to harm
the community, constitutionally exist where
despite 20 or more years of prison life which
indicates the absence of danger to the community
in the future, the BPT commissioners revulsion
towards the crime itself, or some other unchanged
circumstance, constitutes the alpha and omega of
the decision. Nobody elected the BPT commissioners
as sentencing judges. Rather, in some realistic
way, the facts of the unchanged circumstances must
indicate a present danger to the community if
released, and this can only be assessed not in a
vacuum, after four or five eligibility hearings,
but counterpoised against the backdrop of prison
events.

(Bair v. Folsom State Prison, 2005 WL 2219220, *12 n.3 (E.D. Cal.

2005), report and recommendation adopted by, 2005 WL 3081634

The Respondent relied on the commitment offense to deny

parole and also undefined factors such as 'unstable social

history.' Nothing in the CCR Title 15 2402 (c) describes an

unstable personal history as a reason to deny parole. To find

that Petitioner had an unstable personal history is to say that

Petitoner was mentally unstable. Nothing in the Dr. Starret's

evaluation states that Petitioner had any metal instability.

In the its decision the Board further erred by relying on

the district attorney's opposition because there is no evidence

in the record to support the opposition. Public opposition is not

a criteria for determining suitability or unsuitability for

parole. (In re Powell, (1988) 248 Cal.Rptr. 41; In re Fain,

(1983) 19 Cal.App.3d 295). According to the California Code of

Regulations §2402 (c) public outcry is not a criteria for

determining unsuitability.

CONTENTION

II.

## THE DENIAL OF PAROLE BY THE BOARD OF PRISON HEARINGS WAS ARBITRARY AND CAPRICIOUS, AND VIOLATES PETITIONER'S STATE AND FEDERAL DUE PROCESS

Petitioner's March 8, 2007 parole consideration hearing was an arbitrary and capricious decision by the Board. In In re Rosenkrantz, 29 Cal.4th 616, 665 that court held that a parole decision with no basis in fact and not supported by any evidence in the record would be arbitrary and capricious, and it would affect a liberty interest and violates principle of due process of law. Petitioner's claim is supported when a historical review of past parole hearings are considered. On February 10, 2005 Petitioner appeared before a parole consideration panel and was found to be suitable for parole. **On June 10, 2005 the full Board including the Commissioner (Perez)[2] that found Petitioner suitable, confirmed the Petitioner's suitability for parole.** Petitioner's grant of parole was reversed by the Governor. (See Exhibit "B") result of the Governor's reversal Petitioner was again subjected to appear before another parole consideration hearing panel and was denied parole by the same Commissioner (Perez) that found him suitable, along with the same full Board that approved his date one year earlier.

The finding of unsuitability on March 8, 2007 by some of the same Commissioner's that approved Petitioner's parole suitability two years prior is an arbitrary and capricious decision. Petitioner has fulfilled all of the Board's

---

2. Commissioner Perez has since been replaced and no longer serves as a Commissioner.

recommendations when he was found suitable, and also after he was found unsuitable. Petitioner has not in any way committed acts that would indicate that he is a current threat to society.

Concomitant to the guarantee against arbitrary and capricious state action is the right to a fact-finder who has not predetermined the outcome of a hearing. Withrow v. Larkin, 421 U.S. 35 (1975). A fair trial in a fair tribunal is a basic requirement of due process, and this rule applies to administrative agencies as well as to courts; Edward v. Balisok, 35 F.3d 318, 326 (7th. Cir. 1994) a decision-making body "that has prejudged the outcome cannot render a decision that comports with due process." A fair tribunal can not rule the opposite of its earlier ruling, unless it had new and additional evidence than what it used in its first decision when it found Petitioner suitable and later confirmed their decision. A fair trial after it had previously found that defendant innocent. To make a finding of unsuitability after having found Petitioner suitable for parole on the same evidence, or more evidence of exemplary conduct, can only mean that the unsuitability finding was pre-determined renders it arbitrary and capricious, therefore violating Petitioner's due process.

Subjecting Petitioner to appear before a parole consideration panel to re-determine his suitability for parole after having had his parole suitability confirmed by the full Board, will always be a **'visual fallacy.'** Petitioner's hearings will always be pre-determined because the same evidence that was used to find Petitioner suitable, and then find him unsuitable less than a year later, based on the same evidence, is arbitrary

and capricious. The only other decision-maker left to determine Petitioner's suitability is the Governor, the decision-maker that reversed the finding of suitability.

## CONTENTION

### III.

**THE GOVERNOR AND THE BOARD OF PAROLE HEARINGS IMPLEMENTED A NO PAROLE POLICY DENYING PAROLE TO [ALMOST] ALL INDETERMINATELY SENTENCED PRISONERS; THEREFORE VIOLATING PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHT A FAIR AND IMPARTIAL PAROLE CONSIDERATION HEARING**

During the Governorship of Governor Gray Davis, he publicly stated on record that he has a no parole policy of non-release, also known as the "Pine-Box" policy. (See In re Rosenkrantz, Superior Court of Los Angeles County, Case No. A810298). Judges on the Federal Court of Appeal have noted California's non-release policy in <u>Kleeve v. Hill</u>, (9th Cir. 2000) 202 F.3d 1155, fn. 1. Since then, at two other federal judges have determined that there exists a no-parole policy.

A recent decision from the United States District Court for the Eastern District Court concluded that Governors Wilson and Davis operated under a blanket no-parole policy for inmates serving sentences for murder. (See Coleman, No. 96-0783 LKK PAN, slip op. at 9) The Coleman court's factual findings should be equally applicable in the instant petition. <u>Coleman</u> presented testimony from former BPT Commissioners that the no-parole policy The <u>Coleman</u> court concluded that the denial of parole under the Governors' no-parole policy for murders is per se invalid, because the petitioner in that case was denied his constitutional right to be heard by an impartial decision-maker. (See Withrow

v. Larkin 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)
("Not only is a biased decision-maker constitutionally
unacceptable but 'our system of law has always endeavored to
prevent even the probability of unfairness'" (quoting In re
Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942
(1955))). The Ninth Circuit has held that a Calitornia inmate is
"entitled to have his release date considered by a Board that
[is] free from bias or prejudice." O'Bremski v. Maas, 915 F.2d
418, 422 (9th Cir. 1990).

     More recently another federal district court found, based
on the Coleman evidence, that a "No-Parole" policy exists. After
reviewing the Coleman evidence, it concluded in that case:

>     Here, Governor Davis's reasoning behind his reversal
>     of petitioner's parole grant is thin to the point of
>     being pretextual. At best, the Governor gave
>     petitioner's post-conviction accomplishments cursory
>     attention; the conclusion, however, appears to have
>     been preordained. The Governors review of petitioner's
>     case therefore did not comport with petitioner's
>     constitutional rights, and the court finds that
>     the reasoning in Coleman, further justifies a grant
>     of relief in this case.

(Martin v. Marshall, (C.D. CA1. 2006) 431 F.Supp.2d 1038. (Also,
see fn. 4)).

     The Santa Clara County Superior Court recently made a "POST
FINDINGS AND ORDER FURTHER DISCOVERY ORDER" in In re Donnell
E. Jameison, Case No. 71194. The Honorable Judge Linda R. Condron
found that out of 470 parole suitability hearings, the Board
determined at those hearings or in prior hearings that the
commitment offense was 'exceptional' under §2402 (c) (1) (See
fn. 1 of that order, attached Exhibit "C"). This discovery is
simialr to what the Coleman court found  to determine the

"No-Parole" Policy.

## CONTENTION

## IV.

### THE SUPERIOR COURT DECISION WAS AN UNREASONABLE DETERMINATION OF STATE FEDERAL LAW AND OR AN UNREASONABLE DETERMINATION OF THE FACTS

On November 19, 2007 the Los Angeles Superior Court upheld that the Board's decision that the commitment offense was sufficient to deny Petitioner parole. However, the Superior Court does not explain why the crime was sufficient to deny Petitioner parole. (See Exhibit "D").

Recently, the Second Appellate District Court of California in In re Montgomery, 2d Civil No. B1925444 (11/7/07) held that initially the rules governing parole suitability can be easily applied. However, "[A]s time passes and the number of parole denials increase, however, the circumstances of the offense that at first supported a decision to deny parole become increasingly attenuated." As in Montgomery, Petitioner was not the shooter. The Board and the Superior Court failed to give Petitioner individualized consideration of all relevant factors. The Second Appellate District Court further held that Because Montgomery was not the shooter he could not be treated the same as the shooter. The Appellate Court stated:

> Here, the Governor viewed the nature of the crime
> without considering that Montgomery was not the
> shooter. While an accomplice is treated the same
> as the perpetrator of a crime for purposes of
> determining guilt and imposing sentence (e.g.,
> People v. Prettymann (1996) 14 Cal.4th 248, 259),
> continuing to do so in making a parole suitability
> determination violates the prisoner's due process
> right to "an individualized consideration of all
> relevant factors."

14

(In re Montgomery 2d Civil No. B192544 (11/07/07) p. 16).

In the instant action, all of the factors found by the Board to determine unsuitability were rejected by the Superior Court. Therefore, this Court should find that the commitment offense is not a reason to continually deny Petitioner Parole, since he was not the shooter. The Appellate Court in In re Gray, 59 Cal.Rptr.3d 724, 41-742 (Cal.App.3d Dist. 2007), held that parole is the rule for second degree murder, not the exception. Denial of parole based on the commitment alone, violates Petitioner's State and Federal Due Process Rights. The Court in In re Scott, (2004) stated the following:

> "[p]arole is the rule, rather than the exception
> and conviction for second degree murder does not
> automatically render one unsuitable. (In re Smith,
> (2003) 114 Cal.App 4th 343, 366, italics omitted.)

> The Court then attached a caveat:

> As the Court explained, "[a]ll violent crime
> demonstrates the perpetrator's potential for
> posing grave risk to public safety, yet parole is
> mandatory for violent felons serving determinate
> sentences. (Penal Code § 3000, subd. (b) (1).) And
> the Legislature has clearly expressed its intent
> that when murderers -- who are the great majority
> of inmates serving indeterminate sentences --
> approach their minimum eligible parole date, the
> Board 'shall normally set a parole release date.'
> (Pen.Code, §3041, subd. (a).) the Board's authority
> to make an exception based on the gravity of a life
> term inmate's current or past offenses should not
> operate so as to swallow the rule that parole is
> 'normally' to be granted. Otherwise, the Board's
> case-by-case rulings would destroy the proportionality
> contemplated by Penal Code 3041, subdivision (a),
> and also by the murder statutes, which provide
> distinct term of life without possibility of parole,
> 25 years to life, and 15 years to life for various
> degrees and kinds of murder. (Pen Code, § 190.et
> seq.)" (Ramirez, at p. 570. Therefore, to demonstrate
> "an exceptionally callous disregard for human
> suffering" (§ 2402, subd. (c)(1)(D)), the offense in
> question must have been committed in a more aggravated
> or violent manner than that ordinarily shown in the

commission of second degree murder.

(Id., at 891.)

Petitioner has been to the Board for parole consideration seven times[3] and five times he has been denied parole primarily on the commitment offnese. Petitioner has fulfilled alll of the Board's requirement's and yet is being denied parole. Petitioner has no hope but for this Court in the interest of justice grant Petitioner's Petition

---

3.  Petitioner recently went to the Board for parole (on 3/21/08) consideration and was again denied parole because the Board was not comfortable with his last psychological evaluation, although nothihng changed.

commission of second degree murder.

(Id., at 891.)

Petitioner has been to the Board for parole consideration seven times and five times he has been denied parole primarily on the commitment offense. Petitioner has fulfilled all of the Board's requirement's and yet is being denied parole. Petitioner has no hope but for this Court in the interest of justice grant Petitioner's petition for writ of habeas corpus.

### PRAYER FOR RELIEF

**Wherefore,** Petitioner respectfully prays that this Court would:

1. Issue a writ of habeas corpus;

2. Issue an Order to Show Cause;

3. Order an evidentiary hearing;

4. Order Petitioner immediately released forthwith.

5. Appoint Counsel

6. Grant any and all other relief deemed appropriate.

Dated: this  23, day of June 2008.

Demetrius Daniel

Demetrius Daniel
**In Pro Se**

EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life    )
Term Parole Consideration    )    CDC Number:   E-03098
Hearing of:                  )
                             )
DEMETRIUS DANIEL             )    **INMATE COPY**
_____)

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

MARCH 5, 2007

1:10 P.M.

PANEL PRESENT:

JANICE ENG, Presiding Commissioner
RONALD HERRON, Deputy Commissioner

OTHERS PRESENT:

DEMETRIUS DANIEL, Inmate
CANDICE CHRISTENSEN, Attorney for Inmate
DAVE DAHLE, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____No    See Review of Hearing
_____Yes   Transcript Memorandum

Karin R. Lewis, Capitol Electronic Reporting

# I N D E X

                                                            Page

Proceedings........................................     3

Case Factors.......................................    12

Pre-Commitment Factors.............................    18

Post-Commitment Factors............................    44

Parole Plans.......................................    57

Closing Statements.................................   116

Recess.............................................   129

Decision...........................................   130

Adjournment........................................   139

Transcript Certification...........................   140

1            P R O C E E D I N G S

2        **DEPUTY COMMISSIONER HERRON:**  Okay.  We're on the

3   record.

4        **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

5   Good afternoon.  This is a Subsequent Parole

6   Consideration Hearing for Demetrius, D-E-M-E-T-R-I-U-S,

7   Daniel, CDC number E-03098.  Today's date is March 5th,

8   2007 and the time is 1:10 in the afternoon.  We are

9   located at San Quentin State Prison.

10       The inmate was received on December 13th, 1988

11  from Los Angeles County and his life term began on

12  December 13th, 1988.  Minimum eligible parole date is

13  May 23rd, 1998.  The controlling offense for which the

14  inmate has been committed is murder two, case number

15  A645692.  Count one, Penal Code Section 187.  There's

16  also a non-controlling offense, count one, actually it's

17  case number CR44269 from Riverside County, count one.  I

18  believe it's Health and Safety Code 11350(a), possession

19  of a controlled substance.  The inmate received a total

20  term of 15 years to life.

21       This hearing is being tape-recorded, so for the

22  purpose of voice identification, each of us will be

23  required to state our first and last names, spelling out

24  our last names.  And sir, when it comes to your turn,

25  again, after you spell your last name, please provide us

4

1    with your CDC number.

2         So, I will begin and we'll move around to my left

3    and please be sure everyone, to speak up loudly and

4    clearly so it's picked up on the recording device.  My

5    name is Janice Eng, E-N-G, Commissioner.

6         **DEPUTY COMMISSIONER HERRON:**  I'm Ronald Herron,

7    H-E-R-R-O-N, Deputy Commissioner.

8         **DEPUTY DISTRICT ATTORNEY DAHLE:**  Dave Dahle,

9    D-A-H-L-E, Deputy District Attorney, Los Angeles County.

10        **ATTORNEY CHRISTENSEN:**  Candice Christensen,

11   C-H-R-I-S-T-E-N-S-E-N, Attorney for Mr. Daniel.

12        **INMATE DANIEL:**  My name is Demetrius Daniel,

13   D-A-N-I-E-L.

14        **PRESIDING COMMISSIONER ENG:**  CDC number?

15        **INMATE DANIEL:**  E-03098.

16        **PRESIDING COMMISSIONER ENG:**  Thank you.  We also

17   have two correctional officers present for security

18   reasons and they will not be participating in the

19   hearing.

20        Before we go any further, sir, I'm going to ask

21   that you read aloud the ADA Statement that's in front of

22   you.  You can begin.

23        **INMATE DANIEL:**

24             "The Americans with Disabilities Act is a

25        law to help people with disabilities.

*Capitol Electronic Reporting*

1       Disabilities are problems that make it harder

2       for some people to see, hear, breathe, talk,

3       walk, learn, think, work or take care of

4       themselves than it is for others.  Nobody can be

5       kept out of public space -- places or activities

6       because of a disability.

7           "If you have a disability, you have the

8       right to ask for help to get ready for your BPT

9       hearing, get to the hearing, talk, read forms,

10      papers, understand the hearing process.  BPT

11      will look at you to make sure that you have a

12      disability that is covered by ADA and that you

13      asked for the right kind of help.  If you do not

14      get help or if you don't think you got the kind

15      of help you need, ask for a BPT 1040 grievance

16      form.  You can also get help to fill it out."

17    **PRESIDING COMMISSIONER ENG:**  Okay, thank you.  Do

18 you understand what those rights mean?

19    **INMATE DANIEL:**  Yes, Ma'am.

20    **PRESIDING COMMISSIONER ENG:**  Okay.  I just have

21 to go through some standard questions.  For the record,

22 we also notate that you did sign a BPT form 1073 back on

23 November 30th of 2006 and, sir, that form is a

24 Reasonable Accommodation Notice and Request in

25 accordance with the provisions of the Americans with

1    Disabilities Act.  And on this form, you did notate that

2    you do not have any disabilities, as defined under the

3    ADA.  Is that correct?

4          INMATE DANIEL:  Yes, Ma'am.

5          PRESIDING COMMISSIONER ENG:  Okay.  So this

6    information is still current and correct?

7          INMATE DANIEL:  Yeah.

8          PRESIDING COMMISSIONER ENG:  Okay.  So do you

9    have any problems walking up or down stairs or for

10   distances of 100 yards or more?

11         INMATE DANIEL:  No, Ma'am.

12         PRESIDING COMMISSIONER ENG:  Okay.  And I notice

13   that you're wearing glasses.  Are those going to be --

14   Are those for reading or distance or both?

15         INMATE DANIEL:  For reading.

16         PRESIDING COMMISSIONER ENG:  For reading.

17         INMATE DANIEL:  Yes.

18         PRESIDING COMMISSIONER ENG:  So those should be

19   fine for you to get through the hearing today?

20         INMATE DANIEL:  Yes, Ma'am.

21         PRESIDING COMMISSIONER ENG:  Okay, good.  How

22   about, do you have any hearing impairments?

23         INMATE DANIEL:  No, Ma'am.

24         PRESIDING COMMISSIONER ENG:  Okay.  Have you ever

25   been included in the CCCMS or the EOP programs and do

1    you know what those are?

2         **INMATE DANIEL:**  Yes.

3         **PRESIDING COMMISSIONER ENG:**  Okay.  How about,

4    have you ever taken any psychotropic medications, either

5    in prison or on the streets?

6         **INMATE DANIEL:**  No, Ma'am.

7         **PRESIDING COMMISSIONER ENG:**  Okay.  And how far

8    did you get in school?

9         **INMATE DANIEL:**  I graduated.

10         **PRESIDING COMMISSIONER ENG:**  Okay.  While you

11    were growing up, do you recall, were you ever enrolled

12    in any special education classes?

13         **INMATE DANIEL:**  No.

14         **PRESIDING COMMISSIONER ENG:**  Okay.  So do you

15    suffer from any disability that might prevent you from

16    participating in today's hearing?

17         **INMATE DANIEL:**  No, Ma'am.

18         **PRESIDING COMMISSIONER ENG:**  Okay.  Counsel, are

19    there any ADA issues that you feel need further

20    discussion regarding your client's participation?

21         **ATTORNEY CHRISTENSEN:**  No.

22         **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

23    This hearing is being conducted pursuant to the Penal

24    Code and the Rules and Regulations of the Board of

25    Parole Hearings governing parole consideration hearings

1  for life inmates.  So, the purpose of today's hearing is

2  to once again consider your suitability for parole.  And

3  so in doing so, we'll consider the number and nature of

4  the crimes for which you were committed, your prior

5  criminal and social history, your behavior and

6  programming since your commitment and your plans if

7  released, okay?

8       INMATE DANIEL:  Yes, Ma'am.

9       PRESIDING COMMISSIONER ENG:  So, we've had the

10 opportunity to review your Central File and you'll also

11 be given the opportunity to make any corrections or to

12 clarify the record.

13      INMATE DANIEL:  Yes, Ma'am.

14      PRESIDING COMMISSIONER ENG:  Okay.  We will

15 consider your progress since your commitment, your

16 counselors' reports and your mental health evaluations.

17      INMATE DANIEL:  Yes, Ma'am.

18      PRESIDING COMMISSIONER ENG:  However, today we're

19 going to focus on your progress and any new reports

20 since your last hearing.  So any changes to your parole

21 plans should be brought to our attention.

22      INMATE DANIEL:  Yes, Ma'am.

23      PRESIDING COMMISSIONER ENG:  We will reach a

24 decision today and inform you whether or not we find you

25 suitable for parole and the reasons for our decision.

1  So, if you are found suitable for parole, the length of

2  your confinement will be explained to you at that time.

3       **INMATE DANIEL:**  Yes, Ma'am.

4       **PRESIDING COMMISSIONER ENG:**  Okay.  Before we

5  recess for deliberations, the District Attorney's

6  representative, who is present, your attorney and you,

7  yourself, will have an opportunity to make a final

8  statement regarding your parole suitability.  So if you

9  decide to make a final statement, just, we ask you to

10 keep it focused on why you believe you are suitable for

11 parole.

12      **INMATE DANIEL:**  Yes, Ma'am.

13      **PRESIDING COMMISSIONER ENG:**  Okay.  We'll then --

14 We'll then recess and clear the room and deliberate.

15 And once we complete the deliberations, we'll resume the

16 hearing and announce our decision.

17      **INMATE DANIEL:**  Yes, Ma'am.

18      **PRESIDING COMMISSIONER ENG:**  Okay.  California

19 Code of Regulations states that regardless of time

20 served, a life inmate shall be found unsuitable for and

21 denied parole, if in the judgment of the Panel, the

22 inmate would pose an unreasonable risk of danger to

23 society if released from prison.

24      You have certain rights.  Those rights include

25 the right to a timely notice of this hearing, the right

1    to review your Central File, which I see you did, and

2    the right to present relevant documents.  Okay.  So,

3    Counsel, so far have your client's rights been met?

4           **ATTORNEY CHRISTENSEN:**  Yes, they have.

5           **PRESIDING COMMISSIONER ENG:**  Okay.  You have the

6    additional right to be heard by an impartial Panel.

7    You've been introduced to this Panel.  Do you have any

8    objections?

9           **INMATE DANIEL:**  No, Ma'am.

10          **PRESIDING COMMISSIONER ENG:**  Okay.  Counsel, any

11   objections to the Panel?

12          **ATTORNEY CHRISTENSEN:**  No objections.

13          **PRESIDING COMMISSIONER ENG:**  Thank you.  You will

14   receive a copy of our written, tentative decision today.

15   And that decision, as you know, becomes final within 120

16   days.  So a copy of the final decision and a copy of the

17   transcript will be sent to you later on.

18          Okay.  Also, to note that on May 1st of 2004, the

19   regulations regarding your right to appeal a decision

20   made at this hearing were repealed.  So, basically, to

21   appeal, you have to go to court and if you have any

22   questions about that policy, you can discuss that with

23   your legal counsel or you can review the policy at your

24   prison law library.

25          Sir, you're not required to admit to or discuss

1  your offense, however, this Panel does accept as true

2  the findings of the court.  So do you understand what

3  that means?

4        INMATE DANIEL:  Yes, Ma'am.

5        PRESIDING COMMISSIONER ENG:  Okay.  Commissioner,

6  is there any confidential material in the file and if

7  so, will we be using it today?

8        DEPUTY COMMISSIONER HERRON:  There is not.

9        PRESIDING COMMISSIONER ENG:  Okay, thank you.

10  I've already passed the hearing checklist over to your

11  legal counsel and also over to the representative for

12  the DA's office and they have signed off on it and dated

13  it.  And sir, this is marked Exhibit One and we do this

14  to insure that all of us are operating off the same set

15  of documents for your hearing.  Okay, so it's part of

16  the paperwork.

17        Okay.  Counsel, any additional documents to be

18  submitted to the Panel?

19        ATTORNEY CHRISTENSEN:  Other than what I gave you

20  when I came in which is that new stack of documents in

21  front of you, no.

22        PRESIDING COMMISSIONER ENG:  Okay.  Okay.  We do

23  have more updated letters too, so, okay.  Any

24  preliminary objections?

25        ATTORNEY CHRISTENSEN:  None.

12

1    **PRESIDING COMMISSIONER ENG:**  Okay.  And will your

2    client be speaking to the Panel this afternoon?

3    **ATTORNEY CHRISTENSEN:**  Yes, he will, as to all

4    matters.

5    **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

6    So, I'll have to swear you in.  Please raise your right

7    hand.  Do you solemnly swear or affirm that the

8    testimony you give at this hearing will be the truth,

9    the whole truth and nothing but the truth?

10    **INMATE DANIEL:**  Yes, Ma'am.

11    **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

12    Sit back and relax.  Okay, first what I'm going to do is

13    read into the record the Statement of Facts about the

14    life crime.  Okay.  And I'm going to take that from the

15    probation officer's report, which is in the legal

16    section and your legal counsel does have a copy of that,

17    if you want to follow along.  I believe it's way in the

18    back of the legal section.  Okay.  And it's basically on

19    page two and it states that:

20    　　　　"Defendant and codefendants participated

21    　　　　in the fatal shooting of 26-year-old Kenneth Day.

22    　　　　On the present offense date, defendant and

23    　　　　codefendant decided to commit some robberies.

24    　　　　Defendant was the driver of the motor vehicle

25    　　　　with codefendant's passengers.

1           "Defendant and codefendants went to the

2        Paramount area and then drove to the Compton area

3        where they observed victim Kenneth Day driving

4        his 1980 Chevrolet El Camino.  They followed his

5        vehicle to a gas station.  After victim Day

6        parked his vehicle and was pouring water into his

7        radiator, codefendant Eaves, E-A-V-E-S, walked up

8        to the victim and shot him in the head.

9           "Codefendant then jumped into the

10       victim's vehicle and both vehicles fled the

11       scene.  Defendant and companions met later to

12       strip the vehicle's (sic) car.  The vehicle was

13       also burned."

14       Mr. Daniel, is that an accurate description of

15 what occurred that night back in 1987?

16       **INMATE DANIEL:**  Yes, Ma'am, that's close.

17       **PRESIDING COMMISSIONER ENG:**  Close?

18       **INMATE DANIEL:**  Yeah.

19       **PRESIDING COMMISSIONER ENG:**  Why don't you

20 elaborate.

21       **INMATE DANIEL:**  Well, when we participated in the

22 crime, I was behind the gas station, so I didn't see

23 what happened when the man's life was taken, but I still

24 take full responsibility, because I participated in it.

25       **PRESIDING COMMISSIONER ENG:**  Because you drove.

1          **INMATE DANIEL:**  Yeah, I was the driver.

2          **PRESIDING COMMISSIONER ENG:**  You were the driver

3 and --

4          **INMATE DANIEL:**  Yeah.  I was behind the gas

5 station, so I never saw what happened.

6          **PRESIDING COMMISSIONER ENG:**  Okay.  Did you hear

7 it?

8          **INMATE DANIEL:**  Yeah, I heard the shot.  Yeah.

9          **PRESIDING COMMISSIONER ENG:**  And did you hear,

10 after you heard the shot, did you hear someone get into

11 the car and drive away?

12          **INMATE DANIEL:**  No.  I was -- I had already took

13 off.

14          **PRESIDING COMMISSIONER ENG:**  You already took

15 off.

16          **INMATE DANIEL:**  Once I heard the shot, I was gone

17 in a split second.

18          **PRESIDING COMMISSIONER ENG:**  Okay.  Is it true

19 that your crime partner, Mr. Eaves, that did the actual

20 shooting, was he a juvenile?

21          **INMATE DANIEL:**  Yeah, he was a juvenile.  He was

22 17.

23          **PRESIDING COMMISSIONER ENG:**  Seventeen.

24          **INMATE DANIEL:**  I was 22.

25          **PRESIDING COMMISSIONER ENG:**  Okay.  How about the

1  other person, your other crime partner in the vehicle

2  with you.

3        INMATE DANIEL:  He was 22.

4        PRESIDING COMMISSIONER ENG:  He was 22 also.

5  What were you doing hanging out with the 17-year-old Mr.

6  Eaves?

7        INMATE DANIEL:  What happened, the way I met him

8  was he going to school with my sister-in-law and that's

9  how I met him.  I had just met him about 60 days ago,

10  before the crime even took off.

11        PRESIDING COMMISSIONER ENG:  But I know based on,

12  I've read a lot of the information here and correct me

13  if I'm wrong, but that I thought I read in here that you

14  and your crime partners determined earlier in the

15  evening that you were going to go out looking for a car.

16        INMATE DANIEL:  Yeah.  That was on Thanksgiving.

17  I was at the house when they came by and came and got

18  me.  I was at the house all day on Thanksgiving Day.

19        PRESIDING COMMISSIONER ENG:  Had you participated

20  in a carjacking prior to this instant offense?

21        INMATE DANIEL:  Yes, Ma'am.

22        PRESIDING COMMISSIONER ENG:  How many?

23        INMATE DANIEL:  Two.

24        PRESIDING COMMISSIONER ENG:  Two.

25        INMATE DANIEL:  Yeah.

16

1       **PRESIDING COMMISSIONER ENG:** Were they on other

2  days or on the same day?

3       **INMATE DANIEL:** Other days.

4       **PRESIDING COMMISSIONER ENG:** Okay. And is it

5  true also that on those two previous carjackings, that

6  someone was armed?

7       **INMATE DANIEL:** Yes. Somebody was armed. That's

8  right.

9       **PRESIDING COMMISSIONER ENG:** Okay. Were you ever

10 armed in any of those?

11      **INMATE DANIEL:** No, I wasn't armed.

12      **PRESIDING COMMISSIONER ENG:** Okay. Were you

13 always the driver?

14      **INMATE DANIEL:** I was the driver.

15      **PRESIDING COMMISSIONER ENG:** Okay. So you were

16 delivering the carjackers to wherever, so that they

17 could --

18      **INMATE DANIEL:** I was just as guilty as them.

19      **PRESIDING COMMISSIONER ENG:** Okay.

20      **INMATE DANIEL:** You know, it was a serious crime.

21      **PRESIDING COMMISSIONER ENG:** Right, okay. I have

22 another question to ask you. Okay. I read somewhere in

23 here also that, were you affiliated with one of the

24 gangs?

25      **INMATE DANIEL:** No, Ma'am, I wasn't affiliated.

1       **PRESIDING COMMISSIONER ENG:** It says here the

2   Grape Street Watts Crips gang. What do you know about

3   that gang?

4       **INMATE DANIEL:** I don't know nothing. He was

5   from there. I wasn't from there. Kenneth Day was from

6   that neighborhood.

7       **PRESIDING COMMISSIONER ENG:** So Kenneth Day, the

8   victim, was actually a member of the gang?

9       **INMATE DANIEL:** Yeah. We didn't know that at the

10  time.

11      **PRESIDING COMMISSIONER ENG:** Okay. Okay, that's

12  right. So what happened after? You didn't know that at

13  the time, but it states here that you were kidnapped

14  afterwards?

15      **INMATE DANIEL:** Yes, Ma'am.

16      **PRESIDING COMMISSIONER ENG:** How long after the

17  crime happened did that happen?

18      **INMATE DANIEL:** Probably, the crime happened on

19  November 27th. I was kidnapped on December 13th.

20      **PRESIDING COMMISSIONER ENG:** When were you

21  arrested for the crime?

22      **INMATE DANIEL:** I turned myself in the 3rd of

23  January, '88.

24      **PRESIDING COMMISSIONER ENG:** You went to the

25  police.

1      INMATE DANIEL:  I turned myself in.

2      PRESIDING COMMISSIONER ENG:  In that area, did it

3  ever occur to you that one of the victims of these

4  carjackings could be affiliated with one of the gangs?

5      INMATE DANIEL:  Not really.  He was -- When I was

6  out there living on the streets, I wasn't even thinking

7  like that.

8      PRESIDING COMMISSIONER ENG:  Okay.  We'll get

9  back to talking more about the crime, but right now I

10  want to take a look at what could have possibly led up

11  to this and take a look at your prior criminal history.

12  And do you have any juvenile record?

13      INMATE DANIEL:  No, Ma'am.

14      PRESIDING COMMISSIONER ENG:  So you never had

15  gotten -- Well, you never had any occasion to be

16  arrested by the police or any altercation with the

17  police as a juvenile?

18      INMATE DANIEL:  No, Ma'am.

19      PRESIDING COMMISSIONER ENG:  Okay.  So everything

20  started happening as an adult?

21      INMATE DANIEL:  Yeah.  As soon as I turned 20.

22      PRESIDING COMMISSIONER ENG:  As soon as you

23  turned 20.

24      INMATE DANIEL:  Twenty, basically 20, in '85 and

25  '87.

1    **PRESIDING COMMISSIONER ENG:**  You had been staying

2    out of trouble up until then.  Okay.  Were you just

3    staying under the radar?  You were still doing stuff but

4    not getting caught, but all of the sudden at the age of

5    20, you started getting caught?

6    **INMATE DANIEL:**  I just went out there and tried

7    and for the love of money, I was stuck I out there.

8    **PRESIDING COMMISSIONER ENG:**  Okay.

9    **INMATE DANIEL:**  I had a good upbringing.  I can't

10   blame it on my parents or anything like that.  I chose

11   and made that decision, you know.  I have to pay for the

12   consequences of that.

13   **PRESIDING COMMISSIONER ENG:**  Because I see here,

14   according to the CI&I, your first arrest was in May, May

15   6th of 1986 in Long Beach for possession of a narcotic,

16   a controlled substance for sale.

17   **INMATE DANIEL:**  Yeah.

18   **PRESIDING COMMISSIONER ENG:**  Okay.  But it

19   doesn't show any disposition.  You were just arrested

20   for that --

21   **INMATE DANIEL:**  Yeah.

22   **PRESIDING COMMISSIONER ENG:**  -- and was it

23   dismissed?

24   **INMATE DANIEL:**  It was dismissed.

25   **PRESIDING COMMISSIONER ENG:**  Okay.  But right

1  after that, like two months later, close to three months

2  later you were arrested again, or there was a bench

3  warrant for embezzlement.

4          INMATE DANIEL:  That was a rental car.

5          PRESIDING COMMISSIONER ENG:  Did you steal a

6  rental car?

7          INMATE DANIEL:  No, I rented it and somebody

8  didn't turn it back in.

9          PRESIDING COMMISSIONER ENG:  You rented it, so

10  your name was on the paperwork and you gave it to

11  somebody else?

12          INMATE DANIEL:  I let them -- I let them use it

13  and they didn't turn it back in and then a bench warrant

14  was (inaudible).

15          PRESIDING COMMISSIONER ENG:  So what happened

16  with that one?

17          INMATE DANIEL:  It was -- It was dismissed after

18  the car was brought back.  It just wasn't paid on time,

19  that's all.  It wasn't brought back on time.

20          PRESIDING COMMISSIONER ENG:  It wasn't brought

21  back, but you ended up paying it?

22          INMATE DANIEL:  Yeah.

23          PRESIDING COMMISSIONER ENG:  Okay.  Okay, and

24  then, so that was July, the end of July of '86 and then

25  February of '87, another arrest for possession of a

1  narcotic, a controlled substance.  Do you remember that?

2        **INMATE DANIEL:**  Yes, Ma'am.

3        **PRESIDING COMMISSIONER ENG:**  And what happened

4  there?  That was in Riverside.

5        **INMATE DANIEL:**  Riverside.  That one was dropped

6  too.  I was out there selling drugs, addicted to the

7  lifestyle of money and --

8        **PRESIDING COMMISSIONER ENG:**  Were you doing that

9  same thing back when you had your first arrest in '86?

10  Were you out selling drugs too and that's what they

11  picked you up for?

12        **INMATE DANIEL:**  Yeah, that's right.

13        **PRESIDING COMMISSIONER ENG:**  So, so far, these

14  two all had to do with selling.

15        **INMATE DANIEL:**  Yes, Ma'am.

16        **PRESIDING COMMISSIONER ENG:**  But was this one

17  dismissed too?

18        **INMATE DANIEL:**  Yeah.

19        **PRESIDING COMMISSIONER ENG:**  Okay.  But then you

20  got arrested again later on that year in August.

21        **INMATE DANIEL:**  Yes, Ma'am.

22        **PRESIDING COMMISSIONER ENG:**  So, this one was

23  February and then not much longer --

24        **INMATE DANIEL:**  September.

25        **PRESIDING COMMISSIONER ENG:**  Okay.  In Riverside,

1    was that for dealing also?

2         INMATE DANIEL:  Yes, Ma'am.

3         PRESIDING COMMISSIONER ENG:  Okay.  And what

4    happened with that one?

5         INMATE DANIEL:  What happened, when I caught that

6    case, I caught this case right after, so I came to

7    prison.  They took me back down to court in 1992.

8         PRESIDING COMMISSIONER ENG:  All right.  Yeah,

9    because that was 8/18 of '87 and then 12/13/88, it says,

10   yeah, the murder.  Okay.  Yeah, because then I see on

11   9/17/92 --

12        INMATE DANIEL:  That's when I went back to court

13   to Riverside County.

14        PRESIDING COMMISSIONER ENG:  Okay.

15        INMATE DANIEL:  Yeah.

16        PRESIDING COMMISSIONER ENG:  I see that, okay.

17   And you got two years of prison.

18        INMATE DANIEL:  Yes, Ma'am.

19        PRESIDING COMMISSIONER ENG:  Okay.  Two

20   additional years, okay.  Okay, so you were doing a lot

21   of drugs, huh?

22        INMATE DANIEL:  Yes, Ma'am.

23        PRESIDING COMMISSIONER ENG:  Was it using or

24   selling or both?

25        INMATE DANIEL:  I was selling.

1   **PRESIDING COMMISSIONER ENG:** Okay. Because I

2   thought that I had read in here about your background.

3   I thought this new one had a better -- Okay. You were

4   born May 9th, 1965, so you were 22 at the age -- you

5   were 22 years of age at the time of the life crime.

6      **INMATE DANIEL:** Yes, Ma'am.

7      **PRESIDING COMMISSIONER ENG:** Okay. You're now

8   41?

9      **INMATE DANIEL:** Yeah. I'll be 41 -- 42, May 9th.

10     **PRESIDING COMMISSIONER ENG:** Yeah, in May, okay.

11  And you were one of three children. Are you the oldest?

12     **INMATE DANIEL:** Yes, Ma'am.

13     **PRESIDING COMMISSIONER ENG:** Okay. So, you have,

14  do you have a brother and a sister or two brothers, two

15  sisters?

16     **INMATE DANIEL:** I've got a sister and a brother.

17     **PRESIDING COMMISSIONER ENG:** And where are they?

18     **INMATE DANIEL:** My sister stays in Indiana.

19  She's a life insurance manager.

20     **PRESIDING COMMISSIONER ENG:** Okay. What about

21  your brother?

22     **INMATE DANIEL:** My brother is a security guard

23  and he's got his own clothing line.

24     **PRESIDING COMMISSIONER ENG:** Where is he?

25     **INMATE DANIEL:** He's in -- He's in Long Beach.

1    **PRESIDING COMMISSIONER ENG:** Okay. Any of them

2    ever have any problems with the law?

3         **INMATE DANIEL:** My brother did.

4         **PRESIDING COMMISSIONER ENG:** What did he do?

5         **INMATE DANIEL:** Selling drugs.

6         **PRESIDING COMMISSIONER ENG:** He was following in

7    his big brother's footsteps?

8         **INMATE DANIEL:** Yes, Ma'am.

9         **PRESIDING COMMISSIONER ENG:** Okay. Well, your

10   parents were divorced when you were 11, so basically

11   your mother raised you?

12        **INMATE DANIEL:** Yes, Ma'am.

13        **PRESIDING COMMISSIONER ENG:** But your father was

14   always around or no?

15        **INMATE DANIEL:** Basically. He would check on us

16   basically every day.

17        **PRESIDING COMMISSIONER ENG:** Yeah. And he was in

18   the trucking business?

19        **INMATE DANIEL:** Yeah. He still is.

20        **PRESIDING COMMISSIONER ENG:** And you worked --

21   Weren't you working for him?

22        **INMATE DANIEL:** That's what I used to do.

23        **PRESIDING COMMISSIONER ENG:** You were working for

24   him at the time, weren't you?

25        **INMATE DANIEL:** That's what I used to do before I

1  got in trouble.

2      **PRESIDING COMMISSIONER ENG:**  Okay.

3      **INMATE DANIEL:**  Drive trucks.

4      **PRESIDING COMMISSIONER ENG:**  So you were making a

5  decent living, I'm assuming.

6      **INMATE DANIEL:**  Yes, I was.

7      **PRESIDING COMMISSIONER ENG:**  Okay.  Did your

8  father know that you were out dealing drugs?  Did either

9  one of your parents ever have any idea?

10      **INMATE DANIEL:**  At the end, when I told them, I

11  said, I just confessed what I was doing.

12      **PRESIDING COMMISSIONER ENG:**  So they were not

13  aware of all those previous arrests?

14      **INMATE DANIEL:**  No.  What it was, I would tell

15  them, like I called up, just make a lie up to them and

16  just try to hold back in, instead of just telling the

17  truth, you know, to them.

18      **PRESIDING COMMISSIONER ENG:**  Were you still

19  living with your mother at the age of 20?

20      **INMATE DANIEL:**  No, I left.  I had my own little

21  place.

22      **PRESIDING COMMISSIONER ENG:**  Okay, so they didn't

23  know.  But basically up until the time that you went out

24  on your own, you --

25      **INMATE DANIEL:**  I drifted out there.

1      **PRESIDING COMMISSIONER ENG:**  But you -- But you

2    were pretty much on, I mean, did you drop out of school?

3      **INMATE DANIEL:**  No, I graduated.  I had a

4    scholarship to play football and everything.

5      **PRESIDING COMMISSIONER ENG:**  How come I saw

6    somewhere that you got a GED?

7      **INMATE DANIEL:**  I just got another one while I

8    was in here.

9      **PRESIDING COMMISSIONER ENG:**  Okay.

10      **INMATE DANIEL:**  (Inaudible) took advantage of it

11   just to --

12      **PRESIDING COMMISSIONER ENG:**  So when did you

13   graduate?  Where and when did you graduate from high

14   school?

15      **INMATE DANIEL:**  I graduated in 1983 from Long

16   Beach Jordan.

17      **PRESIDING COMMISSIONER ENG:**  Okay.  And then you

18   started right to work for your father?

19      **INMATE DANIEL:**  Yes.

20      **PRESIDING COMMISSIONER ENG:**  So at what age --

21   Were you drinking also back when you were a teenager?

22      **INMATE DANIEL:**  I've tried it, experimental

23   purposes, but I'm not an alcoholic.  I just tried it.  I

24   didn't drink or anything like that.  I tried it.

25      **PRESIDING COMMISSIONER ENG:**  Okay.  What drugs

27

1    did you try?

2        INMATE DANIEL:  I tried weed.  I tried cocaine.

3    That was it.

4        PRESIDING COMMISSIONER ENG:  So what was -- What

5    type of drugs were you into selling?

6        INMATE DANIEL:  Cocaine.

7        PRESIDING COMMISSIONER ENG:  Okay.  When you

8    think back, what got you started into getting involved

9    in selling drugs?

10       INMATE DANIEL:  The lifestyle, the money.

11       PRESIDING COMMISSIONER ENG:  Why?  Because

12   friends of yours or people that you knew, you saw

13   (indiscernible)?  I mean, explain to me.  I don't

14   understand.

15       INMATE DANIEL:  I was going to say, when I was

16   out there driving trucks and I'm working every day, then

17   a few guys were hanging around, I saw this lifestyle of

18   making money.  I'd never been in trouble, so I stepped

19   out there and I was addicted to money.  I lost every

20   sense that I ever had, immature, not being responsible.

21       PRESIDING COMMISSIONER ENG:  Okay.

22       INMATE DANIEL:  And like I said, I take full

23   responsibility.  I don't blame it on nobody but myself,

24   because I made a choice and decision and then I had to

25   suffer the consequences.

1         **PRESIDING COMMISSIONER ENG:** After that first

2 arrest, what did you think?

3         **INMATE DANIEL:** It just went in one ear and went

4 out the other ear. I wasn't really -- I just kept

5 going. I was just addicted to it, to the money. It

6 wasn't about not nothing but just money.

7         **PRESIDING COMMISSIONER ENG:** You never thought

8 about the consequences?

9         **INMATE DANIEL:** I didn't think about the

10 consequences.

11         **PRESIDING COMMISSIONER ENG:** Well, the first time

12 you were arrested, nothing happened?

13         **INMATE DANIEL:** No, they dropped the case, so

14 that's basically probably, it was like, well, it's all

15 right to do it again. But when I look back, I say to

16 myself, everything I did, it was a lie, it was wrong and

17 you know, my parents didn't raise me up like that. And

18 I had everything.

19         **PRESIDING COMMISSIONER ENG:** Did you think back

20 then, after the case got dismissed that, all right, that

21 you could continue because there wasn't any

22 repercussions for it? That if you ever got caught

23 again, did you think that --

24         **INMATE DANIEL:** I wasn't thinking about no

25 repercussions of anything. Like, I figure if I can get

1  away, this is a lifestyle I'm going to live.  This is

2  what I like to do because I'm addicted to (inaudible).

3     PRESIDING COMMISSIONER ENG:  So how did you go

4  from that to carjacking?

5     INMATE DANIEL:  Hanging around, associating

6  myself with bad people.  That everything become like a

7  thrill.  At first, when I'm out there on the streets,

8  I'm saying to myself, I'm not loving myself if I'm

9  taking a chance like this.  So therefore, how can I

10 respect somebody else when I didn't respect myself.

11    PRESIDING COMMISSIONER ENG:  But how often were

12 you really around if you were doing -- were you doing

13 long haul trucking or?

14    INMATE DANIEL:  Yeah, I as doing long haul and

15 local.

16    PRESIDING COMMISSIONER ENG:  Okay.  So there's a

17 lot of hours involved in that.

18    INMATE DANIEL:  A lot of hours.  I always made

19 time.

20    PRESIDING COMMISSIONER ENG:  You made time.  So I

21 still, you have to bridge this for me.

22    INMATE DANIEL:  Yes, Ma'am.

23    PRESIDING COMMISSIONER ENG:  Okay.  How is it

24 you're 22, you've got a responsible job, you were

25 working for your father making decent money, you were

1  making a lot more money in dealing drugs, so how do you

2  end up with a 17-year-old kid with a gun?  It doesn't

3  make sense to me.

4      **INMATE DANIEL:**  It don't make sense, but just

5  hanging around them type of people.  Like I said, he

6  went to school with my sister-in-law.  That's how I met

7  him and we struck up a conversation.  I would even take

8  him to work with me.  In a split second, our whole lives

9  was changed.

10      **PRESIDING COMMISSIONER ENG:**  Was he involved in

11  the other couple of carjackings too?

12      **INMATE DANIEL:**  No.

13      **PRESIDING COMMISSIONER ENG:**  And the other ones

14  where you were with -- were there usually one or two

15  additional people?

16      **INMATE DANIEL:**  Yeah.  Yes, Ma'am.

17      **PRESIDING COMMISSIONER ENG:**  And you were driving

18  your own car?

19      **INMATE DANIEL:**  Yes, Ma'am.

20      **PRESIDING COMMISSIONER ENG:**  And your crime

21  partners didn't have any cars?

22      **INMATE DANIEL:**  They didn't have any cars.

23      **PRESIDING COMMISSIONER ENG:**  Okay.  So each one

24  of those times, you knew that you were going out looking

25  for --

51

1        INMATE DANIEL:  To steal a car.

2        PRESIDING COMMISSIONER ENG:  Okay.  Had you ever

3   owned a weapon before or used one?

4        INMATE DANIEL:  No, I never owned a weapon.

5        PRESIDING COMMISSIONER ENG:  Have you used one?

6        INMATE DANIEL:  But I (inaudible), yeah.

7        PRESIDING COMMISSIONER ENG:  Okay.  So was it

8   really any surprise to you when you heard the gunshot

9   that night?

10       INMATE DANIEL:  It surprised me because it went

11  through me.  It was like, when I heard that shot, it was

12  like, it seemed like I was dead.  You know, I would say

13  to myself that if I can go back to that night, if I knew

14  somebody was going to get hurt, I would have took my

15  life to keep his life.

16       PRESIDING COMMISSIONER ENG:  But after you heard

17  the shot, you really didn't know, did you?

18       INMATE DANIEL:  I didn't know what happened.

19  See, because what happened, when I left and got back to

20  the house, I asked him what happened.  And it was just

21  like, we were stunned.  Everybody was quiet.

22       PRESIDING COMMISSIONER ENG:  So he took off in

23  the car.

24       INMATE DANIEL:  He took off.  I was behind the

25  gas station, so when I heard the shot, I took off.

1          **PRESIDING COMMISSIONER ENG:**  Because he told you

2     that he ended up --

3          **INMATE DANIEL:**  When I heard the shot, before I

4     even left, before it even -- when it was not up in

5     there, that you'll probably read, is the day of the

6     crime, I was with my kids' mother, their family all day.

7     In a split second, she said, don't go with them.  She

8     said in a split second, don't go with them.  You'll get

9     a life sentence just like that.  (Inaudible) revelation

10    (inaudible) and the lifestyle I was living, it was

11    painful.

12         **PRESIDING COMMISSIONER ENG:**  Yeah.  Whose idea

13    was it to carjack?

14         **INMATE DANIEL:**  We was just all in it together,

15    just go steal some cars.

16         **PRESIDING COMMISSIONER ENG:**  And you, with the

17    intent that you would be able to strip them and sell off

18    the parts?

19         **INMATE DANIEL:**  That's it.  That's right.

20         **PRESIDING COMMISSIONER ENG:**  You weren't making

21    enough money dealing coke?

22         **INMATE DANIEL:**  I had stopped selling drugs then.

23    I stopped selling drugs.  I started driving trucks with

24    my dad and my dad was telling me, you're hanging out

25    with some rough customers.  I said, it's going to be all

1  right.  As soon as I went on the right path for a split

2  second.

3        **PRESIDING COMMISSIONER ENG:**  But then you decided

4  to go carjack and --

5        **INMATE DANIEL:**  It was all over.

6        **PRESIDING COMMISSIONER ENG:**  -- make additional

7  money that way.

8        **INMATE DANIEL:**  Right.

9        **PRESIDING COMMISSIONER ENG:**  Okay.  Did you ever

10  get married?

11        **INMATE DANIEL:**  No, Ma'am.

12        **PRESIDING COMMISSIONER ENG:**  Okay.  So you were

13  kidnapped shortly thereafter.  You said that that

14  happened December 13th, so about a week and a half

15  after, after the shooting.  You were stabbed, correct?

16        **INMATE DANIEL:**  Yes, Ma'am.

17        **PRESIDING COMMISSIONER ENG:**  What happened with

18  that?  I mean, you obviously went to the hospital or no?

19        **INMATE DANIEL:**  To the hospital, I was stabbed

20  and that was it.

21        **PRESIDING COMMISSIONER ENG:**  Was there a police

22  report?

23        **INMATE DANIEL:**  There was a police report after

24  that.  Then right at that, that's when I turned myself

25  in.  I told my parents what happened and turned myself

1  in.

2      **PRESIDING COMMISSIONER ENG:** Well, here it --

3  Okay. Here it states, the kidnap and assault he was a

4  victim of after his crime was possibly gang related

5  retaliation by the murder victim's associates. That was

6  that Grape whatever street --

7      **INMATE DANIEL:** Yeah.

8      **PRESIDING COMMISSIONER ENG:** -- Crips gang. It

9  says that Daniel states the victim's friends were

10  responsible for his kidnap and assault. And then in

11  parenthesis, it says the ASP institutional gang

12  investigator noted that Daniel admitted to being a two

13  year member of the, quote, Long Beach Insane Crips,

14  unquote, street gang. But you had not had any gang

15  involvement while in prison. So you had been a member?

16      **INMATE DANIEL:** When on the streets or in prison?

17  I wasn't a gang member on the street at all, period.

18      **PRESIDING COMMISSIONER ENG:** You weren't.

19      **INMATE DANIEL:** No, Ma'am.

20      **PRESIDING COMMISSIONER ENG:** But you were in

21  prison?

22      **INMATE DANIEL:** What it was, when you first came

23  to prison, whoever you hung around, that's how they

24  documented you. So when I came in, I clinged to the

25  people I knew in Long Beach and that's who I hung

1   around.

2          **PRESIDING COMMISSIONER ENG:**  Because then this

3   says that you did not have any gang involvement while in

4   prison.

5          **INMATE DANIEL:**  That's right.

6          **PRESIDING COMMISSIONER ENG:**  So it infers that

7   you were a two year member with the Long Beach Insane

8   Crips while on the streets.

9          **INMATE DANIEL:**  No, that's just a misquoted

10  statement.

11         **PRESIDING COMMISSIONER ENG:**  Okay.

12         **INMATE DANIEL:**  I admitted that at Avenal State

13  Prison.

14         **PRESIDING COMMISSIONER ENG:**  Okay.  Well, I just

15  wanted to be sure --

16         **INMATE DANIEL:**  Yeah.

17         **PRESIDING COMMISSIONER ENG:**  -- I understood

18  that.

19         **INMATE DANIEL:**  Yeah.

20         **PRESIDING COMMISSIONER ENG:**  Because I obviously

21  misread that.

22         **INMATE DANIEL:**  Yeah.

23         **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.  Okay,

24  no military.

25         **INMATE DANIEL:**  No.

1    **PRESIDING COMMISSIONER ENG:**  Okay.  It says that

2  you have two children?

3    **INMATE DANIEL:**  Yes.

4    **PRESIDING COMMISSIONER ENG:**  Demetrius, Jr. and

5  Jerrell (phonetic)?

6    **INMATE DANIEL:**  Yeah, Jerrell.

7    **PRESIDING COMMISSIONER ENG:**  Jerrell, okay, but

8  you never married.

9    **INMATE DANIEL:**  Never married.

10    **PRESIDING COMMISSIONER ENG:**  Okay.  So where are

11  your kids today?

12    **INMATE DANIEL:**  Both of my sons are doing good.

13  I've got one son that goes to Cerritos College.  He's an

14  engineer.  And my baby, he's in Palm Springs.  He plays

15  basketball.

16    **PRESIDING COMMISSIONER ENG:**  Okay.  Are they two

17  separate mothers?

18    **INMATE DANIEL:**  Yes, Ma'am.

19    **PRESIDING COMMISSIONER ENG:**  Okay.  Do you have

20  relationships still with both the mothers?

21    **INMATE DANIEL:**  Yeah.

22    **PRESIDING COMMISSIONER ENG:**  Okay.  And the boys?

23    **INMATE DANIEL:**  Yeah.

24    **PRESIDING COMMISSIONER ENG:**  So do you ever talk

25  to them about why you're here?

1    **INMATE DANIEL:**  I tell them the truth, how I got

2    caught up, hanging around the wrong people and not being

3    responsible for your own actions.  Everything is, you've

4    got to be accountable.  You've got to be in control of

5    every situation.

6    **PRESIDING COMMISSIONER ENG:**  Demetrius, Jr., did

7    he ever have any problems?

8    **INMATE DANIEL:**  No, a good kid.

9    **PRESIDING COMMISSIONER ENG:**  No gang problems?

10   Does it ever worry you?

11   **INMATE DANIEL:**  No.  The reason, because I stay

12   in contact with him.  I let him know what I went through

13   and what I had did to change my life up in here.

14   **PRESIDING COMMISSIONER ENG:**  Do you ever get to

15   see them?

16   **INMATE DANIEL:**  Yeah.

17   **PRESIDING COMMISSIONER ENG:**  How about --

18   **INMATE DANIEL:**  I haven't seen the baby, but I

19   see Demetrius, Jr. all the time.

20   **PRESIDING COMMISSIONER ENG:**  What about your

21   brother and your sister?

22   **INMATE DANIEL:**  Yeah.  I just seen -- I've got a

23   picture of them.

24   **PRESIDING COMMISSIONER ENG:**  Okay.  Are your

25   parents still alive?

1          **INMATE DANIEL:**  Yes, Ma'am.

2          **PRESIDING COMMISSIONER ENG:**  Okay.  Are both of

3   them still down in Southern California?

4          **INMATE DANIEL:**  Yes, Ma'am.

5          **PRESIDING COMMISSIONER ENG:**  And you're in touch

6   with both of them?

7          **INMATE DANIEL:**  Yes, Ma'am.

8          **PRESIDING COMMISSIONER ENG:**  Have I missed

9   anything in terms of your prior record or your personal

10  history?

11         **INMATE DANIEL:**  No, that's everything.

12         **PRESIDING COMMISSIONER ENG:**  Well, if you think

13  of something, you can always add it back in.

14         **INMATE DANIEL:**  Yeah.

15         **PRESIDING COMMISSIONER ENG:**  Okay.  Right now

16  Commissioner Herron is going to bring us up to date on

17  what you've been doing post-conviction, okay?

18         **DEPUTY COMMISSIONER HERRON:**  Okay.  I'm going to

19  cover the period of time since your last hearing.  Okay.

20  Before I go there, I just need to ask you, just a couple

21  of questions about your commitment offense.  Why is it

22  that you stopped selling drugs?

23         **INMATE DANIEL:**  Why?

24         **DEPUTY COMMISSIONER HERRON:**  Uh-hmm.

25         **INMATE DANIEL:**  Because it was the right thing to

1  do.

2      **DEPUTY COMMISSIONER HERRON:**  Okay.  So I'm trying

3  to figure, I need help.  Walk me through this.  You

4  stopped selling drugs because it was the right thing to

5  do but you participated as a principal in the

6  carjacking.  Was that the right thing to do?

7      **INMATE DANIEL:**  It wasn't the right thing to do.

8      **DEPUTY COMMISSIONER HERRON:**  So help me bridge

9  this gap here.  How is it not right to sell drugs, but

10  right to carjack?  And you indicated that you did it

11  more than once.

12      **INMATE DANIEL:**  Well, at that time, the way I was

13  thinking, I didn't really care.  So therefore, when I

14  stopped drugs, my son's mother said, you need to stop

15  selling drugs.  So I did that for her but still --

16      **DEPUTY COMMISSIONER HERRON:**  Because that was the

17  right thing.

18      **INMATE DANIEL:**  That was the right thing to do.

19      **DEPUTY COMMISSIONER HERRON:**  Was it the right

20  thing at that time when you were 26 years old or 22 to

21  stop selling drugs?  Was it the right thing to do?

22      **INMATE DANIEL:**  It was the right thing to do.  To

23  stop selling drugs at 22.

24      **DEPUTY COMMISSIONER HERRON:**  Is that the way you

25  looked at it then?

1        **INMATE DANIEL:**  Yeah, it was the right thing to

2  do.

3        **DEPUTY COMMISSIONER HERRON:**  Okay.  So how do we

4  get to carjacking?

5        **INMATE DANIEL:**  Still hanging around bad people,

6  still associating with people that's another world in

7  the street.

8        **DEPUTY COMMISSIONER HERRON:**  Okay.

9        **INMATE DANIEL:**  And I take full responsibility.

10       **DEPUTY COMMISSIONER HERRON:**  I understand.  So

11  after you hear the shot and everybody runs back to your

12  house where you were having Thanksgiving dinner, right?

13       **INMATE DANIEL:**  Yeah.

14       **DEPUTY COMMISSIONER HERRON:**  Thanksgiving Day?

15       **INMATE DANIEL:**  Yeah.

16       **DEPUTY COMMISSIONER HERRON:**  And so did you guys

17  talk about what happened?

18       **INMATE DANIEL:**  It was -- It was quiet.  Didn't

19  hear anything.

20       **DEPUTY COMMISSIONER HERRON:**  How come?

21       **INMATE DANIEL:**  I was spooked as to why.  Because

22  when you're out there doing something wrong like that,

23  we never thought nobody would get shot if you're just

24  stealing cars.

25       **DEPUTY COMMISSIONER HERRON:**  So why would you

1  have a gun?

2       INMATE DANIEL:  Huh?

3       DEPUTY COMMISSIONER HERRON:  Why would there be a

4  gun present?

5       INMATE DANIEL:  Just for protection because of

6  the lifestyle that we were leading.

7       DEPUTY COMMISSIONER HERRON:  And so it just so

8  happens that the person that was carjacked and killed is

9  a rival gang member?

10       INMATE DANIEL:  Not of mine, because we wasn't in

11  a gang.  We didn't know he was in a gang.

12       DEPUTY COMMISSIONER HERRON:  Okay.

13       INMATE DANIEL:  So we didn't know.

14       DEPUTY COMMISSIONER HERRON:  Would that made a

15  difference?

16       INMATE DANIEL:  Huh?

17       DEPUTY COMMISSIONER HERRON:  Would that have made

18  a difference?

19       INMATE DANIEL:  It wouldn't have made a

20  difference because if you're doing wrong, you're doing

21  wrong.

22       DEPUTY COMMISSIONER HERRON:  Okay.  And then so

23  the reason that everybody found about you, because

24  somebody that you were with was in the neighborhood

25  talking about what you guys had done?

1      INMATE DANIEL:  Yes, Sir.

2      DEPUTY COMMISSIONER HERRON:  Who was that?

3      INMATE DANIEL:  My other crime --

4      DEPUTY COMMISSIONER HERRON:  The one that, the

5  trigger person?

6      INMATE DANIEL:  No, the other guy.

7      DEPUTY COMMISSIONER HERRON:  And so was he

8  boasting about it?

9      INMATE DANIEL:  I guess.  I don't know.  He just

10  said we all committed the crime.

11      DEPUTY COMMISSIONER HERRON:  But he put your name

12  out on the street.

13      INMATE DANIEL:  Put our name out there and that

14  was it.  And when they see me, go ahead.

15      DEPUTY COMMISSIONER HERRON:  So how did your --

16  How did the police arrest your co-offenders?

17      INMATE DANIEL:  Two of us turned ourselves in and

18  the other one, they came and got the other person.

19      DEPUTY COMMISSIONER HERRON:  And when you turned

20  yourself in, you gave a statement?

21      INMATE DANIEL:  Yeah.  I accept full

22  responsibility for what I did.

23      DEPUTY COMMISSIONER HERRON:  And you told them

24  everything that you just told us here today?

25      INMATE DANIEL:  Yeah.

1       **DEPUTY COMMISSIONER HERRON:** And what happened to

2   your co-offenders?

3       **INMATE DANIEL:** I couldn't tell you, Sir, to be

4   honest with you. It's like once we came to prison, all

5   the associations, it was disassembled. It was over

6   with.

7       **DEPUTY COMMISSIONER HERRON:** Okay.

8       **PRESIDING COMMISSIONER ENG:** Hold on one second.

9   Before I forget, while we've got the momentum going,

10  okay, you just told Commissioner Herron that one of your

11  crime partners was boasting out on the street.

12      **INMATE DANIEL:** Yeah.

13      **PRESIDING COMMISSIONER ENG:** Okay. After,

14  shortly thereafter, is that when you were kidnapped?

15      **INMATE DANIEL:** I was kidnapped right after that.

16      **PRESIDING COMMISSIONER ENG:** Did anything happen

17  to your crime partners?

18      **INMATE DANIEL:** No, Ma'am. The only one was me.

19      **PRESIDING COMMISSIONER ENG:** Just you.

20      **INMATE DANIEL:** Just me.

21      **PRESIDING COMMISSIONER ENG:** Okay. Okay, go

22  ahead.

23      **DEPUTY COMMISSIONER HERRON:** Interesting. Okay,

24  we're going to move along here and I'm just going to

25  review what you've accomplished since your last hearing,

1   which was on February the 7th of '06.  Is that correct,

2   sir?

3          INMATE DANIEL:  Yes.

4          DEPUTY COMMISSIONER HERRON:  And at that time,

5   you were denied parole for one year.

6          INMATE DANIEL:  Yes.

7          DEPUTY COMMISSIONER HERRON:  And so you're back

8   here again today.  You were received at San Quentin on

9   30 August '05.  Is that correct?

10         INMATE DANIEL:  (Inaudible.)

11         DEPUTY COMMISSIONER HERRON:  And currently, your

12  classification score is 19, which is the lowest, I think

13  that you can get.

14         INMATE DANIEL:  Yeah.

15         DEPUTY COMMISSIONER HERRON:  You've had no 115s

16  since your last hearing and your last 115 was way back

17  in 1996.  You've been, like disciplinary free for 11

18  years.

19         INMATE DANIEL:  Yes, Sir.

20         DEPUTY COMMISSIONER HERRON:  And you, like I say,

21  you've had a total of three 115s since you've been at

22  the --

23         INMATE DANIEL:  Incarcerated.

24         DEPUTY COMMISSIONER HERRON:  -- Department of

25  Corrections and Rehabilitation.  You've had no 128(a)s

1  since your last hearing.  Your last one was on 11/28 of

2  '95 for excessive contact with a visitor.  Since you've

3  been incarcerated, you've had a total of three 128(a)s,

4  is that correct, sir?

5      INMATE DANIEL:  Yes, Sir.

6      DEPUTY COMMISSIONER HERRON:  Okay.  Moving along

7  positively, 12/7 of '06, you volunteered for the World

8  AIDS Day as a peer health educational facilitator?

9      INMATE DANIEL:  Yeah.

10     DEPUTY COMMISSIONER HERRON:  And what did you do?

11     INMATE DANIEL:  What you do is speak about AIDS,

12 how to protect yourself against AIDS and HIV.

13     DEPUTY COMMISSIONER HERRON:  And how do you know

14 about that?

15     INMATE DANIEL:  I went to a class for it

16 (inaudible).

17     DEPUTY COMMISSIONER HERRON:  Okay, 12/14/06, you

18 donated from your personal account to buy candy from the

19 -- for the 18th Annual Holiday Toy Program?

20     INMATE DANIEL:  Yeah, the Holiday Toy Program.

21     DEPUTY COMMISSIONER HERRON:  How much did you

22 donate?

23     INMATE DANIEL:  Huh?

24     DEPUTY COMMISSIONER HERRON:  How much did you

25 donate?

1       INMATE DANIEL:  About 20 bucks.

2       DEPUTY COMMISSIONER HERRON:  Do you do that every

3 year?

4       INMATE DANIEL:  Yeah.

5       DEPUTY COMMISSIONER HERRON:  How many years have

6 you been doing it for?

7       INMATE DANIEL:  About seven years total.

8       DEPUTY COMMISSIONER HERRON:  Okay.  All right.

9 And let me change this.

10            (Thereupon, the tapes were

11            turned over off the record.)

12       DEPUTY COMMISSIONER HERRON:  Okay.  We're back on

13 the record.  Self-help, I -- Well, you have another

14 positive chrono.  It was on 12/18/06 where you received

15 a letter from the St. Vincent (inaudible) Dining Room

16 for some type of donation.

17       INMATE DANIEL:  Yeah, donating food to them.

18       DEPUTY COMMISSIONER HERRON:  How do you -- How do

19 you donate food?

20       INMATE DANIEL:  We had a -- We had a banquet and

21 we had about 3000 dollars worth of food and we donated

22 it to them.

23       DEPUTY COMMISSIONER HERRON:  A banquet here?

24       INMATE DANIEL:  Yeah.

25       DEPUTY COMMISSIONER HERRON:  Okay.  And that food

1   was donated to (inaudible)?

2          INMATE DANIEL:  No, donated to them.

3          DEPUTY COMMISSIONER HERRON:  I see.  Yeah, self-

4   help-wise, you've been busy since your last hearing.  On

5   3/27/06 to 6/19 of '06, you completed the 16 week Impact

6   Workshop.

7          INMATE DANIEL:  Yes.

8          DEPUTY COMMISSIONER HERRON:  And I see in your C-

9   File that there are chronicles for, like every month for

10  each portion of that workshop that you completed.  On

11  7/24 of '06, you completed No More Tears and that's a

12  Response to Violence Workshop.

13         INMATE DANIEL:  Yeah.

14         DEPUTY COMMISSIONER HERRON:  Nine-twenty

15  September of '05 to August of '06, you completed in

16  August of '06, Changing your Mindset Workshop.  What

17  does that talk about?

18         INMATE DANIEL:  Well, take away your old values

19  versus your new values.

20         DEPUTY COMMISSIONER HERRON:  I see.  October 1st

21  of '06 to October 4th of '06, you participated in the

22  Amicable Roundtable Responsibility, Rehabilitation and

23  Restoration?

24         INMATE DANIEL:  Restorative Justice.

25         DEPUTY COMMISSIONER HERRON:  Restorative Justice.

1    March of '06 to October of '06, you completed a 16 week

2    course on Non-Violent --

3              INMATE DANIEL:  Communication.

4              DEPUTY COMMISSIONER HERRON:   -- Communication.

5    April of '06 to November of '06, you completed the TRUST

6    Program, Teach Responsibility and Utilizing Sociological

7    Training.  What is that?

8              INMATE DANIEL:  It's a man -- It's a group that

9    I'm a part of and what we do is give man the tools to

10   change their lives around.  And what we do, we teach 22

11   sessions to look within yourself, instead of blaming it

12   other people, just give you other ways just to

13   communicate, to talk and to be accountable for your

14   actions.  Go back out there and make restitution, give

15   something back to your community.

16             DEPUTY COMMISSIONER HERRON:  Does it work?

17             INMATE DANIEL:  Yes, it works.

18             DEPUTY COMMISSIONER HERRON:  You've had success

19   stories?

20             INMATE DANIEL:  Yes.

21             DEPUTY COMMISSIONER HERRON:  November of '06 to

22   December of '06, New Leaf on Life Program you committed

23   -- completed?

24             INMATE DANIEL:  Yes.

25             DEPUTY COMMISSIONER HERRON:  And that is?

1      INMATE DANIEL:  Basically preparing you for the

2  Board, how to have your stuff in order.

3      DEPUTY COMMISSIONER HERRON:  And I found it

4  interesting that since 1994 and continuing through now

5  that you have participated in AA and you indicated to

6  Commissioner Eng that you didn't use drugs or alcohol or

7  --

8      INMATE DANIEL:  No.

9      DEPUTY COMMISSIONER HERRON:  So what did you get

10  out of AA?  What did it do for you?

11      INMATE DANIEL:  First and foremost, when I

12  started going to AA, you just listen to stories.  But

13  the key thing that hit me when I went (inaudible), I

14  said I'm in here because I was addicted to a lifestyle

15  of selling drugs, addicted to this, so I jumped up in

16  there and never looked back.

17      DEPUTY COMMISSIONER HERRON:  And you're still

18  doing that now --

19      INMATE DANIEL:  Yes.

20      DEPUTY COMMISSIONER HERRON:  -- as we speak?

21      INMATE DANIEL:  Yes.

22      DEPUTY COMMISSIONER HERRON:  Okay.  You're

23  assigned to, or you're a clerk in the Reentry Program.

24      INMATE DANIEL:  Yes.

25      DEPUTY COMMISSIONER HERRON:  And you've received

1   exceptional reports your C-File indicates.

2        **INMATE DANIEL:**  Yes.

3        **DEPUTY COMMISSIONER HERRON:**  And what are your

4   duties?

5        **INMATE DANIEL:**  Reentry is Breaking Barriers.

6   What you do is you have 28 men in there every three

7   weeks and what you do is you give them a 14 day plan and

8   they plan their lives.  Make sure the first 14 days are

9   the most important days of their life when they get out

10  there and then you ask them to go back and see where

11  they went wrong at in their life.

12       And then what I do is give a testimony of my

13  story, how I got caught up, so they don't get caught up.

14  Just be accountable for yourself and stop being

15  immature.  Be mature.  You can't change the past, but

16  all you can do is continue to make up and every day

17  strive to better yourself.

18       **DEPUTY COMMISSIONER HERRON:**  Okay, very well.  I

19  want to shift your attention to the psychological

20  assessment that was completed by Richard Starrett,

21  Ph.D., S-T-A-R-R-E-T-T, for the record.  It was

22  completed on August the 26th of '05.

23       **INMATE DANIEL:**  Yes.

24       **DEPUTY COMMISSIONER HERRON:**  And in this report,

25  he talks about your Assessment of Dangerousness.  You

1   saw that?

2        INMATE DANIEL:  Yes.

3        DEPUTY COMMISSIONER HERRON:  I'm going to read a

4   little bit in for the record.  It says in order to

5   determine the inmate's risk of representing a

6   substantial danger of physical harm to others, you were

7   assessed on a number of research derived risk factors

8   that are associated with an increased risk for future

9   violence.

10       And that takes into account the history of

11  violence, where you indicated that you would rate in the

12  low range, in terms of your likelihood to commit future

13  violent acts.  The inmate's compliance with Board

14  requests and treatment and it talks about you being

15  disciplinary free, as we spoke of earlier, for 11 years.

16  And then it talks about your activity and self-help.

17  And your serious commitment to AA, NA.  And he indicates

18  that you've over-applied with all Board requests.  What

19  does that mean to you?

20       INMATE DANIEL:  What he's saying, I did

21  everything I can possibly can do within prison.

22       DEPUTY COMMISSIONER HERRON:  You have a

23  dedication to working with youths.

24       INMATE DANIEL:  Yes.

25       DEPUTY COMMISSIONER HERRON:  Substance abuse is

1        PRESIDING COMMISSIONER ENG:  Right.  So you

2    didn't even wait around to see --

3        INMATE DANIEL:  I didn't wait around.

4        PRESIDING COMMISSIONER ENG:  -- if he got a car

5    or if he was shot or anybody was shot?

6        INMATE DANIEL:  Anything.

7        PRESIDING COMMISSIONER ENG:  Okay.

8        INMATE DANIEL:  I took off.

9        PRESIDING COMMISSIONER ENG:  You took off and you

10   went right to your house?

11       INMATE DANIEL:  I went straight to my house.

12       PRESIDING COMMISSIONER ENG:  And what was the

13   plan, that once he got the -- once he jacked the car,

14   that he was going to drive and meet you back at your

15   house?

16       INMATE DANIEL:  The plan was this.  If we was to

17   get the car, was to strip the car down.  The plan was,

18   the opportunity was not to hurt nobody or anything like

19   that, because we had never planned to kill anybody.

20       PRESIDING COMMISSIONER ENG:  You just wanted to

21   get a car.

22       INMATE DANIEL:  Steal a car, strip it down and

23   sell it for money.  That was it.  Then when I got back

24   to the house, I was there before him and busted down

25   like a baby and started crying.

1    not an issue.  There are no mental health issues.  It

2    talks about your insight.  That you have excellent

3    insight into the crime and yourself.  You accept your

4    responsibility and express sincere remorse, he

5    indicates.

6        In rating you in the clinical factor, you would

7    rate in the low range for future violence.  He indicates

8    that you've made excellent plans in many areas and that

9    you have all the bases covered.  Again, he reiterates

10   that you would rate in the low range, in terms of risk

11   management for the future.

12       And he summarizes by basically stating the same

13   thing that I've just read to you and that was done on

14   August the 26th of '05.  His Diagnostic Impressions, on

15   Axis I indicates Polysubstance Abuse in institutional

16   remission for 10 years.  And you've been in treatment,

17   he indicates for 11 years.  Axis II, Adult Antisocial

18   Personality Traits, he says in complete remission.  Axis

19   III is deferred.  Axis IV, psychosocial stressors, he

20   says none and incarceration.  And Axis V, you've got a

21   GAF score of 90.

22       Did I leave anything out in the things that

23   you've accomplished since your last hearing?

24       **INMATE DANIEL:**  It's a few more things.

25       **DEPUTY COMMISSIONER HERRON:**  Well, tell us.

1       INMATE DANIEL:  I'm in VOEG, Victims' Offender

2  Education Group.

3       DEPUTY COMMISSIONER HERRON:  And how recently did

4  you start that, sir?

5       INMATE DANIEL:  That's about six months ago.

6  It's a seven month class.

7       DEPUTY COMMISSIONER HERRON:  And have you

8  received any --

9       INMATE DANIEL:  No, you don't get no

10  certificates.

11       DEPUTY COMMISSIONER HERRON:  I didn't see it in

12  your C-File.

13       INMATE DANIEL:  Yeah.

14       DEPUTY COMMISSIONER HERRON:  That's why I'm

15  asking.

16       INMATE DANIEL:  Yeah.

17       PRESIDING COMMISSIONER ENG:  Okay.

18       INMATE DANIEL:  And I'm in Project Choice.

19  That's not up in there.  There's a lot of stuff that's

20  missing, but what Victims' Offender Education Group is,

21  what it does, it prepares you for (indiscernible) the

22  victim and the perpetrator together, we can build a

23  bridge.

24       DEPUTY COMMISSIONER HERRON:  I see.

25       INMATE DANIEL:  And go through the (inaudible)

1 and all the reminders that a person has went through for

2 the act that you have caused, the harm, to find out what

3 harm, what was the harm done on both sides.

4     DEPUTY COMMISSIONER HERRON:  And Project Choice

5 is like a transitioning to parole?

6     INMATE DANIEL:  What it is --

7     DEPUTY COMMISSIONER HERRON:  Where you're set up

8 with employment and --

9     INMATE DANIEL:  No.

10     DEPUTY COMMISSIONER HERRON:  -- the educational

11 opportunities?

12     INMATE DANIEL:  Basically, what Project Choice

13 is, what they're doing is they're working with guys from

14 18 to 30 and what we do is prepare these guys and give

15 them all kinds of tools, as far as lazy thinking,

16 positive, you know, give yourself positive affirmations

17 to continue to do what's right, to be accountable.  Not

18 to be, you know, recycled in and out of the system.

19     DEPUTY COMMISSIONER HERRON:  And so Project

20 Choice is primarily for Alameda County, huh?

21     INMATE DANIEL:  Yes.

22     DEPUTY COMMISSIONER HERRON:  So somebody going

23 back to your county would not be -- could not avail

24 themselves of those (inaudible).

25     INMATE DANIEL:  Well, they can, because they've

1  still got -- I'm still a part of Amer-I-Can with Jim

2  Brown and we've still got ways that we can help these

3  guys.  The key is not to give up on nobody.  Give

4  everybody an opportunity.

5          DEPUTY COMMISSIONER HERRON:  Very well.  And just

6  one last question and then I'm going to turn you back

7  over to Commissioner Eng.

8          INMATE DANIEL:  You didn't speak on Real Choices.

9  Did you see anything on Real Choices?

10          DEPUTY COMMISSIONER HERRON:  No.  No.  And how

11  recent was it?  How recent?

12          INMATE DANIEL:  Recent?  Now.

13          DEPUTY COMMISSIONER HERRON:  No.  Well, I didn't

14  see anything.  You're asking me if I saw anything in

15  your C-File?

16          INMATE DANIEL:  Yeah.

17          DEPUTY COMMISSIONER HERRON:  No.

18          INMATE DANIEL:  I got -- I put a newspaper

19  clipping in there.  It had a picture of me and a young

20  kid.

21          DEPUTY COMMISSIONER HERRON:  No, I sure don't.

22          ATTORNEY CHRISTENSEN:  It's in there.

23          DEPUTY COMMISSIONER HERRON:  When you -- When you

24  reviewed it, did you see it?

25          INMATE DANIEL:  Yeah.  I can see it from here.

1    It's folded, right there.

2          DEPUTY COMMISSIONER HERRON:  I've got it.

3          INMATE DANIEL:  I can see it right here.

4          DEPUTY COMMISSIONER HERRON:  Okay.  All right,

5    very well.  You were going to parole -- given a parole

6    date once before?

7          INMATE DANIEL:  Yes.

8          DEPUTY COMMISSIONER HERRON:  In?

9          INMATE DANIEL:  Two-thousand-five.

10         DEPUTY COMMISSIONER HERRON:  How did you feel

11   when it was overturned?

12         INMATE DANIEL:  At first, I thought about it and

13   I said to myself, since I surrendered my life over to my

14   Lord and Savior, Jesus Christ, I had a vision that it

15   was going to be taken.

16         So what I did, once it got taken, I still

17   continued to do what I had to do, resiliency, the

18   ability to bounce back up and to continue to keep going.

19         DEPUTY COMMISSIONER HERRON:  All right, sir.

20   Thank you very much.

21         INMATE DANIEL:  You're welcome.

22         DEPUTY COMMISSIONER HERRON:  Commissioner Eng?

23         PRESIDING COMMISSIONER ENG:  Okay.  Right now

24   what I'd like to do is go ahead and go over your parole

25   plans.  And after we do all of that, then we'll get back

1    and open it up for questions.

2          INMATE DANIEL:  Yes.

3          PRESIDING COMMISSIONER ENG:  Follow-up questions,

4    okay?

5          INMATE DANIEL:  Yes.

6          PRESIDING COMMISSIONER ENG:  So regarding your

7    parole plans, it states here and we finally got an

8    updated March 2007 Board report and it states here under

9    your future plans for residence, that you plan to reside

10   with your aunt.

11         INMATE DANIEL:  Yes.

12         PRESIDING COMMISSIONER ENG:  Erma Varnado.

13         INMATE DANIEL:  Yes.

14         PRESIDING COMMISSIONER ENG:  And provides an

15   address.  She lives in Long Beach.

16         INMATE DANIEL:  Yes.

17         PRESIDING COMMISSIONER ENG:  And provided her

18   phone number, all of her phone numbers.  And that your

19   backup plan is to parole to live with your father.

20         INMATE DANIEL:  Yes.

21         PRESIDING COMMISSIONER ENG:  Henry Daniel, who

22   lives in Paramount.

23         INMATE DANIEL:  Yes.

24         PRESIDING COMMISSIONER ENG:  Okay.  And then it

25   also goes on, in terms of employment, that you would

1  like to work as a laborer, setting up concert stages for

2  Century Trade Show Services in Anaheim.  I thought I saw

3  a letter about that.

4          INMATE DANIEL:  Yes.

5          PRESIDING COMMISSIONER ENG:  The general manager

6  is Ralph Holiday.  It states that, yeah, you do have a

7  job offer, a letter from 2006, however, you are awaiting

8  a current job offer letter.  And that you also received

9  a letter from the EDD, dated January 2nd, indicating

10  they will provide you with job placement assistance upon

11  release.

12          Okay, I'll go back and if I miss anything,

13  instead of reading all of this, if I go ahead and let's

14  hit the letters and you pay attention and see if I've

15  missed anything, okay?  Because I know we have quite a

16  few letters.  Most of those were, came recently, I

17  believe.  Yeah, let me make sure.  Yeah, there is -- We

18  do have, all right.  I have one stuck in here.  Okay,

19  I'll make sure that that's in there.

20          Okay, so this first pile that I have, I sort of

21  separated them all out as best I could.  It's a

22  handwritten letter and it's signed by Evangelist Sarah

23  Delany?

24          INMATE DANIEL:  Yes, Ma'am.

25          PRESIDING COMMISSIONER ENG:  D-E-L-A-N-Y.  And I

1  tried to get through these very quickly before we

2  started the hearing, so if I miss something, you need to

3  be able to point that out.  But I thought this was a

4  general support letter, because I didn't see anything

5  specific, what she was offering.  Is that true?

6          INMATE DANIEL:  Yes, Ma'am.

7          PRESIDING COMMISSIONER ENG:  Except it was

8  general support.

9          INMATE DANIEL:  Yes, Ma'am.

10          PRESIDING COMMISSIONER ENG:  Okay.  Okay.  And

11  I'm trying to see when the letter is dated, but I don't

12  see when it's dated, but I'm sure that it's a recent

13  letter.  And again, it's handwritten.

14          INMATE DANIEL:  Yes.

15          PRESIDING COMMISSIONER ENG:  And I don't see any

16  address for her either, so I don't know where that came

17  from, but that's all right.

18          The next letter is also a handwritten letter.

19  This is from Versie (phonetic) Riley?

20          INMATE DANIEL:  Yes.

21          PRESIDING COMMISSIONER ENG:  Okay, R-I-L-E-Y.

22  Okay.  There's no address, no date in that and no

23  signature either.

24          INMATE DANIEL:  What I do is I make copies of

25  every letter and I keep the original, so I know what

1    date they came and everything.

2        PRESIDING COMMISSIONER ENG:  Okay.  Let me take a

3    look at this, so I can put that --

4        INMATE DANIEL:  So, (inaudible).

5        PRESIDING COMMISSIONER ENG:  Okay.  So Versie

6    Riley lives in Compton.

7        INMATE DANIEL:  Yeah.

8        PRESIDING COMMISSIONER ENG:  And this is

9    postmarked January 22nd of 2007.  Okay.  And Versie is,

10   is this a friend of yours or a relative?

11       INMATE DANIEL:  A friend of the family.

12       PRESIDING COMMISSIONER ENG:  A friend of the

13   family.

14       INMATE DANIEL:  Yes, Ma'am.

15       PRESIDING COMMISSIONER ENG:  Okay.  So how long

16   have you known Versie?

17       INMATE DANIEL:  All my life.

18       PRESIDING COMMISSIONER ENG:  Is Versie a he or a

19   she?

20       INMATE DANIEL:  She's a she, Ma'am.

21       PRESIDING COMMISSIONER ENG:  Just making sure.

22   Nowadays it's difficult to tell sometimes with names.

23   Okay.  So this is Ms. Versie Riley.

24       INMATE DANIEL:  Yes, Ma'am.

25       PRESIDING COMMISSIONER ENG:  Okay.  All right, I

1  wanted to be sure about that.  So you've known her all

2  your life.  Did you grow up together?

3       INMATE DANIEL:  No, she's my mother's friend.

4       PRESIDING COMMISSIONER ENG:  She's your mother's

5  friend.

6       INMATE DANIEL:  She's my mother's friend.

7       PRESIDING COMMISSIONER ENG:  Okay.

8       INMATE DANIEL:  My mother's friend.

9       PRESIDING COMMISSIONER ENG:  All right.  It was

10  hard to -- I couldn't quite tell.  She just states, she

11  says, I, in parenthesis, Versie Riley, can assist

12  Demetrius Daniel in transportation and financial

13  support.  Daniel will have a way around to find a job.

14  Okay.  She says there's a lot of love that awaits him, a

15  mother that loves to touch or wants -- well, I can't

16  really tell what that is.  Oh well, okay, to laugh and

17  talk with Demetrius.  So, she's a good friend of your

18  mother.  Okay.  Did I miss anything in this?

19       INMATE DANIEL:  No.

20       PRESIDING COMMISSIONER ENG:  Okay.  The next

21  letter is dated January 9th of 2007, signed by Gregory

22  and Clarice Cook?

23       INMATE DANIEL:  Yes, my auntie.

24       PRESIDING COMMISSIONER ENG:  Okay.  So is --

25  Okay.  It says, states that -- your aunt and uncle?

1          INMATE DANIEL:  Yes.

2          PRESIDING COMMISSIONER ENG:  Okay.  Is this

3   really from your aunt or your uncle?

4          INMATE DANIEL:  That's from my aunt.

5          PRESIDING COMMISSIONER ENG:  Your aunt, okay.  I

6   went to spend several weekends with his mother, my

7   sister and they also visit me occasionally.  He's always

8   respected my husband and me.  Okay.  Okay.

9               "After his mother and father divorced, my

10         sister was left raising her children alone.

11         She's not been doing well since her son has been

12         in prison, so me, my husband, our family were

13         very shocked about his arrest."

14         So apparently you've kept in touch via writing

15   with your aunt and uncle.

16         INMATE DANIEL:  Yes, Ma'am.

17         PRESIDING COMMISSIONER ENG:  Okay.  She states,

18   we're willing to help him financially or if he needs

19   transportation also, to get back on his feet and be a

20   productive person to society.  So where do your aunt and

21   uncle live?

22         INMATE DANIEL:  She stays in Upland, California.

23         PRESIDING COMMISSIONER ENG:  Upland?

24         INMATE DANIEL:  Uh-hmm.

25         PRESIDING COMMISSIONER ENG:  Okay.  Okay.  How

1    far is Upland from the Compton area?

2         INMATE DANIEL:  From Long Beach?

3         PRESIDING COMMISSIONER ENG:  Yeah.

4         INMATE DANIEL:  Probably about 45 minutes.

5         PRESIDING COMMISSIONER ENG:  I'm trying to

6    remember where Upland is.  Okay.  We have another letter

7    dated 1/28/07, handwritten from your first cousin.

8         INMATE DANIEL:  Yeah.

9         PRESIDING COMMISSIONER ENG:  That must mean, am I

10   missing a second page?

11        INMATE DANIEL:  No, that's just one page.

12        PRESIDING COMMISSIONER ENG:  It's just one page?

13        INMATE DANIEL:  Yeah, (inaudible).

14        PRESIDING COMMISSIONER ENG:  I have, there it is.

15   Yeah.

16        INMATE DANIEL:  (Inaudible.)

17        PRESIDING COMMISSIONER ENG:  Terry Varnado,

18   V-A-R-N-A-D-O.  Okay.  You were raised together as

19   children.  Okay.  So is this -- This is a general

20   support letter too, is that correct?

21        INMATE DANIEL:  Yes, Ma'am.

22        PRESIDING COMMISSIONER ENG:  Okay.  Where does

23   your cousin live?

24        INMATE DANIEL:  She stays in LA.

25        PRESIDING COMMISSIONER ENG:  In LA?

1        INMATE DANIEL:  Uh-hmm.

2        PRESIDING COMMISSIONER ENG:  Okay.  So not too

3   far from the rest of the family.

4        INMATE DANIEL:  Yeah.

5        PRESIDING COMMISSIONER ENG:  Okay.  January 24th,

6   2006, wait a minute.  No, that's Terry, so this is Erma

7   Varnado in Long Beach.

8        INMATE DANIEL:  Right.

9        PRESIDING COMMISSIONER ENG:  And okay, so this is

10  Terry's mother?

11       INMATE DANIEL:  No.

12       PRESIDING COMMISSIONER ENG:  No?

13       INMATE DANIEL:  That's her auntie.

14       PRESIDING COMMISSIONER ENG:  Auntie, okay.

15       INMATE DANIEL:  That's my mother's maiden name,

16  Varnado.

17       PRESIDING COMMISSIONER ENG:  Okay.

18       INMATE DANIEL:  So them are sisters.

19       PRESIDING COMMISSIONER ENG:  All right.

20       INMATE DANIEL:  And Terry is my cousin by her

21  father.  Her father is my mother's brother.

22       PRESIDING COMMISSIONER ENG:  Got it.  Okay.  So

23  this is from your aunt --

24       INMATE DANIEL:  Yeah.

25       PRESIDING COMMISSIONER ENG:  -- Erma Varnado and

1   she said that she had been your babysitter since you

2   were three years old.  But she does -- So it's a general

3   support, but she does state that, you know:

4                "Please give him a chance to come out and

5           see the world again and make a new life with his

6           family and friends.  I will make sure he is taken

7           care of when he comes out.  He will have a place

8           to stay and a job of employment."

9           That's not the aunt, wait a minute, I'm trying to

10  remember.  Well, I'll find it.  That's not the aunt,

11  your first choice, is it?

12          **INMATE DANIEL:**  Yes, Ma'am.

13          **PRESIDING COMMISSIONER ENG:**  This one is?

14          **INMATE DANIEL:**  Yes.

15          **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.

16          **INMATE DANIEL:**  She works for the mayor of Long

17  Beach.

18          **PRESIDING COMMISSIONER ENG:**  Okay.  So she -- All

19  right.  She lives in number four on L Street, so what

20  does that mean?  What type of place does she have?

21          **INMATE DANIEL:**  She's got a condo.

22          **PRESIDING COMMISSIONER ENG:**  It's a condo.  How

23  large is it?

24          **INMATE DANIEL:**  It's a two bedroom.  She gots her

25  own sewing company.  She works.

1          PRESIDING COMMISSIONER ENG:  And who lives there
2    with her?
3          INMATE DANIEL:  She lives by herself.
4          PRESIDING COMMISSIONER ENG:  She's all alone?
5          INMATE DANIEL:  Yes.
6          PRESIDING COMMISSIONER ENG:  Okay.  Two bedroom,
7    two bath or one bath or?
8          INMATE DANIEL:  One bath.
9          PRESIDING COMMISSIONER ENG:  Okay.  So she does
10   have a spare bedroom?
11         INMATE DANIEL:  Yes, Ma'am.
12         PRESIDING COMMISSIONER ENG:  And you say, who
13   does she work for?
14         INMATE DANIEL:  She works for the city.  She
15   works for the mayor of Long Beach.
16         PRESIDING COMMISSIONER ENG:  Okay.  How long has
17   she been working there?
18         INMATE DANIEL:  About seven years.
19         PRESIDING COMMISSIONER ENG:  Okay.
20         ATTORNEY CHRISTENSEN:  Commissioner, he also has
21   some pictures of the car that's going to be given to him
22   for transportation.  Would you like to show her that?
23         INMATE DANIEL:  I was going to wait until she got
24   to that letter.
25         PRESIDING COMMISSIONER ENG:  Yeah, we'll wait.

1    The problem is, the more detail that's in the support

2    letter coming from the person, you know, that's what is

3    really important.  Because, we can't sit, you know,

4    people and I don't -- I don't know how well you know the

5    process.  The Panel is the first line.  Then it goes

6    through the Decision Review, where they scrutinize

7    everything.

8            And it's always a good idea, okay, and nobody has

9    to follow this.  But if you think about it, I believe

10   it's a good idea to not leave questions in people's

11   minds.  Okay.  Don't ever assume that people will

12   understand what your thought process is.  If it's not

13   down on paper, you know, leave as little to guesswork as

14   possible so that people don't have to keep digging and

15   digging and digging.

16           **INMATE DANIEL:**  Yeah.

17           **PRESIDING COMMISSIONER ENG:**  Okay.  So, because

18   if this is your number one person of where you want to

19   reside, I have to be honest with you, there's not a

20   whole lot of information here.

21           **INMATE DANIEL:**  Yeah.

22           **PRESIDING COMMISSIONER ENG:**  It's very, very

23   general.  I mean, you know, and I think that you, it

24   would be hard for you to disagree.  He will be taken

25   care of when he comes out.  He'll have a place to stay

69

1   and a job of employment.  Well, what does that mean?

2   It's not stating that you will be living with me, you

3   know, and you'll have your own bedroom.  So that's all

4   I'm saying.

5          INMATE DANIEL:  Okay.

6          PRESIDING COMMISSIONER ENG:  Okay.  So we'll set

7   that aside and we'll get more into that one.  So, okay,

8   then we have February 2nd, 2007, from a good friend of

9   yours, Lashonda Anderson?

10         INMATE DANIEL:  Yeah.  I've got it right here.

11         PRESIDING COMMISSIONER ENG:  Okay.  And Lashonda,

12  where does Lashonda live?

13         INMATE DANIEL:  She stays in Compton.

14         PRESIDING COMMISSIONER ENG:  She's in Compton?

15         INMATE DANIEL:  Yes, Ma'am.

16         PRESIDING COMMISSIONER ENG:  Okay.  How long have

17  you known Lashonda?

18         INMATE DANIEL:  Not long.  About 10 years.  She

19  works where my mother works at.

20         PRESIDING COMMISSIONER ENG:  So she know you

21  through your mother?

22         INMATE DANIEL:  Yeah.

23         PRESIDING COMMISSIONER ENG:  Okay.  All right.

24  Well, this is very nice.  She says, I, Lashonda Anderson

25  will also assist him with funds and transportation until

1    he gets on his feet.  So, have you ever talked to her

2    about that?

3            INMATE DANIEL:  Yes.

4            PRESIDING COMMISSIONER ENG:  So how much money is

5    she willing to help you out with?

6            INMATE DANIEL:  Anything that I need.

7            PRESIDING COMMISSIONER ENG:  So, does she have a

8    family or kids that she's supporting too?

9            INMATE DANIEL:  Yeah.  She's got -- She's got a

10   family.  She's got two young kids.

11           PRESIDING COMMISSIONER ENG:  Two young kids.  So

12   do you have any idea how much she would be able to

13   afford, in terms of helping you transition financially?

14           INMATE DANIEL:  To be honest with you --

15           PRESIDING COMMISSIONER ENG:  I think you see what

16   --

17           INMATE DANIEL:  I know what you're saying.

18           PRESIDING COMMISSIONER ENG:  You see what I'm

19   getting at.  Because when people are offering, it's

20   like, okay, how much are you really offering?  Are you

21   just saying that to be nice or?

22           INMATE DANIEL:  Yeah.

23           PRESIDING COMMISSIONER ENG:  Because reality is

24   this.  If and when you get a date and you step out

25   there, okay, you've been used to being incarcerated and

1   your meals are taken care of, your health care, a lot of

2   things are taken care of.

3          INMATE DANIEL:  Yes.

4          PRESIDING COMMISSIONER ENG:  It's very -- You,

5   yourself said you were addicted to the lifestyle --

6          INMATE DANIEL:  Yeah.

7          PRESIDING COMMISSIONER ENG:  -- that selling

8   drugs afforded to, which we're going to get into later.

9          INMATE DANIEL:  Right.

10         PRESIDING COMMISSIONER ENG:  But I want you to

11  put two and two together and think about, what's it

12  going to take for you to be able to be financially

13  independent out there.

14         INMATE DANIEL:  Right.

15         PRESIDING COMMISSIONER ENG:  Okay.  And you know

16  that once you walk out of here, you're going to need a

17  stable environment to be in for quite awhile.  And it

18  could take you, you know, I mean, everybody would like

19  to believe that, okay, in about a week I'll have a good

20  paying job, I'll have a place to live.

21         INMATE DANIEL:  It's a process.

22         PRESIDING COMMISSIONER ENG:  Reality is --

23         INMATE DANIEL:  Everything is a process.

24         PRESIDING COMMISSIONER ENG:  You know, you're

25  going to be doing really good if you have all the stuff

1    lined up in six to 12 months.

2        INMATE DANIEL:  See, but the key things that I

3    have in my favor is my dad put a couple of CDs away for

4    me, so I've got some money put away for anything that

5    comes up.

6        PRESIDING COMMISSIONER ENG:  Do you have the

7    documentation of that?

8        INMATE DANIEL:  No, I don't have that.

9        PRESIDING COMMISSIONER ENG:  Okay.

10       INMATE DANIEL:  But I have that.

11       PRESIDING COMMISSIONER ENG:  Okay.  All right.

12   Yeah.  But you understand what I'm saying.  When people

13   are saying this, all it's doing, it's creating me asking

14   you a lot of more detailed questions.

15       INMATE DANIEL:  Yes, Ma'am.

16       PRESIDING COMMISSIONER ENG:  So I think it's good

17   that you do have support letters.

18       INMATE DANIEL:  Right.

19       PRESIDING COMMISSIONER ENG:  But people need to

20   understand that they need to be very detailed.  If

21   they're offering you something, they need to be very

22   specific about it.

23       INMATE DANIEL:  Yes.

24       PRESIDING COMMISSIONER ENG:  So I think it's, you

25   know, that's very nice that you haven't known her that

1   long and it's through your mother.

2           **INMATE DANIEL:**  Yes.

3           **PRESIDING COMMISSIONER ENG:**  Then we have another

4   letter dated February 7th, 2007 from Jillian Rader,

5   R-A-D-E-R.

6           **INMATE DANIEL:**  My sponsor.

7           **PRESIDING COMMISSIONER ENG:**  This is a sponsor?

8           **INMATE DANIEL:**  Yeah, it's a sponsor.

9           **PRESIDING COMMISSIONER ENG:**  Okay, so let me see.

10  Okay.   Okay, so.

11              "The actions Demetrius has taken while in

12          prison will insure that once released he will be

13          an asset.  Not only has he spent time on

14          bettering himself through staying sober with the

15          help of NA and AA, he's also active in peer

16          groups and also many Christian groups as well."

17          Okay.  And she goes on about Positive Solutions

18  to Past Problems, that you've been active in that and

19  you're a member of the following groups:  Anger

20  Management, TRUST, one-to-one therapy and ministry

21  group.  I don't see anywhere where they state that they

22  are stepping up to be your sponsor.  Did I miss

23  something in the letter?

24          **INMATE DANIEL:**  That's just my sponsor.  Just,

25  they just write you a letter of recommendations.  Just a

1   sponsor.

2       PRESIDING COMMISSIONER ENG:  But I'm sure you

3   read the letter.

4       INMATE DANIEL:  Yeah, I read it.

5       PRESIDING COMMISSIONER ENG:  Okay.  Because I

6   don't -- That's why I'm asking you to point out to me

7   where it says that they have been your sponsor or

8   anything to do with that.  Because I just see this as a

9   general support letter.

10      INMATE DANIEL:  Yeah.

11      PRESIDING COMMISSIONER ENG:  I don't see anything

12  specific that says that, you know, I will step up to the

13  plate.

14      INMATE DANIEL:  Yeah.

15      PRESIDING COMMISSIONER ENG:  You know, in the

16  interim, until he finds another sponsor, I'll be his

17  sponsor.  You know, so to me that's a general support

18  letter.  But I appreciate your telling me that they're

19  your sponsor, but does -- Are they your -- They're your

20  sponsor here in the institution.

21      INMATE DANIEL:  Yeah, a sponsor here for the

22  group.  Yeah.

23      PRESIDING COMMISSIONER ENG:  Okay.

24      INMATE DANIEL:  Yes, Ma'am.

25      PRESIDING COMMISSIONER ENG:  But not necessarily

1    on the outside, okay.  Okay.  We have a letter dated

2    January 26th of '07 from Bernice Norman, who is your

3    aunt.  Okay.  I believe this is a general support that I

4    saw.  It's a very lovely letter.  As an aunt, please

5    mercy upon him and let him live out his life.

6    Forgiveness is the way to healing.  And she does go on

7    to say you have a very supportive family who is willing

8    to help with his transition back into society.  And she

9    lives in Spring, Texas.  Okay.  Is this on your father's

10   or mother's side?

11        INMATE DANIEL:  That's my mother's side.

12        PRESIDING COMMISSIONER ENG:  Your mother's side.

13        INMATE DANIEL:  Yeah.

14        PRESIDING COMMISSIONER ENG:  Your mother came

15   from a big family, huh?

16        INMATE DANIEL:  There's 12 of them.

17        PRESIDING COMMISSIONER ENG:  Wow.  Okay.  All

18   right.  And then I have a letter dated February 5th,

19   2007 from your cousin, Lashauna Collins.  Where does

20   Lashauna live?

21        INMATE DANIEL:  She stays up here in Hayward.

22        PRESIDING COMMISSIONER ENG:  She's up in Hayward.

23   So, okay.  So that's not far from here, is it?

24        INMATE DANIEL:  It's not far from here.

25        PRESIDING COMMISSIONER ENG:  Yeah.  So Lashauna

1   is here.  She -- How old is she?  Is she married?

2         INMATE DANIEL:  No, she's not married.  I'm 41.

3   She's 30 -- She will be 38.

4         PRESIDING COMMISSIONER ENG:  Okay.  Did you grow

5   up together?

6         INMATE DANIEL:  Yeah.

7         PRESIDING COMMISSIONER ENG:  Okay.  She states,

8   if released, she will personally help you financially

9   and with transportation.  I think that would be a little

10  difficult, unless she's going to pay for your car

11  insurance or something.

12        INMATE DANIEL:  Yeah.

13        PRESIDING COMMISSIONER ENG:  But if she's up in

14  Hayward and if you're back down in Southern California,

15  but I think that that's very nice.  But she says that

16  you are a hard worker and always wanted to start a

17  family business, so that's a -- that's a nice support

18  letter.

19        Then we have a handwritten letter.  It looks like

20  it's dated 2/5/07.

21        INMATE DANIEL:  That's my brother, I think.

22        PRESIDING COMMISSIONER ENG:  Darryl?

23        INMATE DANIEL:  Yeah.

24        PRESIDING COMMISSIONER ENG:  Okay, Darryl Daniel.

25  Okay.

1        INMATE DANIEL:  Two-five '07.

2        PRESIDING COMMISSIONER ENG:  Yes.

3        INMATE DANIEL:  Yes.

4        PRESIDING COMMISSIONER ENG:  Yes.  He writes very

5   large, but easy to see.

6        INMATE DANIEL:  Yeah.

7        DEPUTY COMMISSIONER HERRON:  That's good.

8        PRESIDING COMMISSIONER ENG:  And I guess the car

9   seen on the photo, a '93 Deville Cadillac will be given

10  to Demetrius Daniel once he's situated at home.  So

11  you're going to be driving around in a '93 Cadillac

12  Coupe Deville, huh?

13        ATTORNEY CHRISTENSEN:  Yeah, (inaudible).

14        PRESIDING COMMISSIONER ENG:  I still remember

15  what that is, sort of.

16        INMATE DANIEL:  Yeah.

17        PRESIDING COMMISSIONER ENG:  Okay, that's, yeah.

18            "If he's given the blessed opportunity to

19            parole to our father's home, he will have a mode

20            of transportation for work and to report to and

21            do the things that hard working, good citizens

22            do.  Please consider deeply (inaudible) a good

23            man."

24        Okay.  And you said your brother is still living

25  down south.

1       INMATE DANIEL:  Yes, Ma'am.

2       PRESIDING COMMISSIONER ENG:  I think that's what

3   I recall you saying.

4       INMATE DANIEL:  Yeah.

5       PRESIDING COMMISSIONER ENG:  I wrote that

6   somewhere.

7       INMATE DANIEL:  Yeah.

8       PRESIDING COMMISSIONER ENG:  Okay.  Okay.  Where

9   is your mother?  She's in Long Beach?

10      INMATE DANIEL:  Yes, Ma'am.

11      PRESIDING COMMISSIONER ENG:  Okay.  But she's not

12  in such good health?

13      INMATE DANIEL:  Well, she had, basically a little

14  hip replacement.

15      PRESIDING COMMISSIONER ENG:  Okay.  All right.

16  Then I've got these letters, January 9th, 2007 from

17  Southeast Los Angeles County Work Force Investment Board

18  and it states that they were acknowledging receipt of a

19  letter from you.  Okay. And they state that they would

20  be willing to interview Mr. Daniel upon his release.  At

21  this time, we're not hiring due to budget cuts, but we

22  would be glad to give him a mock interview.

23  (Indiscernible) services we offer to job seekers and

24  everything is at no charge to the customer.

25      Okay.  This organization is in Cerritos,

1   California.  Okay.  It shows initiative on your part and

2   I think that's very important, that you haven't been

3   sitting back there.  You've been getting letters out and

4   bringing them in.  Because not all -- You're not lucky

5   enough to get letters back from a lot of résumés or

6   inquiry letters being sent out.

7        Okay.  Then we have a letter dated January 31st

8   of 2007, signed by Ralph Holiday, the General Manager of

9   --

10       **INMATE DANIEL:**  That's where I'll be working.

11       **PRESIDING COMMISSIONER ENG:**  -- Century Trade

12  Shows Services.  It's hard to see the logo and they're

13  located in Anaheim and it does state that it's a letter

14  directed to Mr. Daniel and states that:

15            "I want to let you know that our thoughts

16            are with you during your current situation.  We

17            wish you well and good luck.  I'm letting you

18            know that whatever happens and if you have a

19            favorable review, you can call on us for possible

20            part-time employment until you get a full-time

21            job.  We're a subcontractor for cleaning in the

22            trade show business and we have part-time work

23            all the time.  So just to let you know that you

24            can look forward to calling us."

25       Okay.  Their work area is the LA Convention

1    Center and Anaheim Convention Center.  Go ahead and flip

2    it over.

3         **DEPUTY COMMISSIONER HERRON:**  I need to change

4    this.

5                   (Thereupon, the tapes were

6                    changed off the record.)

7         **DEPUTY COMMISSIONER HERRON:**  Okay. And just a

8    second.  All right, we're on the record.

9         **PRESIDING COMMISSIONER ENG:**  Is this tape two?

10        **DEPUTY COMMISSIONER HERRON:**  Tape two.

11        **PRESIDING COMMISSIONER ENG:**  Okay.

12        **DEPUTY COMMISSIONER HERRON:**  Thank you.

13        **PRESIDING COMMISSIONER ENG:**  Thank you.  Okay.

14   Sir, have you ever worked for this company before?

15        **INMATE DANIEL:**  No, Ma'am.

16        **PRESIDING COMMISSIONER ENG:**  Okay.

17        **INMATE DANIEL:**  No, Ma'am.

18        **PRESIDING COMMISSIONER ENG:**  Okay.  And do you

19   have any idea what they would be paying you for part-

20   time?

21        **INMATE DANIEL:**  Part-time starts at 12 bucks an

22   hour.

23        **PRESIDING COMMISSIONER ENG:**  Twelve dollars an

24   hour?

25        **INMATE DANIEL:**  Yeah.

1        **PRESIDING COMMISSIONER ENG:**  Okay.  About how

2  many hours is that going to be, do you think?

3        **INMATE DANIEL:**  What, per day?

4        **PRESIDING COMMISSIONER ENG:**  Yeah.

5        **INMATE DANIEL:**  Or per week?

6        **PRESIDING COMMISSIONER ENG:**  When they're talking

7  about part-time, what are they talking about?  How many

8  hours a week?

9        **INMATE DANIEL:**  You can get about 30 hours a

10  week.

11        **PRESIDING COMMISSIONER ENG:**  Okay.  Are there any

12  benefits that come along with that or nothing with the

13  part-time?

14        **INMATE DANIEL:**  With the part-time, you don't

15  have (inaudible).

16        **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.  But

17  it's only when there's trade shows going on?

18        **INMATE DANIEL:**  No, it's every day, you're

19  constantly cleaning up because they're always using it.

20        **PRESIDING COMMISSIONER ENG:**  Okay.

21        **INMATE DANIEL:**  They've constantly got a

22  convention.

23        **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.  Okay,

24  that's good.  All right.  And then we have a letter

25  dated January 10th, 2007 from Community Centers, Inc.,

 1   located in Los Angeles on Vermont Avenue.  And it

 2   states, thank you for thinking of Community Centers,

 3   part of the work force efforts of the city of Los

 4   Angeles for employment needs.  They receive funding to

 5   target ex-felons and help them with their employment

 6   needs.  They will be able to help you more efficiently

 7   and effectively because they have tailored opportunities

 8   for you.

 9        And they give, these people provide a telephone

10   number that you can contact for further information.

11   And this is from Lucia Kung, K-U-N-G, Senior Director.

12   So it's other people that you can contact for

13   employment.

14        Okay.  Then I have these other letters, January

15   26th, 2007, City of Long Beach, Department of Community

16   Development and they're acknowledging your inquiry

17   regarding the Career Transition Center.  And they

18   provide free job search assistance, including workshops,

19   unemployment insurance, information, Cal-Jobs, Internet

20   computer usage, etcetera.  So they ask that, they gave

21   you a flier and they said, please attend an

22   informational workshop to receive information on all of

23   their services.  They gave you the workshop calendar, so

24   that's another area that you have looked into that you

25   know you could tap into.

1         We have a Human Potential Consultants letter,

2    signed by Chanelle, C-H-A-N-E-L-L-E, Brimmer,

3    B-R-I-M-M-E-R, the program assistant, Human Potential

4    Consultants.  And they're stating that, did I state the

5    date, February 2nd, 2007, that they received your

6    correspondence and appreciate your inquiry about their

7    program.  But it states, unfortunately, they no longer

8    are the designated employment program for the Inglewood

9    Parole complex.

10        They do state that once you're released, you'll

11   attend a parolee orientation where you'll receive an

12   abundance of resources to aid in your success while

13   reentering society.  So if you need our assistance,

14   please feel free to contact our offices so we can

15   determine if you qualify for any of our community

16   programs.  So, that's good.

17        Also, an indication that Mr. Daniel is not

18   waiting until, you know, after he receives a date and he

19   gets out to go and inquire, but you've jumpstarted it to

20   get some idea.  That's good.

21        Then we've got a letter dated January 2nd, 2007

22   from Narcotics Anonymous World Services and I believe

23   that's the one letter that we do have in here too.  I

24   want to double-check.  I saw a letter.  Yes, okay, so I

25   won't have to pay attention to that one.  And it gives

1   you just some information.  It states that they received

2   a letter from Mr. Daniel working on his parole plans and

3   it says that, and this letter states that he needs a

4   referral of sorts that acknowledges that he would be

5   accepted into a Narcotics Anonymous fellowship and/or to

6   have a sponsor prior to his parole.  So they outline

7   some information particulars.  They state that, choosing

8   a sponsor is a personal decision that every person has

9   to make for themselves and it does state:

10          "Unless done through some type of

11          personal contact, it's rare that someone has a

12          sponsor waiting for them upon their release.

13          Therefore, it's upon the individual when released

14          to begin attending NA meetings and looking and

15          listening to those sharing their experiences with

16          recovery in NA."

17          So it states that they would hope that it would

18   be taken into consideration that this letter is

19   generated at NA World Services and would serve as

20   notification that Mr. Daniel can attend NA meetings

21   without any further notice of approval.  The only

22   approval needed is that he identify himself as an

23   addict.  This is signed by Freddie Aquino, A-Q-U-I-N-O,

24   (inaudible) staff fellowship services.

25          And then I think the last letter I have is dated

1    January 30th, 2007 from Oakland Private Industry Council

2    and:

3                "Thank you for your interest in the

4          Oakland Private Industry Council's Adult Career

5          Services Program.  After reviewing your request,

6          it's been determined that you would best -- be

7          best served by continuing to utilize our career

8          center or other East Bay work (inaudible) stops."

9          And it outlines the different services that are

10   offered and their times and scheduled activities, so

11   that's good.  And this is by Katherine Lively,

12   L-I-V-E-L-Y, Adult Career Services.

13         Sir, have I missed any letters?

14         **INMATE DANIEL:**  Yeah.  I think you missed quite a

15   few, to be honest.  I didn't see the (inaudible).  I

16   gave you a copy of it.

17         **PRESIDING COMMISSIONER ENG:**  I don't have it.

18   No, I read all the ones that were in the packet.  I went

19   through every single one.

20         **INMATE DANIEL:**  I've got another AA that I wrote.

21   I've got all of the originals.  I keep all of the

22   originals.

23         **PRESIDING COMMISSIONER ENG:**  That's good.

24         **INMATE DANIEL:**  Yeah, I've got all of the

25   originals.

1    **PRESIDING COMMISSIONER ENG:** Do you have anything

2    that's more specific, in terms of residence or job?

3    **INMATE DANIEL:** I've got two more job offers, but

4    it's up this way. I don't have anything further down

5    there.

6    **PRESIDING COMMISSIONER ENG:** Okay. Because I

7    believe and we discussed it, that you are -- All right,

8    let's go over it again. Your primary, your primary

9    parole plans are for where?

10    **INMATE DANIEL:** My auntie, Erma Varnado.

11    **PRESIDING COMMISSIONER ENG:** Which is where?

12    **INMATE DANIEL:** In Long Beach.

13    **PRESIDING COMMISSIONER ENG:** Okay. All right.

14    And then the job?

15    **INMATE DANIEL:** Is in Santa Ana.

16    **PRESIDING COMMISSIONER ENG:** Okay.

17    **INMATE DANIEL:** The Trade Center.

18    **PRESIDING COMMISSIONER ENG:** Right. Okay.

19    **INMATE DANIEL:** And my second job will be with my

20    dad, driving trucks.

21    **PRESIDING COMMISSIONER ENG:** Okay.

22    **INMATE DANIEL:** Yeah, I always have that before

23    others.

24    **PRESIDING COMMISSIONER ENG:** And your father owns

25    the company?

1    **INMATE DANIEL:**  No.  He sold his truck and he

2  works for the company now.  He's been there since 1987,

3  with D & F Trucking.

4    **PRESIDING COMMISSIONER ENG:**  Okay.  So it's the

5  trucking company that would have to hire you, correct?

6    **INMATE DANIEL:**  Yeah, I know them real good.

7    **PRESIDING COMMISSIONER ENG:**  Okay.  Do you have

8  any letters from them, stating that they would consider

9  you?

10    **INMATE DANIEL:**  No, (inaudible).

11    **PRESIDING COMMISSIONER ENG:**  Okay.

12    **INMATE DANIEL:**  I left a good rapport with them

13  when I left, so I would still have that option.

14    **PRESIDING COMMISSIONER ENG:**  Well, do you -- Do

15  you know if it's any problem for the trucking company to

16  hire ex-felons?

17    **INMATE DANIEL:**  There's no problem, because we do

18  that in our Reentry.

19    **PRESIDING COMMISSIONER ENG:**  Okay.

20    **INMATE DANIEL:**  We've got forms where they hire

21  ex-cons, (indiscernible) and it's all kinds of trucking

22  companies hiring.

23    **PRESIDING COMMISSIONER ENG:**  Have you written to

24  the people that own the company about possibly getting

25  hired by them?

1    **INMATE DANIEL:**  No, no, no.

2    **PRESIDING COMMISSIONER ENG:**  Okay.  Is it

3    something that you would want to do?

4    **INMATE DANIEL:**  Not really, but if I had to, I

5    would, because my profession, what I truly wanted to do

6    is I do masonry and welding.  That's my (inaudible).

7    **PRESIDING COMMISSIONER ENG:**  All right.  So tell

8    this Panel, okay, your number one choice would be to

9    live with your auntie?

10   **INMATE DANIEL:**  Yes, Ma'am.

11   **PRESIDING COMMISSIONER ENG:**  Okay.  And then

12   what's your -- What job do you really, really want to

13   do?

14   **INMATE DANIEL:**  The job that I truly want to do

15   --

16   **PRESIDING COMMISSIONER ENG:**  Yes.

17   **INMATE DANIEL:**  -- is be a counselor and I don't

18   have no offers from that.  I'm going to school to be a

19   biblical facilitator counselor.

20   **PRESIDING COMMISSIONER ENG:**  Okay.  And be more

21   specific.  A counselor to whom for what?

22   **INMATE DANIEL:**  A spiritual advisor, spiritual

23   couples just in general.  It's a 20 -- It's a 24 week

24   that we're taking.  You get college credits for it and

25   you've got to go to school for it and that's basically

1    what I'd like to do is be a counselor and that's what

2    I'm working on.

3         PRESIDING COMMISSIONER ENG:  And have you

4    investigated as to financially, could you afford to be a

5    counselor?

6         INMATE DANIEL:  Yeah, I can afford it.

7         PRESIDING COMMISSIONER ENG:  How do you know?

8         INMATE DANIEL:  Because of my parents.

9         PRESIDING COMMISSIONER ENG:  What do you mean

10   because of your parents?

11        INMATE DANIEL:  Well, they've got funds set aside

12   for me to participate up in this, something that I truly

13   desire to do.

14        PRESIDING COMMISSIONER ENG:  Well, they have

15   funds set aside for you, for you to live?

16        INMATE DANIEL:  Everything.

17        PRESIDING COMMISSIONER ENG:  Okay.  For life?

18        INMATE DANIEL:  Not for life, Ma'am.

19        PRESIDING COMMISSIONER ENG:  So again, how could

20   you become financially independent or can you, being a

21   counselor?

22        INMATE DANIEL:  You could become independent

23   financially becoming a counselor.

24        PRESIDING COMMISSIONER ENG:  Or to do what you

25   want to do, if that's what you really like to do.  So,

1    are you talking about that's want you want to do full-

2    time?

3         **INMATE DANIEL:**  That's what I want to do full-

4    time.

5         **PRESIDING COMMISSIONER ENG:**  Okay.

6         **INMATE DANIEL:**  Counsel.

7         **PRESIDING COMMISSIONER ENG:**  All right.  So

8    that's what I'm asking.  Have you inquired or done

9    enough research to see, can you afford to do that?

10        **INMATE DANIEL:**  I can afford to do that, because

11   --

12        **PRESIDING COMMISSIONER ENG:**  Without having your

13   parents pay for your, you know, room and board,

14   basically.

15        **INMATE DANIEL:**  I can afford it all, because what

16   it is, it would keep me busy.  There's enough time.

17   When I get up there, if I have a job as far as

18   counseling kids, it starts me off with 25 dollars an

19   hour, on the side, based on the job I have at the Trade

20   Center.

21        So I'm a part of Amer-I-Can, the Jim Brown

22   program.  I'm a part of that program, so I have a job

23   there, a part-time job.  So as I'm putting all of this

24   together, once I find the right job and set up

25   everything I'm supposed to, that's what I'm going

1    towards.

2         PRESIDING COMMISSIONER ENG:  Okay.  I'm just

3    trying to understand how you -- how you've laid this

4    out.

5         INMATE DANIEL:  Yes.

6         PRESIDING COMMISSIONER ENG:  And how -- You know,

7    how realistic it is for you.

8         INMATE DANIEL:  It's realistic, because you've

9    got to realize, everything is a process.  I have to go

10   through the stage, as far as working at this Trade Show

11   Center.  As I'm doing my homework behind the scene and

12   laying out the plan, so once I leave here, this is what

13   I'm going straight to.

14        Because my whole -- It's like every day that I'm

15   in here, my whole day is filled.  It's already lined up.

16   I want to continue to keep it lined up and once I leave

17   here, I'm going to school and doing what I need to be

18   doing, being in classes.

19        PRESIDING COMMISSIONER ENG:  Well, we see that

20   you've kept very, very busy while incarcerated.  There's

21   no doubt.

22        INMATE DANIEL:  I'm going to continue, you know.

23        PRESIDING COMMISSIONER ENG:  Yes.

24        INMATE DANIEL:  Yeah.

25        PRESIDING COMMISSIONER ENG:  Okay.  So what if

1  this doesn't work out with the trade shows and the

2  cleaning and that you start to get, you know, a lot of

3  different things could happen.  You could get very

4  frustrated because all you're doing is cleaning up and

5  for 12 dollars an hour or thereabouts.

6       INMATE DANIEL:  Right.

7       PRESIDING COMMISSIONER ENG:  What's another

8  alternative, because you said that you have vocations.

9       INMATE DANIEL:  I've got plenty of them.  I know

10  how to weld everything.

11       PRESIDING COMMISSIONER ENG:  Okay.

12       INMATE DANIEL:  See, one thing about it, I'm

13  already prepared if it doesn't work out, because I've

14  got peace within myself.  What it is, is to get up and

15  have resiliency and go to another job and keep pushing.

16  That's a process in life.  I have to continue to go.

17       PRESIDING COMMISSIONER ENG:  Right.  But also,

18  sir, part of the process is explaining what this is to

19  the Panel.  Because we don't want you going out there

20  and this is whether or not you get a date today.

21       INMATE DANIEL:  Yes.

22       PRESIDING COMMISSIONER ENG:  If you get one today

23  or if you don't get one today.

24       INMATE DANIEL:  Yes, Ma'am.

25       PRESIDING COMMISSIONER ENG:  You need to be able

1   to tell the Panel that you do have a solid -- and not

2   just telling it, but showing us.

3        INMATE DANIEL:  Yes, Ma'am.

4        PRESIDING COMMISSIONER ENG:  Because remember

5   what I said, that this is the first line.  It goes

6   through a very stringent Decision Review and then again,

7   you know it goes to -- it goes to the Governor.

8        INMATE DANIEL:  Yes.

9        PRESIDING COMMISSIONER ENG:  So, and part of sort

10  of convincing the Panel, you know, it's a big step for a

11  Panel to put our names to a grant.

12       INMATE DANIEL:  Yes, Ma'am.

13       PRESIDING COMMISSIONER ENG:  Because the last

14  thing any Panel wants to do is risk an inmate going out

15  --

16       INMATE DANIEL:  That's right.

17       PRESIDING COMMISSIONER ENG:  -- and not

18  succeeding.  Okay.

19       INMATE DANIEL:  I'm determined to succeed.  I'm

20  determined.

21       PRESIDING COMMISSIONER ENG:  Well, trust me, any

22  Panel who is going to put their names down to a grant

23  wants to be sure that any inmate that's going to get a

24  grant is going to succeed.

25       INMATE DANIEL:  I know what you're talking about.

1      PRESIDING COMMISSIONER ENG:  So that's what I'm

2  talking about.  So, you sit there and you say that,

3  well, you know that, you know, this is your backup plan.

4  I don't know that until you -- you're just telling me

5  that.

6      INMATE DANIEL:  That's why I explained it to you.

7      PRESIDING COMMISSIONER ENG:  You're just telling

8  me that, but I don't -- I don't see that, in terms of

9  the documents.

10      INMATE DANIEL:  Yeah.

11      PRESIDING COMMISSIONER ENG:  Okay?  So it's one

12  thing.  Anybody can tell somebody words across the table

13  and it's another thing to be able to back it up with --

14      INMATE DANIEL:  With the word.

15      PRESIDING COMMISSIONER ENG:  -- the documents.

16      INMATE DANIEL:  Yeah.

17      PRESIDING COMMISSIONER ENG:  Okay.  And it

18  benefits you too.

19      INMATE DANIEL:  Yes.

20      PRESIDING COMMISSIONER ENG:  Because that way you

21  know, when people are willing to put it down on paper,

22  it's slightly more difficult to walk away from that.

23      INMATE DANIEL:  Yes.

24      PRESIDING COMMISSIONER ENG:  Then just saying the

25  words.  Because saying the words, people can say, well,

1    I never said that.  Okay.  So it benefits you too to

2    learn to get the documentation.  So that's why I was

3    asking you, have you written to the trucking company,

4    you know, as a backup.

5            INMATE DANIEL:  Yeah.

6            PRESIDING COMMISSIONER ENG:  And you deserve to

7    know.

8            INMATE DANIEL:  Yeah.

9            PRESIDING COMMISSIONER ENG:  How much money are

10   they willing to pay you.

11           INMATE DANIEL:  Yeah.

12           PRESIDING COMMISSIONER ENG:  Because how else can

13   you plan.  Okay?  Because what happens if something

14   happens to your aunt and she can no longer, you know,

15   have you living in that home, what are you going to do,

16   you know?  If something happens to people and your

17   housing disappears, you know, and versus how much money

18   you're going to have, will you be able to afford to get

19   a place for yourself for that?  Where are you going to

20   be able to get it?  Stuff is expensive.  Also, health

21   care.

22           INMATE DANIEL:  Yes.

23           PRESIDING COMMISSIONER ENG:  Okay.  You're at an

24   age now --

25           INMATE DANIEL:  Forty-one.

1       **PRESIDING COMMISSIONER ENG:** Yeah. Well, you

2 know, you're still -- you're still young, however, all

3 the sudden you're going to find that, oh, things start

4 to break down in the body.

5       **INMATE DANIEL:** Yes, Ma'am.

6       **PRESIDING COMMISSIONER ENG:** Healthcare is very,

7 very expensive now.

8       **INMATE DANIEL:** Yes.

9       **PRESIDING COMMISSIONER ENG:** So these are things

10 that it's to your benefit to start thinking about

11 because you need to, you know, you've done a very good

12 job at planning things and doing stuff with your time

13 and really upgrading yourself, but it's really showing

14 the Panel that you're truly taking total responsibility

15 and planning out and thinking about all the ups and

16 downs, the pros and cons. You know, getting a good,

17 solid plan for yourself that's realistic, right, and

18 having those backups.

19       Also, what safety nets have you set up for

20 yourself on the outside. Okay, so we'll go on and I

21 want to get more into that.

22       **INMATE DANIEL:** Yes.

23       **PRESIDING COMMISSIONER ENG:** But is there

24 anything else in terms of good, solid support or

25 documentation that you want to provide the Panel?

1  Because, you know, we do have quite a few letters and

2  you do have very, very good support.

3          INMATE DANIEL:  Yes.

4          PRESIDING COMMISSIONER ENG:  It's not as specific

5  --

6          INMATE DANIEL:  Yes.

7          PRESIDING COMMISSIONER ENG:  -- as I personally

8  would like to see it, but you still have good support.

9          INMATE DANIEL:  Yes.

10         PRESIDING COMMISSIONER ENG:  Okay.  So anything

11  else there?

12         INMATE DANIEL:  That's it.  That's it.

13         PRESIDING COMMISSIONER ENG:  Okay.  Okay.  And

14  before I go on any further, I do have to state that we

15  have sent out Penal Code Section 3042 notices and, you

16  know, those notices go to agencies that have a direct

17  interest in your case.

18         INMATE DANIEL:  Yes.

19         PRESIDING COMMISSIONER ENG:  We did receive a

20  letter and I've got it somewhere here.  I probably piled

21  it -- There is a letter from the Sheriff's Department

22  and I think I may have just mistakenly grouped it

23  together, doggone it.  I had it right out in front of

24  me.  I apologize, everybody, that --

25         DEPUTY COMMISSIONER HERRON:  Here you go.

1    PRESIDING COMMISSIONER ENG:  Do you see it?

2    Thank you.  Okay.  Okay.  Yeah, this letter is from

3    Leroy Baca, B-A-C-A, Sheriff and Raymond Peavy,

4    P-E-A-V-Y, Captain of the Homicide Bureau.  And this, I

5    believe is, this is the Los Angeles County Sheriff's

6    Department?  I believe that's where he is, dated

7    February 13th, 2007.  And they're acknowledging that

8    they did receive notification that your parole hearing

9    was coming up.

10    Okay.  They go into, basically give a summary of

11    the life crime and basically ends by saying that:

12    "The three stripped items from the

13    vehicle, each obtained (inaudible) removed the,

14    is it Daytona rims, which were subsequently sold

15    to the buyer in Arizona.  Based on these facts,

16    it's the opinion of this Department that parole

17    of inmate Daniel is inappropriate and should be

18    denied."

19    So they are in opposition to parole at this time.

20    INMATE DANIEL:  Yes.

21    PRESIDING COMMISSIONER ENG:  We also take note

22    that we do have a representative from the Los Angeles

23    County District Attorney's Office, Mr. Dahle, that I'm

24    sure will be giving a statement regarding your parole

25    suitability --

1       INMATE DANIEL:  Yes.

2       PRESIDING COMMISSIONER ENG:  -- prior to us

3   taking a recess for deliberations.  I have misplaced

4   that letter.  Okay.

5       All right, now what we'll do, sir, this next step

6   is to open it up for questions, follow-up questions,

7   okay, regarding the crime or what have you.  And I do

8   have a few, which I'm sure my fellow Commissioner will

9   have some too.

10      And I wish I had asked you that question before

11  because now I can't remember.  We were talking about the

12  letters and now I can't remember.  Oh, about the

13  lifestyle, yeah.  On numerous times you've stated that

14  you were addicted to the lifestyle.  Okay, not the

15  drugs, but the lifestyle of selling drugs.  And are you

16  referring to the money?

17      INMATE DANIEL:  The money.

18      PRESIDING COMMISSIONER ENG:  You were addicted to

19  making the money and did you consider that, like a quick

20  and easy way?

21      INMATE DANIEL:  Quick and easy way.

22      PRESIDING COMMISSIONER ENG:  Okay.  All right.

23  So you're used to making quick money, okay, and that's

24  why you switched, even though, because somebody told you

25  in your family, I guess it was your father or maybe your

1  mother, saying you're going down the wrong track with

2  the drugs.  So you switched.  You stated to my fellow

3  Commissioner that you gave that up because it was a bad

4  idea or the wrong thing to do and you switched over to

5  carjacking.

6        INMATE DANIEL:  Just as bad.

7        PRESIDING COMMISSIONER ENG:  Which was just as

8  bad.

9        INMATE DANIEL:  Just as bad, yes, Ma'am.

10       PRESIDING COMMISSIONER ENG:  So if somebody had

11  told you, had someone in your family said, you're still

12  on the wrong track, would you have listened?

13       INMATE DANIEL:  I would listen.

14       PRESIDING COMMISSIONER ENG:  But then would you

15  have moved onto another illegal activity to make the

16  quick money?

17       INMATE DANIEL:  I don't think so.  There was

18  nothing else.  Because I look at everything.  At that

19  time, I was immature.  I was 22, impressionable and I

20  was basically a follower.  And the person I am today is

21  not that person back then 20 years ago.  I take full

22  responsibility.  I can't change what happened, but I can

23  press on forward, to continue to do what's right.  I

24  can't change that.

25       PRESIDING COMMISSIONER ENG:  Well, okay, and I

1    hear what you're saying, but again, you were addicted to

2    the lifestyle that money --

3            INMATE DANIEL:  Yeah.

4            PRESIDING COMMISSIONER ENG:  -- can provide.

5    Okay.

6            INMATE DANIEL:  Money can provide.

7            PRESIDING COMMISSIONER ENG:  So how do you

8    overcome that now?

9            INMATE DANIEL:  How do I overcome it?  I

10   surrender my life over to my Lord and Savior, Jesus

11   Christ.  And I don't need -- I don't look at it as money

12   as back then, how I look at it now.  I was immature and

13   I knew the best way of life is to work for it, to earn

14   it.  You know, I wasted 20 years of my life where

15   normally a person at 41, 42 has a house.  He has a plan

16   the way he's going.  He has retirement.  I don't have

17   any of that.  I chose the street and this was my

18   consequence.

19           There's not a day that I don't think about what I

20   did because of my choices.  And what I did, I instilled

21   that in my sons.  I said, if you want to see the

22   goodness, this is what I have turned it into.  Be your

23   own (inaudible), be respectful.  Follow the rules.  Be a

24   law abiding citizen.

25           PRESIDING COMMISSIONER ENG:  All this programming

1  you've been doing through the years, okay, tell me what

2  one thing, what one key thing that you may have gained

3  from all of this, whether it be NA, AA, Impact, TRUST,

4  whatever it was, what's one thing that you can say has

5  been most beneficial to you that would convince this

6  Panel that would help you besides talking about the Lord

7  Jesus Christ, etcetera.

8          INMATE DANIEL:  Yes, Ma'am.

9          PRESIDING COMMISSIONER ENG:  What's something

10 more, something else besides that that you think would

11 be the biggest tool for you to use to not get to a

12 position where you get frustrated, you're putting in all

13 this time, you're not making any money.

14         INMATE DANIEL:  Right.

15         PRESIDING COMMISSIONER ENG:  You're barely making

16 ends meet, you know.  You know what the alternatives

17 are.

18         INMATE DANIEL:  Yes.

19         PRESIDING COMMISSIONER ENG:  So what could you

20 possibly use, what tools have you learned from all these

21 years and these lists and lists of therapy programming?

22 What one thing can you actually use that you think would

23 stop you from making that bad choice?

24         INMATE DANIEL:  First and foremost, what would

25 stop me is maturity.  And the second thing, you would

1    have to earn it.  But the most important group I think

2    would be Nonviolent Communication, because everything

3    that you tell yourself is you're listening to it as a

4    story.  You've got to find out (indiscernible), the

5    requests and the observation.  Then you've got to paint

6    all of this.  I paint all of this in my head, paint a

7    picture, a mental picture.  What is the beginning, what

8    is the middle and what is the outcome and continue to

9    just keep going.

10        I understand that these life changes, we're all

11   going to go through them and money is not the key.  As

12   long as I'm happy with what's inside myself,

13   (inaudible), positive affirmations (inaudible).

14        **PRESIDING COMMISSIONER ENG:**  When you say

15   maturity, aside from being 20 years older --

16        **INMATE DANIEL:**  Yeah.

17        **PRESIDING COMMISSIONER ENG:**  -- what do you mean?

18        **INMATE DANIEL:**  Maturity to make the right

19   choices, to be a leader, to be accountable, stand up for

20   what you did.  When I was 22, everything was irrational,

21   just split second, just go do it.  I don't do none of

22   that now.

23        The person I am today, I take my time.  I weigh

24   it out.  I look within myself.  I'm loved.  I made a

25   mistake.  I ask for forgiveness and continue to move on.

1    And I ask for forgiveness towards the family, Mr. and

2    Mrs. Day, even their son, Kenneth Day.  There's no

3    reason he should have lost his life, but I have to live

4    with that.  But still I have to continue to move on with

5    my life, be positive and be a role model to myself,

6    first and foremost.

7        PRESIDING COMMISSIONER ENG:  Sir, what I'm

8    looking for is I'm looking for you to convince this

9    Panel why you wouldn't do, make the same decisions, you

10   know, given a situation.  What concerns this Panel is

11   that -- And I commend you for being up front and honest

12   as much as you can, okay.

13       However, what really concerns this Panel is that

14   you came from a good family, a good upbringing.  Okay.

15   You got hooked into this lifestyle, okay.  A lot of

16   people do, into what money will buy you, okay.  And I

17   mean, if anything, this society has even got worse about

18   that.

19       INMATE DANIEL:  Yes, Ma'am.

20       PRESIDING COMMISSIONER ENG:  And how much we can

21   accumulate, okay.  It's all materialistic.  So you've

22   got a lot of pressures out there.

23       INMATE DANIEL:  Yeah, I know.

24       PRESIDING COMMISSIONER ENG:  So I don't

25   understand, okay.  You haven't convinced me what would

1    stop you from, if you're outside, you're making 12

2    dollars an hour, you're barely going to make ends meet.

3    You know, let alone put food on the table or anything

4    else and I hear what you're saying, but you've also been

5    institutionalized for the last 18, 20 years.

6        And I'm just not convinced you're being realistic

7    enough.  And my biggest concern is that you get

8    frustrated not making enough money.  And it's very

9    typical human nature to take the path of least

10   resistance or that that we know from before.

11        **INMATE DANIEL:**  Yeah.

12        **PRESIDING COMMISSIONER ENG:**  And especially if

13   you have some idea of what the possible consequences or

14   not consequences there might be in doing some illegal

15   activities.  So how do you convince this Panel?

16        **INMATE DANIEL:**  I was going to say, first and

17   foremost, the 20 years I lost, I can't get them back, so

18   I have to live today.  And when I put myself in that

19   situation, when I wake up every day, I can say to

20   myself, I will never, ever put another family through

21   what I put the -- I have to wake up with that daily.  I

22   have to live with that and that's my conscience, not my

23   subconscious.

24        There's not a day I don't think about that fact.

25   I have to wake up with that every day, so I will never,

1  ever get no ripple effect that it had on his family, his

2  wife, his mother, his father.  I don't know how his kids

3  turned out.  I've got concerns for them.

4         Then I have to understand what it's done to my

5  family.  It's not just one side.  It's generation to

6  generation, this ripple effect happening.  So therefore,

7  every day that I wake up, I'm making the decision that I

8  could make.

9         As far as the monetary gains, that's not going to

10  make you happy because it didn't make me happy.  I

11  thought it made me happy.  Happy is within inside.  I'm

12  happy.  I'm at peace within myself today.  And I

13  wouldn't give that up for nothing.

14         **PRESIDING COMMISSIONER ENG:**  Okay.  I'm asking

15  you these questions for a reason, okay?  Not to give you

16  a hard time, okay.  Also, tell me what you were doing

17  with a .357 magnum and a .22 caliber sawed-off shotgun

18  or sawed-off rifle in your home?

19         **INMATE DANIEL:**  The reason why I had that, the

20  lifestyle that I was living.  When I was selling drugs,

21  I had them.  I accept full responsibility for them.

22         **PRESIDING COMMISSIONER ENG:**  Okay.

23         **INMATE DANIEL:**  One thing, everything that's on

24  my jacket, I'm not in denial.  I can't change any of

25  that.  I accept full responsibility.  I played the game.

1    I've got to suffer the consequences.  But therefore, I

2    would not jeopardize my freedom for nobody ever, period.

3    Inside prison or outside in society.

4         PRESIDING COMMISSIONER ENG:  Okay.  One thing --

5    The other thing that concerned me was when I read --

6    when I read through your, the last psych evaluation.

7    And this, and I'm going to be honest with you, I read it

8    before I read the prior decision from the other Panel.

9    And I had underlined and highlighted this area that I

10   wanted to question you about.

11        INMATE DANIEL:  Yes, Ma'am.

12        PRESIDING COMMISSIONER ENG:  And I already asked

13   you one of the questions, because I had asked you about

14   your, you know, why you were hanging out with a 17 --

15   you know, your crime partner was a juvenile.

16        INMATE DANIEL:  Yes.

17        PRESIDING COMMISSIONER ENG:  And you were 22,

18   what were you doing hanging around with a 17.  So I

19   already asked that one.  But the other one that got me

20   was that he stated -- And it's in the same section,

21   under Review of Life Crime, the next to the last

22   paragraph, the very last statement, he states that he

23   will never again get involved in a high risk behavior

24   with low gain.  And I wrote in here versus high gain.

25   Okay, so what did you mean by that statement?

1    INMATE DANIEL:  First and foremost, when I said

2    that statement, I participated in all that high risk

3    activity and looked at my life as low gains and I will

4    never participate in anything.  That goes to clarify

5    that.  I was out there participating in high risk and

6    the low gains was my life, was my freedom at that time

7    and I didn't care.  So it was like I'm playing a suicide

8    mission out there in that world and I take full

9    responsibility for that.

10    PRESIDING COMMISSIONER ENG:  But you understand

11    how a lot of people read this.

12    INMATE DANIEL:  Yes.

13    PRESIDING COMMISSIONER ENG:  And how I have to

14    admit, I perceived it --

15    INMATE DANIEL:  I know.

16    PRESIDING COMMISSIONER ENG:  -- to be that, oh,

17    it wasn't a high enough gain.  Not a good enough return.

18    INMATE DANIEL:  Right.

19    PRESIDING COMMISSIONER ENG:  So that you would

20    never bother again unless it was, you know, if it's high

21    risk, got to have high returns.  Okay.

22    INMATE DANIEL:  Yeah.

23    PRESIDING COMMISSIONER ENG:  So that's what --

24    INMATE DANIEL:  It's understandable.  It hurts

25    every time when you reread this, like a TABE report,

1   everything that's in it hurts and you say to yourself,

2   how could I stoop that low.  You know, I'm saying

3   maturity, immaturity versus matureness (inaudible).  It

4   was sad, you know.

5       And every day that I'm here, that I'm still

6   living and breathing, I'm going to continue to do what's

7   right and tell my story to save some souls.  If that's

8   the process that the higher, the big guy asks for,

9   that's what I'm going to do.  I'm going to save souls,

10  because you don't have to do that.  It's a lie.  It was

11  a lie told to me.  Nobody never told me what the outcome

12  was going to be, living that lifestyle.

13      **PRESIDING COMMISSIONER ENG:**  Well, you know, you

14  made the choices.

15      **INMATE DANIEL:**  That's right.

16      **PRESIDING COMMISSIONER ENG:**  You made those

17  choices.

18      **INMATE DANIEL:**  Yes.

19      **PRESIDING COMMISSIONER ENG:**  And you're living

20  with those.

21      **INMATE DANIEL:**  That's right.

22      **PRESIDING COMMISSIONER ENG:**  Okay.

23      **INMATE DANIEL:**  We've got a saying in our Real

24  Choice Program, is instead of using CDC with the new

25  rehabilitation now, we use it as choice, decision and

110

1  consequences and you've got to review everything

2  (inaudible).  I'm happy to (inaudible).

3          PRESIDING COMMISSIONER ENG:  Okay.  Commissioner,

4  do you have any other questions?

5          DEPUTY COMMISSIONER HERRON:  No, I do not.  Thank

6  you.

7          PRESIDING COMMISSIONER ENG:  Okay.  We're going

8  to open it up and I'm going to ask Mr. Dahle if he has

9  any questions to be posed to Mr. Daniel through the

10  Panel.

11          DEPUTY DISTRICT ATTORNEY DAHLE:  Thank you.  I'd

12  ask the Chair to ask Mr. Daniel to explain why, if he

13  broke down after he returned to his family home and

14  learned of the death of Mr. Day, if he broke down, I'd

15  like to have him explain or kind of put into perspective

16  why thereafter he went and was a participating in the

17  secreting of the victim's car and the ultimate stripping

18  and placement of parts of the car into his own personal

19  vehicle.  How can he do that if he was feeling angst and

20  remorse over the death of Mr. Day and then go ahead and

21  live with and enjoy the fruits of the crime?

22          PRESIDING COMMISSIONER ENG:  Do you understand

23  the question?

24          INMATE DANIEL:  Yes, Ma'am.

25          PRESIDING COMMISSIONER ENG:  Okay, so, because I

1   do remember and I was going to ask that, but I forgot

2   to.

3          INMATE DANIEL:  Yes, Ma'am.

4          PRESIDING COMMISSIONER ENG:  So, you do admit

5   that you, after this happened, that you were with your

6   girlfriend?

7          INMATE DANIEL:  Yes, Ma'am.

8          PRESIDING COMMISSIONER ENG:  Okay.  Okay.  So?

9          INMATE DANIEL:  To answer his question?

10         PRESIDING COMMISSIONER ENG:  Yes.

11         INMATE DANIEL:  I thought -- I thought you had

12  more.  I was going to say, once I heard the shot, I went

13  back and cried like a baby because I felt like the

14  bullet had went through me.

15         But still, I was still living a double life and I

16  still participated in the crime.  I didn't have no

17  respect, first and foremost for myself, no respect at

18  all for nobody else's life.

19         PRESIDING COMMISSIONER ENG:  But think about,

20  what was going through your head?  Why did you go ahead

21  and then strip down that car?

22         INMATE DANIEL:  Greed.  Still participating.  I

23  was just as guilty.  I was going to still get just as

24  much time as (inaudible).

25         PRESIDING COMMISSIONER ENG:  Is that what you

1    were thinking back then?

2        **INMATE DANIEL:**  I wasn't thinking that at that

3    time.  I said to myself that I'm stuck, I'm caught.  I'm

4    stuck in between a rock, where I can't do nothing about

5    it.  I'm stuck.  And that's something I have to deal

6    with the rest of my life, why I put myself in that

7    situation.  I can't change the circumstances.  But I

8    would never, where I'm at today, I would never put

9    myself in a situation like that.  But back then, 20

10   years ago, it was painful.

11       **PRESIDING COMMISSIONER ENG:**  Did you really care

12   that the person, you know, would have -- Did you really

13   care what happened to the person who owned the car --

14       **INMATE DANIEL:**  I always cared.

15       **PRESIDING COMMISSIONER ENG:**  -- back then?

16       **INMATE DANIEL:**  See, back then, I cared because I

17   figured nobody would get shot.  When you participate in

18   a crime, you figure nobody is not going to get hurt.

19   Then all the sudden when that happened, it shook me up.

20       **PRESIDING COMMISSIONER ENG:**  But not enough --

21       **INMATE DANIEL:**  After that, I didn't --

22       **PRESIDING COMMISSIONER ENG:**  -- to stop you from

23   stripping the car.

24       **INMATE DANIEL:**  Not enough to stop me from

25   stripping the car, yes, Ma'am.

1     **PRESIDING COMMISSIONER ENG:**  Did he answer your

2  question, sort of?

3     **DEPUTY DISTRICT ATTORNEY DAHLE:**  I don't -- I

4  don't think there's any sense in asking a follow-up

5  question to that.  But I do have other questions that I

6  would ask.

7     **PRESIDING COMMISSIONER ENG:**  Okay.

8     **DEPUTY DISTRICT ATTORNEY DAHLE:**  If I can proceed

9  with, I'd ask the inmate to indicate to the Board why he

10  plans to return to the community where he was a constant

11  and frequent associate of gang members.

12     **INMATE DANIEL:**  Is it all right?

13     **PRESIDING COMMISSIONER ENG:**  Uh-hmm, go ahead.

14     **INMATE DANIEL:**  First and foremost, the person

15  that I am now, I can help my community.  I want to be a

16  part of the city council, to give -- to have gang

17  preventions and (inaudible) you don't have to do that.

18  It's a cry out with people looking for help.  And

19  they're looking for people that have been through the

20  same situations that they're going through.  And that's

21  why I want to go up there and help.

22        My community, I wasn't destroying my community.

23  I was destroying other people's communities.  Because if

24  I was doing -- destroying (inaudible) and it's just, it

25  hurts me so bad to even just hear the story.  But the

1  point is to go out there, is to make amends for what I

2  did and to fix what I did, fix (inaudible).

3      PRESIDING COMMISSIONER ENG:  So you're going to

4  do something to try to communicate with gangs?

5      INMATE DANIEL:  No, just in general, where we

6  have positive programs and they're sprouting out all

7  over the world now, these youth interventions.  I've got

8  a -- I've got a job letter from (inaudible), because I'm

9  a facilitator and this is what I teach, young men how to

10  change their way of thinking.

11      PRESIDING COMMISSIONER ENG:  Can you explain

12  something to me?  Why is it that in various places

13  within your file, okay, there's all of these statements

14  about your possible affiliation with different gangs.

15  Because I -- When I was asking you about it before and

16  then I -- then I took note when I first reviewed your

17  case, that something about the Roaring '60s gang.

18      INMATE DANIEL:  Yeah.

19      PRESIDING COMMISSIONER ENG:  But there's so many

20  different places where I've seen something written about

21  questioning your gang affiliation.  So why?

22      INMATE DANIEL:  Just hanging around the wrong

23  people. First and foremost, I'm not -- I wasn't a gang

24  member on the street.  I was born and raised in Long

25  Beach.  I never committed a crime nowhere in Los

1    Angeles.

2         Second, just hanging around the same guys I grew

3    up with in prison.  I accept it, my responsibility that

4    I'm affiliated with these gangs.  This is what I clung

5    to.  I accept my full responsibility.

6         PRESIDING COMMISSIONER ENG:  Well, who are the

7    Roaring '60s?

8         INMATE DANIEL:  That was just in my file.  Once

9    things are in your file, you can't challenge that.

10        DEPUTY COMMISSIONER HERRON:  Let me ask you this.

11        INMATE DANIEL:  Go ahead, Sir.

12        DEPUTY COMMISSIONER HERRON:  Are these people

13    that you associated with, were they gang members?

14        INMATE DANIEL:  Yeah.

15        DEPUTY COMMISSIONER HERRON:  Did some of the

16    people that you associated --

17        INMATE DANIEL:  Yeah.

18        DEPUTY COMMISSIONER HERRON:  Were they Crips?

19        INMATE DANIEL:  Yeah.  Yes, Sir.

20        DEPUTY COMMISSIONER HERRON:  Okay.  So it's kind

21    of like if it walks like a duck, if it talks like a duck

22    --

23        INMATE DANIEL:  (Inaudible) a duck.

24        DEPUTY COMMISSIONER HERRON:  Okay.

25        INMATE DANIEL:  That's right.

1    PRESIDING COMMISSIONER ENG:  Okay.  Okay.

2    DEPUTY DISTRICT ATTORNEY DAHLE:  I have no more

3    questions.

4    ATTORNEY CHRISTENSEN:  Actually, Commissioner,

5    you asked the questions that I was going to ask.  You do

6    a good job, so I have none to ask.

7    PRESIDING COMMISSIONER ENG:  Okay.  Commissioner

8    Herron, any other questions?

9    DEPUTY COMMISSIONER HERRON:  You've asked all the

10   questions I was going to ask.

11   PRESIDING COMMISSIONER ENG:  Okay.  I could take

12   that in different ways but --

13   DEPUTY COMMISSIONER HERRON:  No.

14   PRESIDING COMMISSIONER ENG:  Okay.  We'll move on

15   to final statements.  Mr. Dahle?

16   DEPUTY DISTRICT ATTORNEY DAHLE:  Thank you.  I'm

17   speaking on behalf of the District Attorney of Los

18   Angeles County and opposing parole at this time for Mr.

19   Daniel.  I don't believe that it is appropriate to grant

20   him parole at this point in time.  There are two primary

21   reasons that I'm asking that you, in evaluating and

22   weighing your decision, find that he is not yet

23   suitable.

24   First is the nature of the crime.  The defendant

25   stands convicted of second degree murder, but you must

1  look beyond that and look into the record, go over the

2  facts that are available to you that discuss the nature

3  and substance of this particular crime.  And if you do

4  so, you will note there are police reports from the

5  crime itself.  There are the crime partners' statements

6  and the most recent evaluations and statements by the

7  inmate's crime partner and life prisoner serving time in

8  another institution.

9         The facts of this crime show that this was a

10  murder that took place in the course of a planned,

11  organized effort to commit robbery.  This is an

12  exceptionally egregious, aggravated situation.  This

13  inmate was involved in a number of prior robberies and

14  robbery attempts.  He was involved in a long pattern of

15  criminality.

16         In considering second degree murder, even if you

17  look at it as second degree murder, you must weigh and

18  consider the facts and look at the factors that

19  aggravate.  And the fact is, this was a murder that

20  occurred in the course of a robbery.

21         **PRESIDING COMMISSIONER ENG:**  Keep going.  No, we

22  can go a few more minutes.  Go ahead.

23         **DEPUTY DISTRICT ATTORNEY DAHLE:**  In light of that

24  crime, I think with the gravity and seriousness of this

25  crime, it is far higher than a typical second degree

118

1  murder.  The murder committed when a person is driving a

2  motor vehicle, for example, that is under the influence

3  and kills somebody.  This was a crime of predatory

4  conduct by these three individuals.  It was a planned

5  act.  These three individuals all had tied (inaudible)

6  relationships in the gang community.

7       This crime was a crime of opportunity that was

8  moving from one community as Mr. Daniel has indicated,

9  in that it came from Paramount down to Compton and

10 originated in Long Beach, where they sat and discussed

11 this crime.  I think the nature of the crime itself

12 certainly should give you great pause and make a finding

13 that this particular victim was alone, he was at a gas

14 station and then he was shot for the purposes of getting

15 his vehicle.

16      Moreover, while this inmate was not the actual

17 shooter in this case, nonetheless, accepted all of the

18 consequences for this crime, including his post

19 (inaudible) conduct in stripping the victim's automobile

20 and sharing in the take from -- with his crime partners

21 of this victim's property and continued to do so until

22 he was taken back into custody and arrested by police

23 from Compton.

24      Additionally, I am very troubled by his parole

25 plan.  It is not really a parole plan.  He has job

1    offers.  He has plans for residence.  These are not

2    adequately prepared to (inaudible) become a successful

3    parolee.  To that end, this inmate has not laid out a

4    plan that articulates his understanding of what it will

5    cost him to live in society as a bare minimum and

6    (inaudible) with that, a plan for employment that will

7    provide him compensation that will meet those various

8    costs that he would incur.

9         He has indicated in a cumulative sense that his

10   parents have provided money for him.  Flashing back to

11   him at age 22, when this crime occurred, he was on his

12   own, living on welfare, had quit work and was caught up

13   in the lifestyle of money and using illicit drugs to

14   fund his behavior.  He knows what it takes to live on

15   the streets or did.  The question is, does he know what

16   it takes to live on the streets today.  I don't believe

17   that's been adequately demonstrated on his part, his

18   responsibility to show (inaudible).

19        Moreover, I think that it is a very faulty plan

20   for him to plan to return to the same area he frequented

21   when he was victimizing the community by committing his

22   conduct in going out and committing robberies in

23   Paramount and Compton and in the Long Beach area.  As a

24   result of that, while he should be returned to the

25   county of commitment, I think Mr. Daniel needs to

1    reassess his plan.  He has been in custody for nearly 20

2    years.  He should plan, I believe to go back to a

3    Reentry Program that will give him stability and

4    organization in his life and allow him to take advantage

5    of the vocational skills and training that he obtained

6    here in the institution.

7         There is no nexus between his vocations that he

8    has completed and his plan for returning into the

9    community.  He plans to do part-time work, which is an

10   admirable opportunity to keep busy and to earn some

11   money.  But at the Chair noted, it's not going to cover

12   the costs of living in this society today, 20 years

13   after he was received into prison.

14        The circumstances of this plan, I think need to

15   be significantly bolstered.  I think that Mr. Daniel

16   also needs to reflect more upon his (inaudible) view of

17   his crime.  His view of his conduct is internal.  He's

18   looking at him.  He's not looking out at what he did to

19   the victim.  He's looking at what he did to himself.

20   This was a high risk (inaudible).  I have heard nothing

21   here that talked about what the risk was to the people

22   in the community that he was victimizing.

23        I would also note that in 2005, while the inmate

24   was granted a date because his behavior has been

25   admirable in the institutional setting and he has been

1  an active programmer, there was a significant fault with

2  the decision in that Panel, in that they noted that he

3  had no prior juvenile record.

4         But the record in this hearing is replete with

5  indications he was involved in criminal activity very

6  early on.  As early as age 10, he was abusing

7  substances, alcohol and then drugs.  And every time he

8  was imbibing, taking drinks as a minor, every time he

9  was using drugs as a minor, every time he was on the

10  street selling, he was engaged in criminal behavior,

11  whether there was a conviction or not.  And his own

12  admissions to the conduct are self-damning.

13         So to that extent, there is a history here that

14  shows that despite having a supportive family, he had a

15  very unstable relationship, a very unstable antisocial

16  pattern of behavior that I think warrants a longer

17  examination in the institutional setting.

18         I commend him for his disciplinary free behavior

19  and planning, but I don't believe at this time they

20  balance exactly to warrant the grant of a date and I'll

21  submit it on that basis.

22         **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

23         **DEPUTY COMMISSIONER HERRON:**  Let me turn

24  (inaudible).

25                    (Thereupon, the tapes were

1      turned over off the record.)

2      **DEPUTY COMMISSIONER HERRON:**  And this is tape

3  two, side B and we're on the record.

4      **PRESIDING COMMISSIONER ENG:**  Okay.  Ms.

5  Christensen, final statement.

6      **ATTORNEY CHRISTENSEN:**  I strongly disagree with

7  what the District Attorney believes to be true

8  concerning Mr. Daniel's parole plans.  I believe his

9  parole plans are excellent.  I don't see any need for

10  him to have any alternate plans for any transitional

11  living situation.  I don't see any need for him to come

12  here with some sort of cost benefit analysis or budget

13  of how he's going to spend every last cent.  His parole

14  plans are fine.  He has multiple job offers.  He can

15  work either for the -- for the organization that breaks

16  down the -- what is the name of it, sir?

17      **INMATE DANIEL:**  The Trade Center.

18      **ATTORNEY CHRISTENSEN:**  Right.  Either for that

19  company.  He can work for his dad.  He's got multiple

20  job offers and marketable skills.  Mr. Daniel spoke

21  about a number of things that he would be interested in

22  doing.  Masonry, counseling, he's a multi-talented

23  person with many, many interests and these are skills

24  that he's developed since he has been in prison.  So in

25  terms of being able to support himself, I would say he

123

1   gets four stars right there.

2        And in terms of returning to the county of

3   commitment, will he be in gang territory?  Well, I

4   suppose you could say that there's gangs all through Los

5   Angeles County and the fact that he's going to be living

6   with his auntie in a very positive environment.  She

7   seems to be a very stable person and has a good job.  It

8   seems to be ridiculous to conclude that he's going to

9   revert to any gang lifestyle, if, in fact, he was ever

10  in a gang in the first place, which he denies.

11       But there's really nothing wrong with his parole

12  plans.  He says that his family has set money aside.

13  He's got funds to support himself, so I would say it's a

14  safe bet that he will be able to maintain himself and to

15  stay away from any criminal activity.

16       Now, with regard to the crime, he can't do

17  anything about that.  Mr. Daniel takes full

18  responsibility.  In fact, he took responsibility very

19  early on in turning himself in.  He's got very deep

20  remorse for the family.  Mr. Daniel is not the same

21  person that he was when he came to prison.  He's changed

22  dramatically in terms of all the self-help groups that

23  he's been involved in and all the therapy groups.  Just

24  an incredibly long list of activities and he's benefited

25  from all of that tremendously.  Just very, very

124

1  positive, striving to improve himself since he has come

2  into prison.

3      The psychological evaluation gives him a GAF

4  score of 90 and rates him as a low risk.  I would

5  conclude with that.  And just some of the comments that

6  Dr. Starrett makes in his report are notable.  He says

7  that he has been more active in self-help than any other

8  individual that I've ever interviewed.  And Dr. Starrett

9  also says that he is very positive, he's a very

10  positive, upbeat person and a joy to interact with.

11      Mr. Daniel, over the years, has made very

12  positive impressions upon others who have worked with

13  him.  In the binder of materials that he's brought in

14  today, there are multiple letters from correctional

15  officers and others who have worked with him and

16  observed him over a long period of time and have very

17  positive comments to say about him.

18      So truly, the change in Mr. Daniel has been

19  genuine.  This is someone who has set goals for himself

20  and you can see that by the way he approaches the task

21  at hand, just approaching the task of getting ready for

22  a parole hearing.  Look at all the work that went into

23  this.  The letters of support that he tried to get for

24  himself and he succeeded in large part and reached out

25  to the community, trying to develop all of the resources

125

1  in order to succeed on parole.

2      He has so much going for him, because Mr. Daniel

3  is very pro-active.  He's very intelligent.  He's not

4  one who just sits by and lets things happen to him.  I

5  believe he's one of the inmates who initiated the New

6  Leap in Life.  Am I correct?

7      **INMATE DANIEL:**  Yes.

8      **ATTORNEY CHRISTENSEN:**  Yes.  And that is an

9  inmate who sees a need for something to be of benefit to

10  the employees and he actually, I think with a couple of

11  other inmates here, actually began a group and that's

12  very noteworthy.  There are not that many inmates who

13  would put themselves out to do that.  That shows a great

14  deal of self-confidence.  He sees a need, not only to

15  help himself, but to help others.

16      So all in all, Mr. Daniel can be safely released

17  -- can be safely released to the community.  He has been

18  rehabilitated and that he has utilized all of the

19  resources available in the institution to improve

20  himself and learn and to grow and to develop good

21  judgment.  And he is not the same antisocial person he

22  was when he came to prison.  According to Dr. Starrett,

23  the antisocial traits are in complete remission.  He

24  does not say in institutional remission, but in complete

25  remission.

126

1    And Mr. Daniel will succeed on parole. He was

2 given a date in 2005. I believe that he is just as

3 deserving today in 2007 that he was a couple of years

4 ago. And I think he's a great risk to do -- Excuse me,

5 he is no risk out there whatsoever to revert to any

6 criminal behavior. But there's no doubt that he would

7 be a productive, law abiding member of society because

8 he's prepared himself well to go out and do just that.

9 Thank you.

10    **PRESIDING COMMISSIONER ENG:** Okay, thank you.

11 Okay, Mr. Daniel, if you would like, this is your chance

12 to --

13    **INMATE DANIEL:** Yes, Ma'am.

14    **PRESIDING COMMISSIONER ENG:** -- give us a final

15 statement regarding your parole suitability.

16    **INMATE DANIEL:** First and foremost, I want to,

17 with all due respect to Ms. Eng and all due respect to

18 the Deputy Commissioner, all due respect to the District

19 Attorney, but first and foremost, to Mr. and Mrs. Day,

20 there is not a day I don't think about what I did, what

21 I participated in. Their son is precious. They didn't

22 have no responsibility for doing that. I take full

23 responsibility for that.

24    But still another thing I wanted to throw at you

25 was, in this was a couple of things that you didn't see

1    that, where I planned and then when you're talking about

2    the job, I have an uncle that is a supervisor that works

3    at Costco.  So, I have support as far as job offers.

4    I'll always have a backup.

5            But first and foremost, I take full

6    responsibility.  And the person that the District

7    Attorney was talking about, that person does not exist.

8    That was 20 years ago.  I put myself in that situation,

9    as far as immature versus mature.  I'm mature.  I know

10   what I did.  I know what I must achieve every day.  I

11   know how to continue to do this right.

12           And the reason why I deserve to be out there,

13   first and foremost, I would never, ever put nobody

14   else's family in that type of situation.  First and

15   foremost is that family.  I wake up with them every day,

16   so I could never, ever put somebody else.  And then,

17   I've got to think about my family.  It's not just me.  I

18   can't be selfish.  That's why I said, I love myself.

19   And he was talking about looking within yourself.  I

20   have to, became I'm the one, I was that person.  And

21   there's not a day that I don't think about what I did

22   and I have plans.  I have so many aspirations.

23           So, I'm just, I'm asking for the opportunity.  I

24   deserve it.  I have did everything up in here that I

25   possibly can do in prison.  I feel that I'm more of a

128

1  benefit in society, where I can help older and young and
2  stop what's going on.  They're crying out and that's
3  what I love to do is to help.  Is to (inaudible)
4  example.  I'm just grateful and continue to do what's
5  right.  And there's so much more to offer to me.  You
6  know, it's not the community.  It was the person.  The
7  community is never unsafe.  It's the persons that live
8  in the community.  (Inaudible) college, if the window is
9  broken, somebody got to fix it.  I'd be one of the guys
10  who are going to fix it.  I know I have a small limited
11  role, but I'm going to still continue to do my part.  I
12  have plans.  I just need the opportunity.
13       And I understand what you were saying as far as
14  putting everything in detail, but it's kind of hard
15  because you don't know, you know, as far as health, the
16  healthcare and all of that.  I understand that's
17  important, I need that, but I know I'm going to continue
18  to strive.  I will have that.
19       You know, for 20 years, it's hard to say what a
20  person can write on a letter and can do for you.
21  They're not going to offer to that somebody that they
22  really don't know, so they've got to get a chance to
23  know me.  And I understand what you were saying, you
24  know.  I'm just grateful to be here.  Like I said,
25  anything that I have achieved, it goes toward the

1    family, to (inaudible), if they need anything, I'm

2    there.

3          And then another thing, what was never brought

4    up, I sent them a letter.  I send them a letter every

5    year.  A letter, it was marked February 6th.  It's just

6    to open up.  You know, I understand that I might not

7    ever be forgiven because of the program that I'm in,

8    Victims Education group, so it lets you know about these

9    (inaudible).  So therefore, I've got to continue to do

10   what's right and continue to do what's right.  I'm just

11   grateful.  That's (inaudible).

12         **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you for

13   your comments.  We'll now recess for deliberations.  The

14   time is 3:18.

15                      R E C E S S

16                       --o0o--

17

18

19

20

21

22

23

24

25

1         CALIFORNIA BOARD OF PAROLE HEARINGS

2              D E C I S I O N

3     **DEPUTY COMMISSIONER HERRON:**  We're on record.

4     **PRESIDING COMMISSIONER ENG:**  Okay, thank you.

5  The time is 3:39 and all parties who were present prior

6  to our recess for deliberations have since returned.

7       In the matter of Demetrius Daniel, CDC number

8  E-03098, the Panel has reviewed all of the information

9  received from the public and relied on the following

10 circumstances in concluding that the prisoner is not

11 suitable for parole and would pose an unreasonable risk

12 of danger to society or a threat to public safety if

13 released from prison.

14      The Panel finds that the offense was carried out

15 in an very cruel, very cold and callous manner.  And

16 that the inmate and his crime partners basically sought

17 out to go find someone to carjack and Mr. Daniel's crime

18 partner basically approached an unarmed Mr. Day while he

19 was putting water into his radiator and proceeded to

20 shoot him to death.  And then the, everyone just took

21 off.

22      It was carried out in a very calculated manner.

23 And again, it goes to the planning stages.  I mean, this

24 was a planned out offense by the inmate and his two

25 **DEMETRIUS DANIEL     E-03098     DECISION PAGE 1     3/5/07**

 1   crime partners, where they had planned to drive around

 2   and look for a potential victim, where they could easily

 3   carjack a vehicle in order to be able to strip the car

 4   down later on and be able to sell the parts for money.

 5        It was carried out in a manner that demonstrates

 6   an exceptionally callous disregard for human suffering.

 7   After the victim was shot, even though this inmate did

 8   not see the shooting occur, he did hear the shot and

 9   proceeded to just take off, as well as his crime partner

10   who did the shooting, took off in the victim's car

11   without any regard for whether or not Mr. Day was still

12   alive or not.

13        The motive for the crime was really based on

14   greed and was very trivial in relation to the offense.

15   As the inmate had stated to this Panel that it was the

16   intent of the trio to be able to get a vehicle in order

17   to strip it down and be able to make money from the sale

18   of the auto parts.

19        These conclusions are drawn from the Statement of

20   Facts, wherein the inmate and his two friends, Mr.

21   Howard and Mr. Eaves, on November 27th, 1987,

22   participated in the fatal shooting of Kenneth Day.  They

23   basically decided to drive around during the evening.

24   The inmate, Mr. Daniel, was driving the automobile with

25   **DEMETRIUS DANIEL     E-03098     DECISION PAGE 2     3/5/07**

1   Mr. Howard and Eaves as passengers.  Mr. Eaves was armed

2   with a handgun and he told Mr. Daniel that he wanted to

3   get a car.  So they ended up in Compton, where they saw

4   Kenneth Day in his 1980 Chevrolet El Camino.  They

5   followed Mr. Day to a gas station, where Day was putting

6   water into the radiator of the El Camino.  Freddie Eaves

7   then walked up to Day and shot him in the head.  Eaves

8   then jumped into the victim's vehicle and both vehicles

9   fled the scene.  Later the three men met to strip and

10  burn the vehicle.

11          Regarding the inmate's prior records, we note

12  that he does have an escalating pattern of criminal

13  conduct.  And does have, we think is a history of

14  somewhat unstable, tumultuous relationships with others

15  in his admitted association with negative peers that

16  happened to be gang members.  And again, this is based

17  on what, in our discussions with the inmate about the

18  types of people he was hanging around with and when he

19  was first starting to deal with drugs.  And then was

20  advised by his parents that he was hanging out with the

21  wrong people and to stop doing this, so he turned to

22  carjacking instead.

23          And again, we find that his prior criminality

24  does include three prior arrests, basically for selling

25  **DEMETRIUS DANIEL      E-03098      DECISION PAGE 3      3/5/07**

1  drugs, which we had discussed during the hearing. And

2  one incident regarding embezzlement, which according to

3  the inmate, had to do with a failure to return a rental

4  car, in which the inmate had signed the papers and given

5  it to someone else to use, who then failed to return the

6  car. But according to the inmate, that was, I believe

7  it was finally dismissed because the car was eventually

8  returned and the inmate did pay for the extra time.

9          Regarding this inmate's institutional behavior,

10  we only note that his only misconduct while incarcerated

11  includes three 128(a) counseling chronos, the last one

12  being back in November of '95 for excessive contact with

13  a visitor. And he also has three 115 disciplinary

14  reports, the last one being in February of '96 for

15  organizing a football gambling pool.

16          We do note that the psychological evaluation, I

17  believe dated August 26th, 2005 and authored by

18  R. Starrett, S-T-A-R-R-E-T-T, is somewhat positive.

19          Regarding this inmate's parole plans, he did

20  supply this Panel with numerous support letters, which

21  we commend him for. However, they were rather vague and

22  I ended up having to ask a lot of different questions of

23  this inmate to try to get additional information. So,

24  based on just the surface, when one reads these letters,

25  DEMETRIUS DANIEL    E-03098    DECISION PAGE 4    3/5/07

1  we find that, and he doesn't have viable residential

2  plans in the last county of legal residence, if you just

3  read the letters by themselves and not have any

4  additional conversation.  And that he has indications of

5  acceptable employment, you know, for the part-time job.

6  However, stating that you wouldn't have a problem going

7  back into the trucking, but having no letters from the

8  trucking company stating that they would even consider

9  hiring you.  That's really what this Panel needs to see,

10  okay?

11        And we discussed this in great detail and length

12  about what you, Mr. Daniel, need to do to really firm

13  things up.  And again, it's in your best interest to do

14  that.  Again, the worst thing you could do is provide a

15  document that ends up raising more questions than it

16  supplies answers to, which I think you understand.

17  You're a very bright man, so you do understand, I

18  believe, what I'm explaining to you.  And that we do

19  commend you because you have been looking in the county

20  of commitment.

21        However, I do want to add this also.  We have had

22  inmates that have terrific support from their families

23  and could easily go back into their county of

24  commitment, you know, upon parole.  And some have chosen

25  **DEMETRIUS DANIEL    E-03098    DECISION PAGE 5    3/5/07**

1   specifically to go to other types of residential

2   programs to make it -- to make it easier for them to

3   transition back into the community, due the various

4   things that could be drug problems before or drinking

5   problems, whatever.

6        But they have chosen to release to some sort of

7   residential plan away from the county of commitment

8   where they have already prepaid and set things up.  And

9   that goes a long way because it shows real foresight in

10  an inmate to realize that I need everything that I can

11  get my hands on to succeed.

12       And sometimes even though it would be easiest to

13  go home, sometimes it may not be in your best interest.

14  So, you know, Panels do have the authority to order

15  parole into a different county if all the plans that are

16  provided for the inmate, by the inmate veer towards

17  better success being away from home, being away from the

18  county of commitment.  Does that make sense to you?

19           INMATE DANIEL:  Yes, Ma'am.

20           PRESIDING COMMISSIONER ENG:  Okay.  Okay.  This

21  Panel also notes that the representative from the

22  District Attorney's Office of Los Angeles County did

23  state their opposition to parole at this time, along

24  with a, we did receive a response to the 3042 notice

25  DEMETRIUS DANIEL      E-03098      DECISION PAGE 6      3/5/07

1  from the Los Angeles County Sheriff's Department.  And

2  in that letter, it also stated opposition to parole at

3  this time.

4       The Panel makes the following findings.  That we

5  really believe that you should be commended for really

6  maintaining your disciplinary free status and for your

7  continuing programming.  Okay.  You haven't given up at

8  all which is -- which is good and you've come in here

9  and you were up front and, you know, and honest with the

10 Panel, which is to your benefit.  You've got a ways to

11 go, but I think that you understand.

12      And I believe that, you know, you're heading in

13 the right direction, okay, and I think that you know

14 what needs to be done.  And again, we hope that you stay

15 on track because it's always to your benefit, okay?

16 However, these positive aspects of his behavior do not

17 outweigh the factors of unsuitability.

18      Sir, basically, you've got 12 months to pull it

19 together.  Okay, we're giving you a one year denial.

20 And the Panel recommends that you remain disciplinary

21 free.  Okay.  That if available, that you continue to

22 upgrade yourself vocationally and educationally.

23 Another thing, you've got some very good vocations.

24 That didn't come across very strong to us.

25 DEMETRIUS DANIEL      E-03098      DECISION PAGE 7      3/5/07

1    **INMATE DANIEL:**  Yeah.

2    **PRESIDING COMMISSIONER ENG:**  Okay.  And again, I

3  really recommend that you pay attention to the

4  transcript when you get it and listen to some of the

5  things that Mr. Dahle had stated.  Okay.  And because I

6  think that Mr. Dahle with the DA's Office said some

7  very, very important statements to you that, and they're

8  really good recommendations, okay?

9    And that you've got some very, very solid skills

10  that you've developed, but yet, we don't see that

11  connect with your plans on the outside for working,

12  okay?  And some of these skills like welding can bring

13  you a lot more money to live off of.  So, maybe you hate

14  it.  If you hate it, then you should tell the Panel,

15  yeah, I did it, but I really don't like it, I really

16  don't want to do this.

17    So again, it's to your benefit, the better that

18  you can lay things out for yourself, then it, you know,

19  if your goal is to do the counseling, lay that out for

20  yourself.  Lay out that plan, because then you're going

21  to have a clear path that you're going to follow and you

22  can put, you know, a timeline along with it, okay?

23    So, continue to upgrade yourself vocationally,

24  educationally and again, continue to participate in any

25  DEMETRIUS DANIEL      E-03098      DECISION PAGE 8      3/5/07

1   and all types of self-help that you can, because this is

2   very, very beneficial to you, okay?

3        That basically concludes the reading of our

4   decision.  And I wish you the best of luck and I'm going

5   to ask if Commissioner, my fellow Commissioner has

6   anything else to add?

7        **DEPUTY COMMISSIONER HERRON:**  Just one thing.  And

8   your parole plans, like say I'm going to drive a truck

9   for my father, and have your father write a letter of

10  support saying that, you know, you're going to work 40

11  hours a week and you're going to be paid X amount.

12       Try to be as meticulous and as specific as you

13  possibly can.  Try to leave nothing uncovered.  Dot all

14  Is, cross all Ts that you can think of, as far as your

15  parole plans are concerned.

16       **INMATE DANIEL:**  Yes.

17       **DEPUTY COMMISSIONER HERRON:**  Okay.  That's all I

18  have.

19       **PRESIDING COMMISSIONER ENG:**  Okay.

20       **DEPUTY COMMISSIONER HERRON:**  Good luck to you.

21       **PRESIDING COMMISSIONER ENG:**  The time is 3:51.

22                         --o0o--

23

24

25  DEMETRIUS DANIEL      E-03098      DECISION PAGE 9      3/5/07

```
1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21  PAROLE DENIED ONE YEAR

22  THIS DECISION WILL BE FINAL ON: _____ JUL 0 3 2007 _____

23  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

24  DATE, THE DECISION IS MODIFIED

25  DEMETRIUS DANIEL    E-03098    DECISION PAGE 10    3/5/07
```

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KARIN R. LEWIS, as the Official Transcriber,

hereby certify that the attached proceedings:

| | |
|---|---|
| In the matter of the Life ) | |
| Term Parole Consideration ) | CDC Number:  E-03098 |
| Hearing of: ) | |
| ) | |
| DEMETRIUS DANIEL ) | |
| ) | |

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

MARCH 5, 2007

1:10 P.M.

were held as herein appears.  Further, this transcript

is a true, complete and accurate record, to the best of

my ability, of the recorded material provided for

transcription.

_Karin R. Lewis_
_____
Karin R. Lewis
April 23, 2007
Capitol Electronic Reporting

EXHIBIT "B"

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
## (Penal Code Section 3041.2)

**DEMETRIUS DANIEL, E-03098**
**SECOND-DEGREE MURDER**

AFFIRM:                      _____

MODIFY:                      _____

REVERSE:                         X_____

On the evening of November 27, 1987, Demetrius Daniel was hanging out with two friends when they decided to steal some cars. Mr. Daniel drove them around the Los Angeles area to find a car to steal. After awhile, they observed 26-year-old Kenneth Day driving a 1980 Chevrolet El Camino. Mr. Day drove into a gas station and stopped to pour water into his radiator. Mr. Daniels followed him to the gas station and parked nearby. One of the crime partners got out of the car, walked up to Mr. Day, and shot him in the head. The shooter then jumped into Mr. Day's car and fled. Mr. Daniel and his remaining passenger also fled. Mr. Day was transported to a local hospital and subsequently died. Mr. Daniel and his partners stored the stolen car in Mr. Daniel's uncle's garage and stripped it for parts.

Mr. Daniel was arrested several weeks later. He pled guilty to second-degree murder and was sentenced to 15 years to life in prison. A one-year firearm enhancement was stayed by the court.

Mr. Daniel was 22 years old when he murdered Mr. Day. Prior to the murder, he had never been convicted of a crime, but was arrested multiple times for drug possession and, at one point, was wanted for embezzlement. Following his conviction for Mr. Day's murder, however, Mr. Daniel was convicted of drug possession—based on an arrest that occurred before the life offense—and was sentenced to two years in prison. Moreover, Mr. Daniel told the 2005 Board that he sold drugs in the past and that a couple of weeks prior to Mr. Day's murder, he participated in a carjacking in which his crime partners were armed. Mr. Daniel's drug conviction and admitted involvement in criminal acts, which includes a violent crime committed just days before the murder, is a negative factor weighing against his parole.

Once incarcerated for the life offense, Mr. Daniel's conduct did not immediately improve. In the 1990s, Mr. Daniel was disciplined three times for violating prison rules: in 1990 for taking a threatening stance with a correctional officer by threatening to "sucker punch" the officer and clenching his fists, in 1992 for refusing a direct order, and in 1996 for organizing a football gambling pool. And throughout his incarceration, Mr. Daniel has been counseled three times for minor misconduct. Mr. Daniel has been discipline-free now since 1996, but given the serious nature of his disciplinaries in 1990 and 1996, as well as the relative recency of his 1996 disciplinary, his current good behavior is too recent a gain to weigh in favor of his parole.

Demetrius Daniel, E-03098
Second-Degree Murder
Page 2

To his credit, Mr. Daniel has made efforts to enhance his ability to function within the law upon release from prison. He has taken adult-basic education and Hebrew language classes, has received vocational training in masonry, building maintenance, office machine repair, and welding, and has held skilled institutional jobs. He has participated in a wide array of self-help and therapy, including Breaking Barriers, Anger Management, Logo Mentoring workshop, Non-Violent Conflict Resolution, Creative Conflict Resolution, Alternatives to Violence, Youth Adult Awareness Program, Responsibility of Self-Determination Program, Parenting Program, Network for Life Faith-Based Pre-Release Program, Greystone Chapel's Faith-Based 12-Step Recovery Program, Substance Abuse Program, Alcoholics Anonymous, and Narcotics Anonymous. He has received positive evaluations from mental-health and correctional professionals and has made confirmed plans for parole to live with family in Los Angeles County and work at one of multiple job offers. These are all positive factors supportive of Mr. Daniel's parole.

Mr. Daniel told his 1997 Life Prisoner evaluator that for many years he was angry at the justice system for holding him just as liable for Mr. Day's murder as if he were the shooter, but he now claims to take full responsibility for the murder and is sorry. Mr. Daniel's current insight into the life offense is a creditable gain, but I would be remiss to ignore the gravity of the murder he committed. Although Mr. Daniel maintains that he did not know his crime partner was going to shoot the victim, he and his friends planned to steal a car that night and he knew that one of his friends was armed with a gun. Mr. Daniel drove the group around the Los Angeles area looking for a victim. When they spotted Mr. Day's car, Mr. Daniel followed the victim to a gas station and parked nearby so that his crime partner, who was armed, could rob Mr. Day of his car. The fact that Mr. Day was murdered in the commission of a robbery makes the gravity of Mr. Daniel's actions more than the minimum necessary for his second-degree murder conviction and this fact alone is a sufficient basis for me to conclude that he would pose an unreasonable public-safety risk if released from prison at this time.

I note that both the Los Angeles County District Attorney's Office and the Los Angeles County Sheriff's Office have both voiced opposition to Mr. Daniel's parole in the past year.

Mr. Daniel is 40 years old now, and has made commendable gains during his 17-year incarceration. But given the current record before me and after carefully considering the same factors the Board must consider, I believe his release from prison would pose an unreasonable risk of danger to society at this time. Accordingly, I REVERSE the Board's 2005 decision to grant parole to Mr. Daniel.

Decision Date: 6/29/05

ARNOLD SCHWARZENEGGER
Governor, State of California

EXHIBIT "C"

FILED

JAN 1 2 2007

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
By _____ Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SANTA CLARA

|  |  |
|---|---|
| In re | No.: 71194 |
| DONNELL E. JAMEISON, | POST FINDINGS AND ORDER |
| On Habeas Corpus | FURTHER DISCOVERY ORDER |

Factual Findings

Based upon the evidence presented at the hearing, the Court makes the following factual findings:

1) During the months of October through December of 2003 the Board conducted 470 parole suitability hearings. For all of the 470 inmates considered, the Board determined at those hearings or in prior hearings that the commitment offense was 'exceptional' under §2402(c)(1).[1]

2) The number of cases examined (470) is a statistically significant sample from which conclusions can be extrapolated for the entire year and for several years before and after.

---

[1] In over 90% of cases the inmates were denied parole at that hearing and the 'exceptional' nature of the commitment offense was a basis for that decision. In the remaining 10% of cases, inmates had been denied parole at a previous hearing in which the commitment offense was also found to be 'exceptional.'

1

1      3)   The number of cases examined (470) is statistically

2   sufficient to make conclusions about a population of 20,000, and thus

3   the actual population of all inmates serving life sentences and

4   currently subject to the Board's interpretation of § 2402(c)(1).[2]

5   Discussion

6        The applicable law is articulated in the following passage from

7   *Dannenberg*, explaining its holding in *Rosenkrantz*:

8        [In *Rosenkrantz*] we cautioned, sole reliance on the
        commitment offense might, in particular cases, violate
9        section 3041, subdivision (a)'s provision that a parole
        date "shall normally be set" under "uniform term"
10       principles, and might thus also contravene the inmate's
        constitutionally protected expectation of parole.   We
11       explained that such a violation could occur, "for
        example[,] where no circumstances of the offense
12       reasonably could be considered more aggravated or
        violent than the minimum necessary to sustain a
13       conviction for that offense." (*In re Rosenkrantz* (2002)
        29 Cal.4th 616, 683.)  Quoting *In re Ramirez* (2001) 94
14       Cal.App.4th 549, 570, we suggested that, in order to
        prevent the parole authority's case-by-case suitability
15       determinations from swallowing the rule that parole
        should "normally" be granted, an offense must be
16       "particularly egregious" to justify the denial of
        parole. (*Rosenkrantz, supra*, at p. 683.)
17       (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1094-
        1095.   See also *In re Weider* (2006) C.D.O.S. 11137,
18       D.A.R. 15795, LEXIS 1916, quoting this language.)

19       Thus, the general rule is that a parole date should normally be

20   set.  Using the crime itself as grounds for a parole denial is

21   permissible but should not "swallow" that rule.  While there does not

22   need to be intra case comparison for the purposes of assuring

23   proportionality, or uniformity, of the sentence, the requirement that

24   "an offense must be 'particularly egregious' to justify the denial of

25   parole" necessarily envisions some sort of comparison.  It is for

26   

27   [2] Professor Kafai testified that a "sample size of 470 would [] still be a reliable
     sample" for "a population of 20,000."  (TX at p. 51.)  According to the Board's
     official website (www.corr.ca.gov) there are 20,916 inmates serving life sentences
28   as of the June 30, 2006, "Prison Census."  Since not all of those inmates are
     currently eligible for parole hearings it can safely be said that there are less
     than 20,000 inmates who could possibly come before the Board for parole hearings as
     are at issue here

                                            2

1  this reason that it was essential to the *Dannenberg* holding that "the
2  regulations do set detailed standards and criteria for determining
3  whether a murderer with an indeterminate life sentence is suitable
4  for parole." (*Dannenberg* at p. 1080. See also page 1096, footnote
5  16: "the Board must apply detailed standards when evaluating whether
6  an individual inmate is unsuitable for parole on public safety
7  grounds.")

8      Admittedly, the Board's decision making processes, guided by the
9  "detailed standards and criteria" need not be so regimented that
10  different panels may not see *some* cases differently. However, if the
11  § 2402(c)(1) factor truly constitutes an exception to the rule, then
12  there must be a substantial number of cases to which the exception
13  does not apply. The fact that 100% of cases are deemed to be
14  'exceptionally egregious' in the findings of the Board reveals not
15  only a mere violation of the rule that a parole date shall normally
16  be set, but also that the "detailed standards and criteria" are being
17  applied in such a way that they have no meaning whatsoever.

18      In formulating a proper remedy in this case, it must be noted
19  that the sample/point estimate from 2003 may not be ~~not~~ valid for
20  drawing conclusions about the behavior of the Board today. With a
21  different Governor, and different commissioners, there may have been
22  some effort to apply the § 2402(c)(1) criteria in a meaningful (as
23  opposed to blanket) manner. It therefore appears that a more recent
24  sampling is necessary to definitively and conclusively resolve the
25  issue before the court. Absent this determination, there is no way
26  to guarantee that an order requiring the Board to conduct a new
27  hearing will ensure due process or provide any real solution at all.

28      The significance of the question before the Court cannot be

1   overstated. If Petitioner proves, as it so far appears, that the

2   Board has uniformly applied § 2402(c)(1) to deny parole in every

3   case, Petitioner will have also proved the invalidity of the Board's

4   supposedly "detailed standards" and the existence of a bias which

5   permeates the Board's processes.

6      Because of the far reaching implication of these findings and

7   conclusions, the Board shall have every opportunity to demonstrate

8   good faith efforts to operate within the "detailed standards"

9   mandated by the California Supreme Court.[3]  Respondent shall

10  therefore provide discovery, in the same manner as already provided,

11  for the month of June 2006.

12 Separation of Powers

13      Counsel for Petitioner has indicated that he will seek a court

14  order that Petitioner be released on parole if this Court invalidates

15  the Board's criteria and methods and decides to independently review

16  the matter guided by the controlling Penal Code sections instead of

17  the Title 15 guidelines. Respondent has objected "it's a separation

18  of powers issue for a petitioner to ask the Court to grant him

19  parole." Respondent has correctly identified the issue presented,

20 and the question should be fully briefed.

21      The separation of powers doctrine provides "that the legislative

22 power is the power to enact statutes, the executive power is the

23 power to execute or enforce statutes, and the judicial power is the

24 power to interpret statutes and to determine their

25 constitutionality." (Lockyer v. City and County of San Francisco

26  

—————————————————————

27 [3] Along these lines, Respondent may want to have the Commissioners themselves offer an explanation for the evidence thus far gathered.  Because the Board performs a "quasi-judicial function" in this regard, (Hornung v. Superior Court (2000) 81

28 Cal.App.4th 1095, 1099,) Petitioner may not inquire into the Board members mental processes. However that does not mean Respondent is precluded from offering such direct evidence if they want to testify as to their good faith and conscientious efforts.

4

1    (2004) 33 Cal.4th 1055, 1068.)  If the evidence proves that the Board

2    is not executing/enforcing the legislature's statutes as intended it

3    will be the court's duty to intervene.  The question to be answered

4    in that case is whether the Board is violating the separation of

5    powers doctrine by appropriating to itself absolute power over parole

6    matters and disregarding the limits and guidelines placed by the

7    statute.[4]

8        "Government Code section 11342.2 provides: 'Whenever by the

9    express or implied terms of any statute a state agency has authority

10    to adopt regulations to implement, interpret, make specific or

11    otherwise carry out the provisions of the statute, no regulation

12    adopted is valid or effective unless consistent and not in conflict

13    with the statute and reasonably necessary to effectuate the purpose

14    of the statute.'  Administrative regulations that alter or amend the

15    statute or enlarge or impair its scope are void and courts not only

16    may, but it is their obligation to strike down such regulations."

17    (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75

18    Cal.App.4th 1315, 1341, citations omitted.)

19        The vice of overbroad and vague regulations such as are at issue

20    here is that they can be manipulated, or 'interpreted,' by executive

21    agencies as a source of unfettered discretion to apply the law

22    without regard to the intent expressed in the legislature's enabling

23    statutes.  In short, agencies may usurp unlimited authority from

24    vague regulations and become super-legislatures that are

25

26    [4] "It is settled that Administrative regulations that violate acts of the
Legislature are void and no protestations that they are merely an exercise of
administrative discretion can sanctify them.  They must conform to the legislative

27    will if we are to preserve an orderly system of government.  Nor is the motivation
of the agency relevant: It is fundamental that an administrative agency may not
usurp the legislative function, no matter how altruistic its motives are."

28    (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16
Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of
San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

5

1  unaccountable to the people.  As it has sometimes been framed and

2  addressed in the case law, a vague or all encompassing standard runs

3  the risk of "violat[ing] the separation of powers doctrine by

4  'transforming every [executive decisionmaker] into a "mini-

5  legislature" with the power to determine on an ad hoc basis what

6  types of behavior [satisfy their jurisdiction].'"  (*People v. Ellison*

7  (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*

8  *(Caswell)* 1988) 46 Cal.3d 381, 402.)

9      "It is concern about 'encroachment and aggrandizement,' the

10  [United States Supreme Court] reiterated, that has animated its

11  separation of powers jurisprudence.  'Accordingly, we have not

12  hesitated to strike down provisions of law that either accrete to a

13  single Branch powers more appropriately diffused among separate

14  Branches or that undermine the authority and independence of one or

15  another coordinate Branch.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th

16  472, 493, quoting *Mistretta v. United States* (1989) 488 U.S. 361,

17  382.)

18      This articulation of the principle seems to speak directly to

19  the situation at hand.  The Board, by its enactment and

20  interpretation of Title 15, § 2402, has appropriated to itself

21  absolute and unreviewable power over parole decisions for inmates

22  serving life terms.  Extending far beyond the letter and spirit of

23  the Penal Code provisions, Title 15, § 2402, gives the Board the

24  power to declare every crime sufficient to deny parole forever.

25  "[I]t is an elementary proposition that statutes control

26  administrative interpretations."  (*Ohio Casualty Ins. Co. v.

27  Garamendi* (2006) 137 Cal.App.4th 64, 78.) Title 15 § 2402 as applied,

28  however, has no controls or limitations.

6

1    The PC § 3041(b) exception to the rule that parole shall be
2    granted can only be invoked when the "gravity of the current
3    convicted offense or offenses, or the timing and gravity of current
4    or past convicted offense or offenses, is such that consideration of
5    the public safety requires a more lengthy period of incarceration for
6    this individual." The word "gravity" is a directive for comparison
7    just as "more lengthy" indicates a deviation from the norm. While
8    *Dannenberg* held there does not need to be intra case comparison for
9    the purposes of term uniformity or proportionality, there necessarily
10   has to be some sort of comparison for the purposes of adhering to the
11   legislative mandate that parole is available. The evidence so far
12   presented strongly supports a finding that the Board employs no
13   meaningful yardstick in measuring parole suitability. This would be
14   a violation of the separation of powers doctrine. (*People v. Wright*
15   (1982) 30 Cal.3d 705, 712-713. And see *Terhune v. Superior Court*
16   (1998)65 Cal.App.4th 864, 872-873.)

17   Due Process Considerations

18       The same evidence shows a fundamental violation of due process.
19   Although the Board's Title 15 criteria are not on par with
20   legislative enactments, there is no reason a vagueness challenge,
21   such as has been presented in this case, should not be analyzed
22   identically. When distinguishing between murders for purposes of the
23   death penalty the United States Supreme Court has stated: "Our
24   precedents make clear that a State's capital sentencing scheme also
25   must genuinely narrow the class of persons eligible for the death
26   penalty. When the purpose of a statutory aggravating circumstance is
27   to enable the sentencer to distinguish those who deserve capital
28   punishment from those who do not, the circumstance must provide a

7

1  principled basis for doing so.  If the sentencer fairly could

2  conclude that an aggravating circumstance applies to every defendant

3  eligible for the death penalty, the circumstance is constitutionally

4  infirm." (*Arave v. Creech* (1993) 507 U.S. 463, 474, citing *Maynard*

5  *v. Cartwright* (1988) 486 U.S. 356, 364: "invalidating aggravating

6  circumstance that 'an ordinary person could honestly believe'

7  described every murder," and, *Godfrey v. Georgia* (1980) 446 U.S. 420,

8  428-429: "A person of ordinary sensibility could fairly characterize

9  almost every murder as 'outrageously or wantonly vile, horrible and

10 inhuman.'")

11      The evidence here demonstrates the lack of any "principled

12 basis" for distinguishing between cases.  It has been shown that the

13 Board has applied the criteria in a way that results in finding that

14 "an aggravating circumstance applies to every defendant eligible" for

15 parole.  There is no demonstration of any effort by the Board to

16 narrow the group of inmates who may be denied parole because of their

17 parole eligible crime.

18      In the same vein, the United States Supreme Court has also

19 stated: "In evaluating a facial challenge to a state law, a federal

20 court must, of course, consider any limiting construction that a

21 state court or enforcement agency has proffered." (*Kolender v.*

22 *Lawson* (1983) 461 U.S. 352, 355, quoting *Hoffman Estates v. Flipside,*

23 *Hoffman Estates, Inc.* (1982) 455 U.S. 489, 494, n. 5 (1982).)  No

24 'limiting construction' of the regulations has been offered to rebut

25 the conclusion that the Board employs § 2404 to in a way that

26 provides for limitless power and unrestricted authority.

27 <u>Orders</u>

28      The parties shall submit further briefs, on or before March 2,

8

1  2007, addressing the three points outlined above.  ([1] Whether,

2  based on all the evidence, the Board has knowingly violated the

3  statutory directive that parole should be the rule and not the

4  exception, [2] Whether the Board standards and criteria are invalid

5  as violating the separation of powers doctrine, and, [3] Whether the

6  Board standards and criteria are void for vagueness and a due process

7  violation.)

8       Respondent is further ordered to provide discovery to Petitioner

9  of the transcripts of the parole denials of every life term inmate

10  who had a parole hearing in June of 2006.  Respondent shall first

11  examine the list of hearings and results for June 2006, and for those

12  inmates who were denied parole shall provide a copy of that

13  transcript to Petitioner.  For those inmates who were granted parole

14  Respondent shall provide a copy of the transcript of the prior

15  hearing at which parole was denied.

16       Respondent is to comply with the first part of this discovery

17  order (the inmates who were denied parole in June, 2006,) within 25

18  days.  Respondent is to comply with the remainder of the discovery

19  order (the prior parole denials for those who were granted parole in

20  June, 2006,) within 15 days thereafter.

21

22

23  DATED:   January 11, 2007

24                                    LINDA R. CONDRON
                                      JUDGE OF THE SUPERIOR COURT

25

26  cc:  Petitioner's Attorney (Jacob Burland)
         Attorney General (Jessica Blonien)

27

28

EXHIBIT "C"

EXHIBIT "D"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 29, 2007 | | | Deputy Clerk |
|-------|------------------|---------|----------|--------------|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | |
| | NONE | Bailiff | NONE | Reporter |

<table>
<tr><td></td><td colspan="2">(Parties and Counsel checked if present)</td></tr>
<tr><td>BH004763<br>In re,<br>DEMETRIUS DANIEL,<br>            Petitioner,<br><br>On Habeas Corpus</td><td>Counsel for Petitioner:<br><br>Counsel for Respondent:</td></tr>
</table>

job offer for a part time job and his plans to enter into counseling were unreasonable, does not support a finding of unsuitability. The Petitioner is only required to demonstrate that he has marketable skills under subsection (d)(8). The Board noted that the Petitioner has completed vocational programs while incarcerated, which satisfies this requirement. His job offer and future plans for a career only bolster his parole plans.

The Board also considered the Petitioner's arrests for selling drugs and his admitted previous carjackings. While these factors, alone, may not justify a finding of unsuitability, the Board may properly consider them as relevant to a determination of whether the Petitioner is suitable for parole. Cal. Code Regs., tit. 15, §2402(b).

The Board's decision may be upheld, despite flaws in its findings, if it is clear it would have reached the same decision even absent the errors. See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1100. Here, it is clear that the nature of the commitment offense, alone, was sufficient to support the Board's finding of unsuitability. See *In re Morrall* (2002) 102 Cal.App.4th 280, 301.

The Court finds that the Petitioner's argument that the Board has an illegal "no parole policy" is without merit. In order to establish a cause of relief on this ground, the Petitioner must show that there is no basis in fact for the decision. See *In re Morrall* (2002) 102 Cal.App.4th 280, 285. As explained above, the Court finds that there is some evidence to support the Board's decision.

Accordingly, the petition is denied.

3

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | | |
|---|---|---|---|---|
| Date: | OCTOBER 29, 2007 | | | |
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004763
In re,
DEMETRIUS DANIEL,
               Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

A true copy of this minute order is sent via U.S. Mail to the following parties:

Demetrius Daniel
E-03098
San Quentin State Prison
San Quentin, California 94964

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

4

Minutes Entered
10/29/07
County Clerk

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | **FILED**<br>LOS ANGELES SUPERIOR COURT<br>NOV 19 2007<br>BY _____ DEPUTY |
| PLAINTIFF/PETITIONER:<br>DEMETRIUS DANIEL | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br>BH004763 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

- ☐ Order Extending Time
- ☐ Order to Show Cause
- ☐ Order for Informal Response
- ☐ Order for Supplemental Pleading

- ☑ Order re: Writ of Habeas Corpus Denied
- ☐ Order
- ☐ Order re:
- ☐ Copy of Petition for Writ of Habeas Corpus for the Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

November 19, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
    Alexandre J. Aldana


Demetrius Daniel
E-03098
San Quentin State Prison
San Quentin, California 94964


Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 29, 2007 | | | Deputy Clerk |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | |
| | NONE | Bailiff | NONE | Reporter |

| | (Parties and Counsel checked if present) | |
|---|---|---|
| BH004763<br>In re,<br>DEMETRIUS DANIEL,<br>Petitioner,<br>On Habeas Corpus | Counsel for Petitioner:<br><br>Counsel for Respondent: | |

Nature of Proceeding: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on June 14, 2007 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the determination that the Petitioner presents an unreasonable risk of danger to society and is, therefore, not suitable for release on parole. See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

The Petitioner was received in the Department of Corrections on November 13, 1988 after a conviction for murder in the second degree. He was sentenced to 15 years to life. His minimum parole eligibility date was May 23, 1998. The Board previously granted parole to the Petitioner in 2005, but that decision was reversed by the Governor on July 8, 2005. He was subsequently denied parole for one year on March 25, 2006.

The record reflects that on November 27, 1987, the Petitioner and his accomplices decided to steal someone's car, in order to strip the vehicle and sell the parts. They drove around and spotted the victim, Kenneth Day. The Petitioner was driving and they followed Mr. Day to a gas station. The Petitioner exited the vehicle and went behind the gas station and waited for his accomplices to steal the victim's car. The Petitioner heard a gunshot and ran from the gas station. One of the Petitioner's accomplices shot Mr. Day in the head, killing him, and then fled in Mr. Day's vehicle. After the Petitioner's accomplices told him what happened, he assisted them in stripping Mr. Day's vehicle and setting the remains on fire. The Petitioner was subsequently

1

| Minutes Entered |
|---|
| 10/29/07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 29, 2007 | | | Deputy Clerk |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | |
| | NONE | Bailiff | NONE | Reporter |

| | (Parties and Counsel checked if present) | |
|---|---|---|
| BH004763<br>In re,<br>DEMETRIUS DANIEL,<br>　　　　　　　　Petitioner,<br>On Habeas Corpus | Counsel for Petitioner:<br><br>Counsel for Respondent: | |

kidnapped by some of Mr. Day's fellow gang members and stabbed. He turned himself in to police after being released from the hospital.

The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on March 5, 2007. The Petitioner was denied parole for one year. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense and his parole plans.

The Court finds that there is some evidence to support the Board's findings that the Petitioner's commitment offense was carried out in a dispassionate and calculated manner and that the motive for the offense was very trivial. Cal. Code Regs., tit. 15, §2402, subds. (c)(1)(B) and (c)(1)(E). The Petitioner and his accomplices planned the armed carjacking, armed themselves for that purpose and then stalked Mr. Day before attacking him at the gas station. Then, the Petitioner's accomplice shot Mr. Day in the head at close range, execution-style. Although the Petitioner did not actually confront or shoot Mr. Day, he was acting in concert with his accomplice and, thus, those actions are attributed to him. The offense was planned, deliberate, and calculated. Further, the Petitioner's motive for participating in the offense was to get money from the sale of the car's parts. This is an extremely trivial motive for executing a man during an armed carjacking.

The Court finds that there is no evidence to support the Board's finding that the Petitioner has unreasonable and incomplete parole plans. Cal. Code Regs., tit. 15, §2402, subd. (d)(8). The Petitioner has a promised residence supported by a letter from his aunt. Although the District Attorney expressed concern about the Petitioner returning to the county where his former crimes were committed, there is no requirement for the Petitioner to have alternate plans in another county. *Id.* Additionally, the Board's finding that the Petitioner's

2

| Minutes Entered |
|---|
| 10/29/07 |
| County Clerk |

EXHIBIT    "E"

Court of Appeal, Second Appellate District, Div. 2 - No. B204327
**S162343**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re DEMETRIUS DANIEL on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

JUN 1 1 2008

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice

Legal
Mail

DEMETRIUS DANIEL E-03098
SAN QUENTIN STATE PRISON 4-N-25
SAN QUENTIN, CA 94974

UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483

6-23-8

**10 X 13**